IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS | : | MDL DOCKET NO. 1203 |
| (PHENTERMINE, FENFLURAMINE, | : | |
| DEXFENFLURAMINE) PRODUCTS | : | |
| LIABILITY LITIGATION | : | |
| | : | |
| THIS DOCUMENT RELATES TO:_____ | : | _____ |
| _____ | : | |
| SHEILA BROWN, et al. | : | |
| | : | |
| v. | : | |
| | : | |
| AMERICAN HOME PRODUCTS | : | |
| CORPORATION | : | CIVIL ACTION NO. 99-20593 |

**MEMORANDUM AND PRETRIAL ORDER NO.** _____

Bartle, C.J.                                          April 8, 2008

        Before the court is a renewed joint petition for a
final award of counsel fees and expense reimbursements ("Joint
Petition") in connection with the Diet Drug Nationwide Class
Action Settlement Agreement ("Settlement Agreement") with Wyeth[1]
and in connection with the multidistrict litigation involving
Wyeth's diet drugs known as "fen-phen."  The Joint Petition has
been filed by a large group of law firms consisting primarily of
the Plaintiffs' Management Committee and Class Counsel for
claimants under the Settlement Agreement (hereinafter "Joint Fee
Applicants") and is joined by some of the major filers in this

_____

1.  On March 11, 2002, American Home Products changed its name to
Wyeth.  The Settlement Agreement was amended to reflect this name
change.  <u>See</u> Settlement Agreement § VIII.F.12.  Thus, we will use
the present name "Wyeth" throughout this memorandum, although
much of the history of this litigation took place before Wyeth
assumed its current name.

multidistrict litigation (hereinafter "Major Filers"), who
collectively constitute the "Joint Petitioners."  The Joint Fee
Applicants seek fees and costs from four different sources:  (1)
the Fund A Escrow Account established pursuant to the Settlement
Agreement; (2) the Fund B Attorneys' Fees Account established
pursuant to the Settlement Agreement; (3) the Supplemental Class
Settlement Fund established pursuant to the Seventh Amendment to
the Settlement Agreement; and (4) the MDL 1203 Fee and Cost
Account.  The Joint Petitioners also request incentive awards for
representative plaintiffs in two class actions.  Two sets of
objections[2] have been timely filed in response to the Joint
Petition and a renewed motion for incentive awards has been filed
by named plaintiffs in three class actions.

## I.  BACKGROUND

A detailed description of the early course of this
litigation, including the factual basis for liability, the
medical circumstances of the Class Members, and the provisions of
the Settlement Agreement, can be found in this court's Pretrial
Order ("PTO") No. 1415, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000),

---

2.  The Law Offices of Brian S. Riepen filed an objection on
behalf of Attorney Brian Riepen and his clients.  The firm
Freedland, Farmer, Russo, Behren & Sheller and the firm of
Raymond W. Valori, P.A. filed a joint objection on behalf of
themselves and their clients.
    On November 15, 2007, Objector Charles Volz filed a motion
for leave to plead and assert untimely objections to the Joint
Petition.  Subsequently, on November 29, 2007, Objector Volz
withdrew his motion and proposed objections.
    On February 5, 2008 pro se Class Members Nicholas Napora,
Jennifer Ferguson, Sonia Howell, Judith Dahlke, and Sherry Soltis
also filed an objection.

entered by my predecessor Judge Louis C. Bechtle.  We will
summarize the relevant background and chronology of this
litigation.

From 1989 through September, 1997, Wyeth marketed and
sold two prescription drugs for weight loss in the United States
under the brand names Pondimin (fenfluramine) and Redux
(dexfenfluramine) (hereinafter "diet drugs").  Beginning in 1992,
physicians commonly prescribed Pondimin in combination with
phentermine, another prescription diet drug.  Phentermine was and
still is distributed and sold under several different brand
names.  The combination of Pondimin with phentermine was often
referred to as "fen-phen."  Wyeth had significant sales of both
Pondimin and Redux in the mid-1990's.  From January, 1995 until
mid-September, 1997, approximately four million persons in the
United States took Pondimin.  Similarly, from June, 1996 through
September, 1997, two million people in this country used Redux.

During the period from March to August, 1997 the Mayo
Clinic in Rochester, Minnesota observed and reported an
association between the use of fenfluramine and/or
dexfenfluramine and valvular heart disease ("VHD").  On
September 15, 1997, Wyeth and the Food and Drug Administration
("FDA") announced that there would be no further sales of
Pondimin and Redux in the United States.  Since that time,
epidemiological studies have established a causal relationship
between fenfluramine and dexfenfluramine and VHD.  These studies
have also determined that fenfluramine and dexfenfluramine cause

-3-

a fatal but rare disease known as primary pulmonary hypertension ("PPH").[3]

A tidal wave of litigation followed the withdrawal of Pondimin and Redux.  Individuals who had ingested diet drugs filed lawsuits and class actions in federal and state courts against Wyeth and other defendants, including manufacturers, distributors, weight-loss clinics, pharmacies and physicians.  On December 10, 1997, the Judicial Panel on Multidistrict Litigation (the "JPML") designated the United States District Court for the Eastern District of Pennsylvania as the transferee court for IN RE: DIET DRUGS (PHENTERMINE/FENFLURAMINE/DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION, MDL 1203 ("MDL 1203").  See 28 U.S.C. § 1407.  All cases filed in the federal judicial system were subsequently transferred to the Eastern District of Pennsylvania for coordinated and consolidated pretrial proceedings.  To date, at least 105,000 plaintiffs have filed lawsuits, over 130 class actions were transferred to the MDL and the claims of more than 35,000 plaintiffs have been transferred by the JPML to this court.

Shortly after the first transfer of cases to MDL 1203, the court established the Plaintiffs' Management Committee ("PMC") to oversee the coordinated and consolidated pretrial

---

3.  Today, PPH is commonly known in the medical community as pulmonary arterial hypertension ("PAH").  This was not the case at the time the Settlement Agreement was drafted.  For consistency, we will refer to "PPH" throughout this memorandum as it is the term used in the Settlement Agreement.

proceedings and to conduct discovery of widespread applicability on behalf of plaintiffs in MDL 1203.  See PTO No. 6 (Feb. 5, 1998).  As part of its duties and responsibilities, the PMC assisted and continues to assist all plaintiffs in MDL 1203 and state-federal coordinated proceedings by appearing frequently before this court, attending regular status conferences held by the Special Discovery Master, Gregory P. Miller, Esq., preparing motions and responses regarding case-wide discovery matters and other pretrial issues, and maintaining a document depository for all documents produced in MDL 1203.

The PMC was also charged with establishing a Discovery Committee, which consisted of PMC members as well as additional lawyers representing plaintiffs in various state courts.  See PTO 38 ¶¶ 1, 2 (Apr. 21, 1998).  The PMC Discovery Committee coordinated and completed numerous depositions of defendants' corporate representatives, employees and generic experts.  The court permitted the PMC and the co-chairs of the PMC Discovery Committee to assign work to other "common benefit" attorneys ("PMC common benefit attorneys").  The members of the PMC,[4] the

---

4.  The members of the PMC were:  (1) Arnold Levin of Levin, Fishbein, Sedran & Berman; (2) John J. Cummings, III of Cummings, Cummings & Dudenhefer; (3) Stanley Chesley of Waite, Schneider, Bayless and Chesley; (4) Michael Hausfeld of Cohen, Milstein, Hausfeld & Toll; (5) Darryl J. Tschirn; (6) Elizabeth Cabraser of Lieff, Cabraser, Heimann and Bernstein; (7) Will Kemp of Harrison, Kemp & Jones; (8) Dianne Nast of Roda Nast; (9) Michael Papantonio of Levin, Middlebrooks, Thomas, Mitchell, Green, Echsner, Proctor & Papantonio; (10) John Restaino of Lopez, Hodes, Restaino, Milman, Skikos & Polos; and (11) Roger Brosnahan of Brosnahan, Joseph & Suggs.

PMC Discovery Committee,[5] and the PMC common benefit attorneys[6] are all Joint Fee Applicants in this matter.

In late April, 1999, Wyeth and a coalition of plaintiffs' attorneys consisting of the PMC and counsel for plaintiffs in certified state class actions pending in Illinois, New Jersey, New York, Pennsylvania, Texas, Washington, and West Virginia began negotiations for a global resolution of the diet drug litigation.[7] As a result of the negotiations the parties

_____

5. In addition to the PMC members, the PMC Discovery Committee consisted of:  (1) Mike Williams of Williams, Dailey & O'Leary; (2) Michael Slack of Slack and Davis; (3) Michelle Parfitt of Ashcraft and Gerrell; (4) Alex MacDonald of Robinson & Cole; (5) John Hornbeck of Sherman, Salkow, Peyton & Weber; and (6) John Baker of Bragg & Baker.  Initially, Andrew Hutton of Hutton & Hutton also was a member of the PMC Discovery Committee.  Mr. Hutton, however, resigned from the committee on December 1, 1998, and Mr. Baker was added to the committee as his replacement.

6. The common benefit firms and attorneys were:  (1) Alley & Ingram; (2) Climaco, Lefkowitz, Pecca; (3) Wilcox & Garofoli, L.P.A.; (4) Gancedo & Nieves; (5) Dennis Mackin; (6) Norrum & Pearson, P.A.; (7) Robinson, Calcagnie & Robinson; (8) Sybil Shainwald; (9) Spangenberg, Shibley & Liber, LLP; (10) Law Office of Daniel Thistle; and (11) Weisman, Goldberg & Spitzer.

7. The following persons acted as "Class Counsel" in connection with the settlement negotiations and were thereafter formally appointed by the court to serve in that capacity:  (1) Arnold Levin of Levin, Fishbein, Sedran & Berman; (2) Michael D. Fishbein of Levin, Fishbein, Sedran & Berman; (3) John J. Cummings, III of Cummings, Cummings & Dudenhefer; (4) Stanley Chesley of Waite, Schneider, Bayless & Chesley; (5) Gene Locks of Greitzer & Locks; (6) Sol Weiss of Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C.; and (7) Christopher Placitella of Wilentz, Goldman & Spitzer.  See PTO No. 997 ¶ 5.  Ultimately, Mr. Placitella resigned as Class Counsel and was replaced by Charles Parker of Hill & Parker.  See PTO No. 1062 (Jan. 19, 2000).  The following persons acted as "Sub-Class Counsel" in connection with the settlement negotiations and were thereafter
(continued...)

executed the Settlement Agreement on November 18, 1999.  Five
days later the court granted preliminary approval of the
settlement.  PTO No. 997 ¶ 6 (Nov. 23, 1999).  At that time, the
court also set forth procedures for providing notice and
conducting discovery in preparation for the fairness hearing.
From May 2, 2000 through May 11, 2000 the court held a hearing to
consider the fairness, reasonableness and adequacy of the
settlement.[8]  The court approved the Settlement Agreement on
August 28, 2000 in Pretrial Order No. 1415.  Appeals of Pretrial
Order No. 1415 followed.  Our Court of Appeals affirmed on
October 3, 2001 with respect to the last outstanding appeal.  In
re Diet Drugs Prods. Liab. Litig., 275 F.3d 34 (3d Cir. 2001)
(affirmed without opinion).  "Final Judicial Approval," as that

---

7.(...continued)
appointed to serve in that capacity:  (1) Richard Lewis of Cohen,
Milstein, Hausfeld & Toll; (2) Mark Tanner of Feldman, Shepard &
Wohlgelernter; (3) Dianne Nast of Roda Nast; (4) Richard Wayne of
Strauss & Troy; and (5) Eric Kennedy of Weisman, Goldberg &
Weisman.  See PTO No. 997 ¶ 5.

8.  Prior to the hearing, the parties executed the First, Second,
and Third Amendments, which were considered by the court as part
of the Settlement Agreement.  The court received additional
testimony at a post-fairness hearing on June 1, 2000.
Thereafter, the parties agreed to the Fourth Amendment, requiring
the court to hold a hearing on August 10, 2000 to consider its
provisions.  The Settlement Agreement as approved by this court
therefore incorporated the first through fourth amendments to it.
See PTO No. 1415.  As discussed in more detail below, the parties
also executed the Fifth, Sixth, Seventh, Eighth and Ninth
Amendments, which were approved by the court in PTO Nos. 2677
(Dec. 10, 2002), 2778 (Mar. 12, 2003), 4567 (Mar. 15, 2005), 3881
(Aug. 26, 2004), and 5398 (July 1, 2005), respectively.

-7-

term is defined in the Settlement Agreement, occurred on
January 3, 2002.

Prior to Final Judicial Approval, Class Members had two
options for seeking settlement benefits:  the Accelerated
Implementation Option ("AIO") or registration.  By electing the
AIO, Class Members agreed to waive all of their opt-out rights in
exchange for certain benefits, if eligible, regardless of whether
the Settlement Agreement ultimately achieved Final Judicial
Approval.  In contrast, eligible Class Members who registered for
benefits were not entitled to receive any benefits until after
Final Judicial Approval.  Class Members who registered also
preserved potential future opt-out rights under the terms of the
Settlement Agreement.  As of Final Judicial Approval, the AIO
ceased as an option available to Class Members.  See Settlement
Agreement § V.B.  However, Class Members were still permitted to
register for various benefits in accordance with the deadlines
set forth in the Settlement Agreement and the Official Notice of
Final Judicial Approval.

At the time of Final Judicial Approval, two categories
of benefits were available to all Class Members under the
Settlement Agreement.  First, Class Members could apply for
medical monitoring and refund benefits.  The nature of these
benefits depended on the length of time that a Class Member
ingested diet drugs.  Class Members who took drugs for 61 days or
more were entitled to:  (1) a free echocardiogram and physician
visit as part of a screening program or reimbursement for an

-8-

echocardiogram received outside of the screening program; (2) additional medical services to monitor their VHD of up to $10,000 in value or $6,000 in cash if they were FDA Positive[9]; and (3) a refund for prescriptions up to a maximum amount of $500 if sufficient funds were available to pay such benefits after the payment of all other expenses and benefits.[10]  Settlement Agreement § IV.A.1.  Class Members who took diet drugs for 60 days or less were entitled to:  (1) a refund of $30 per month for each month they took Pondimin and $60 per month for each month they took Redux; (2) reimbursement for out-of-pocket costs for certain privately-obtained echocardiograms if they were FDA Positive; and (3) additional medical services of up to $5,000 to

---

9.  "FDA Positive" is defined in the Settlement Agreement as:

> a.   With respect to a diagnosis based on an Echocardiogram conducted between the commencement of Diet Drug use and September 30, 1999 ... the individual has mild or greater regurgitation of the aortic valve and/or moderate or greater regurgitation of the mitral valve ....

> b.   With respect to a diagnosis based on an Echocardiogram conducted after September 30, 1999 ... mild or greater regurgitation of the aortic valve of the heart and/or moderate or greater regurgitation of the mitral valve of the heart ....

Settlement Agreement § I.22.

10.  In the Fifth Amendment to the Settlement Agreement, the parties agreed that sufficient funds were available in Fund A to pay these refund benefits.  See PTO No. 2677 (Dec. 10, 2002); Revised Fifth Amendment ¶ 1.

monitor their VHD or $3,000 in cash if they were FDA Positive. Id. § IV.A.2.  Additionally, the Settlement Agreement provided for the establishment of a $25 million Medical Research and Education Fund to finance medical research and education related to heart disease and for the creation of a medical/legal registry to track the medical conditions of Class Members.  Id. § IV.A.3.

In addition to seeking medical monitoring and refund benefits, Class Members with serious VHD could apply for Matrix Compensation Benefits ("Matrix Benefits").  All Class Members diagnosed as FDA Positive or as having Mild Mitral Regurgitation by the end of the Screening Period,[11] including their Derivative Claimants, were qualified to receive these Matrix Benefits.  Id. §§ IV.B.1.a-c.  Furthermore, all Class Members diagnosed as having endocardial fibrosis by September 30, 2005, including their Derivative Claimants, were also eligible to receive Matrix Benefits.  Id. §§ IV.B.1.d-f.  The value of Matrix Benefits for Class Members now ranges from $8,321 to $1,672,351.  Id. § IV.B.2.a.  A particular Class Member's benefit was calculated based on his or her age at the time of diagnosis of a Matrix-level condition and the severity of the condition.[12]  Id.

---

11. The "Screening Period" was defined as the 12-month period following Final Judicial Approval.  See Settlement Agreement § I.49.  In the Fifth Amendment, the Screening Period was extended six months for certain eligible Class Members.  See id.

12. Matrix Benefits are paid according to two benefit matrices (Matrix "A" and Matrix "B").  See Settlement Agreement §§ IV.B.2.b. & IV.B.2.d.(1)-(2).  Matrix A-1 describes the compensation available to Diet Drug Recipients with serious VHD
(continued...)

§§ IV.B.2.a & IV.B.2.b.  Recognizing the progressive nature of VHD, the Settlement Agreement also allowed for additional payments to eligible Class Members who develop serious levels of VHD at any time up to December 31, 2015.[13]  Id. §§ IV.B.1 & IV.C.2.

Two separate funds were established under the Settlement Agreement to provide all of these benefits to Class Members, and the AHP Settlement Trust ("Trust") was created to administer them.  See id. §§ III.A.1, III.B, & III.C.  Fund A provided compensation for all non-Matrix Benefits available under the Settlement Agreement including the Medical Research and Education Fund, the associated costs of administering those benefits, and the out-of-pocket and pre-settlement litigation expenses of plaintiffs' counsel approved by the court for reimbursement in relation to Fund A.  Id. § III.B.2.  Shortly

---

12.(...continued)
who took the drugs for 61 days or longer and who did not have any of the alternative causes of VHD that made the B matrices applicable.  In contrast, Matrix B-1 outlines the compensation available to Diet Drug Recipients with serious VHD who were registered as having only Mild Mitral Regurgitation by the close of the Screening Period or who took the drugs for 60 days or less or who had factors that would make it difficult for them to prove that their VHD was caused solely by the use of these diet drugs. Matrices A-2 and B-2 pertain to those benefits available to Derivative Claimants.
    Within the A and B Matrices, there are five "Levels" of benefits, see id. § IV.B.2.c, in ascending order based upon the severity of a claimant's condition.

13.  Those Class Members who did not opt out of the Seventh Amendment to the Settlement Agreement may apply for High Level Matrix Benefits if their valve disease progresses to Levels III, IV or V by December 31, 2011.

after the Settlement Agreement achieved Final Judicial Approval, Wyeth paid $1 billion into Fund A.  Id. § III.B.1.  As of March 31, 2007, the Trust has paid $535,952,414 in Fund A benefits.

Fund B was the source of Matrix Benefits, the associated costs of administering those benefits, and attorneys' fees and common benefit fees and costs approved by the court in relation to Fund B.  Id. § III.C.4.c.  Shortly after Final Judicial Approval, Wyeth deposited $650 million into Fund B and has since made deposits on an on-going basis.  Ultimately, Wyeth is obligated to pay a total of $2.55 billion plus accretions in Fund B,[14] minus certain credits to which it is entitled under the Settlement Agreement.  As of March 31, 2007, approximately $1,878,763,842 in Matrix Benefits has been disbursed to Class Members.

As mentioned above, the Settlement Agreement allowed Class Members to opt out of the Settlement Agreement in lieu of seeking Matrix Benefits.  The original Settlement Agreement provided for various opt-out rights including the Initial Opt-Out, Intermediate Opt-Out and Back-End Opt-Out rights.[15]  See id.

14.  The undeposited portion of Wyeth's Fund B obligation, that is, $2.55 billion maximum Fund B amount less the payments already made by Wyeth, accrete at the rate of 1.5% per quarter, compounded quarterly.  The undeposited portion and the compounded accretions on that money are known as the Maximum Available Fund B Amount.

15.  The original Settlement Agreement also provided for a Financial Insecurity Opt-Out right, which allowed eligible Class
(continued...)

§ IV.D.  Those who exercised their Initial Opt-Out right were free to "initiate, continue with, or otherwise prosecute any legal claim against [Wyeth] and the Released Parties without any limitation, impediment or defense arising from the terms of the Settlement Agreement ...." Id. § IV.D.2.c.  Approximately 45,000 individuals chose to exercise their Initial Opt-Out right.

Class Members who were diagnosed with FDA Positive regurgitation during the Screening Period had the right to exercise their Intermediate Opt-Out rights and pursue claims against Wyeth in the courts.  Id. § IV.D.3.  In exchange for Wyeth's relinquishing any statute of limitations and claims-splitting defenses, Intermediate Opt-Out plaintiffs were barred from seeking punitive damages.  Id. § IV.D.3.c.  Class Members also had the opportunity to exercise their Back-End Opt-Out right.  The Back-End Opt-Out right was generally available to any Class Member who develops serious VHD up to the end of 2015.  Id. § IV.D.4.a.

Final Judicial Approval of the Settlement Agreement did not, however, put litigation of this Class Action to rest. Little did we know that controversy over payment of benefits to those harmed by diet drugs was just beginning.  The Trust, which

---

15.(...continued)
Members to pursue claims in the tort system if Wyeth failed to remit required payments.  See Settlement Agreement § III.E.9. Additionally, the Sixth Amendment opt-out right was available to certain Class Members in the event of a funding shortfall and a decision by Wyeth not to pay claims for Matrix Benefits.  See id. § IV.D.5.  These opt-out rights, though important, were never utilized and thus warrant less attention in this context.

was established to administer these benefits, was flooded with approximately 85,000 Level I and II claims for Matrix Benefits. See Diet Drugs, 226 F.R.D. 498, 508 (E.D. Pa. 2005).  The federal and state courts were inundated with claims filed by Intermediate and Back-End Opt-Out plaintiffs (collectively "Downstream Opt-Outs").  Somewhere between 60,000 and 70,000 cases were filed by Downstream Opt-Out plaintiffs, more than half of which were filed in, or removed to, the federal courts.  In re Wilson, 451 F.3d 161, 166 n.6 (3d Cir. 2006).  The sheer volume of claims for Matrix Benefits and Downstream Opt-Out cases caused great alarm among everyone involved in this litigation, including this court.  Questions were raised about whether there was a reasonable medical basis to believe that many of the Class Members who sought Matrix Benefits or exercised their Downstream Opt-Out rights had the medical conditions they claimed.  Even more disheartening were the growing concerns that some of the Matrix Benefits claims and Downstream Opt-Out cases were premised upon fraudulent diagnoses.  We cannot overstate the intensity of the clashes that ensued.

       To address this second, unexpected wave of litigation, several steps were taken to ensure that only Class Members with meritorious claims were compensated.  First, we ordered a 100% audit of all matrix claims to ensure that only proper claims would be paid.[16]  See PTO No. 2662 at 13 (Nov. 26, 2002).  In PTO

---

16.  Prior to PTO No. 2662, the Settlement Agreement permitted
                                              (continued...)

No. 2662, we noted that "the claims simply do not mesh with the legitimate expectations of the court and the parties."  Id. at 12.  Faced with the dueling possibilities that either the epidemiologists were wrong or that "something may be seriously amiss," we found the "only way we can ever find out which answer is correct is through 100% audits."  Id.

Shortly thereafter, the Fifth Amendment to the Settlement Agreement was approved by this court.  See PTO No. 2677 (Dec. 10, 2002).  The Fifth Amendment, among other things, provided for the consolidation of Fund A and Fund B into a single Settlement Fund and extended the Screening Period to allow Class Members six additional months to obtain a free echocardiogram from the Trust.  See id.

In 2003, this court approved the Sixth Amendment to the Settlement Agreement which created a mechanism for Wyeth to pay Matrix Benefits or, in the alternative, to allow certain Class Members to opt out of the Settlement Agreement in the event of a funding shortfall — a real possibility at that time due to the completely unanticipated number of claims for Matrix Benefits.  PTO No. 2778 (Mar. 12, 2003).

The most dramatic change to the Settlement Agreement came with court approval of the Seventh Amendment.  PTO No. 4567

---

16.(...continued)
quarterly audits of up to 15% of claims submitted to the Trust in order to prevent fraud, with the right of the court to require additional audits for "good cause shown."  Settlement Agreement § VI.E.8.

(Mar. 15, 2005).  It is important to reiterate that, as matters stood in late 2002, the viability of the Settlement Agreement, which was intended to be a global resolution to the diet drug litigation, was thought by some to be in serious jeopardy.  Of paramount concern was the risk that Class Members who were genuinely and seriously injured by their use of diet drugs would not receive the compensation they deserved because of inadequate settlement funds.  With those concerns in mind, the Seventh Amendment was intended to resolve many of the issues posed by the flood of claims for Matrix Benefits.

Under the Seventh Amendment, Wyeth agreed to pay an additional $1.275 billion into a Supplemental Class Settlement Fund ("Supplemental Fund") to pay the claims of Class Members who had perfected Matrix Level I or II claims by November 9, 2004, and who did not opt out of the Seventh Amendment.  These Class Members became "Category One Class Members" and their claims were forwarded for processing to a new Supplemental Fund Administrator, separate from the Trust.

The claims of Category One Class Members underwent an independent medical review by a "Participating Physician."[17]  The medical review determined whether each Category One Class Member had no significant valvular regurgitation, FDA Positive regurgitation alone, a Low Threshold Condition or a High

_____

17.  The medical review process was overseen by the Medical Review Coordinating Committee ("MRCC") appointed by the court.

-16-

Threshold Condition.[18]  The Category One Class Members with no significant valvular regurgitation or FDA Positive regurgitation alone were entitled to a "Minimum Payment Amount" of $2,000 from the Supplemental Fund.  Those with FDA Positive regurgitation were also entitled to Cash/Medical Services ("CMS") Benefits from the Trust.  Category One Class Members with Low Threshold Conditions and High Threshold Conditions were entitled to a pro rata share of the balance of the Supplemental Fund after distribution of the Minimum Payment Amounts and other incidental costs, hereinafter "Grid Benefits."[19]  Grid Benefits were disbursed to Category One Class Members based on age, duration of diet drug use, existence of a Low or High Threshold Condition, and the presence or absence of any alternative causation factors.[20]

---

18.  The standard for Low and High Threshold Conditions, together, is the same as the conditions required to claim Matrix Level I and Level II benefits; however, the distinction between a Low Threshold Condition and a High Threshold Condition is not the same as the distinction between Matrix Level I and Matrix Level II claims.

19.  A motion for final distribution of Category One Grid Benefits is currently pending before this court.

20.  With respect to the aortic valve, alternative causation factors include:  (1) congenital aortic valve abnormalities; (2) aortic dissection involving the aortic root and/or aortic valve; (3) aortic sclerosis in individuals who are 60 years or older at the time they are first diagnosed with FDA Positive regurgitation; (4) aortic root dilatation greater than 5.0 cm; and (5) aortic stenosis with an aortic valve area less than 1.0 square centimeter by the Continuity Equation.  The alternative causation factors for the mitral valve include:  (1) congenital mitral valve abnormalities; (2) mitral valve prolapse; (3)

(continued...)

Class Members who did not perfect Matrix Level I and II claims as of November 9, 2004 were deemed "Category Two Class Members" unless they opted-out of the Seventh Amendment. Category Two Class Members who have Mild Mitral or FDA Positive regurgitation are entitled to a $2,000 benefit from the Trust in addition to the drug refund and CMS Benefits. The Category Two Class Member benefits are paid by money deposited by Wyeth over and above its payments to the Settlement Fund and the Supplemental Fund.

Both Category One and Category Two Class Members were also entitled to seek High Level Matrix Benefits, that is, Matrix Level III or higher, if their VHD progresses to that level by December 31, 2011. The High Level Matrix claims of Category One and Category Two class members were not limited by the Maximum Available Fund B Amount funding limitation contained in the original Settlement Agreement.

Although the Seventh Amendment dealt with the influx of claims for Matrix Benefits under the Settlement Agreement, there still remained the Downstream Opt-Out cases in the tort system in MDL 1203. Wyeth pursued a "Global Settlement Process" to resolve the bulk of the 60,000 to 70,000 Downstream Opt-Out cases. The

---

20.(...continued)
chordae tendineae rupture or papillary muscle rupture, or acute myocardial infarction associated with acute mitral regurgitation; (4) mitral annular calcification; (5) echocardiographic evidence of rheumatic mitral valves; and (6) diagnosis of mild mitral regurgitation as opposed to moderate or greater regurgitation prior to the end of the Screening Period.

Global Settlement Process has been extraordinarily successful. By March, 2007 only about 200 of these actions remained.  Wyeth has paid the aggregate sum of $2.3 billion to settle these Downstream Opt-Out cases.

## II.   PROVISIONS AND PROCEDURES REGARDING AN AWARD OF FEES AND COSTS

The counsel fees and costs at issue here will be drawn from four different funds:  the Fund A Escrow Account, the Fund B Attorneys' Fees Account, the Supplemental Fund and the MDL 1203 Fee and Cost Account.  We will describe each available fund in turn.  We will then, before turning to the petition at hand, review counsel's first petition to this court for an award of fees and costs ("2002 Joint Fee Petition"), as well as PTO No. 2622, 2002 WL 32154197 (E.D. Pa. Oct. 3, 2002), which granted an interim distribution on October 3, 2002 ("Interim Distribution"), and PTO No. 2859, 2003 WL 21641958 (E.D. Pa. May 15, 2003), which modified and allocated the Interim Distribution.

## A.   FUND A ESCROW ACCOUNT

After Final Judicial Approval of the Settlement Agreement in January 2002, Wyeth deposited $200 million into the Fund A Escrow Account.  Settlement Agreement § III.B.3.  The Settlement Agreement states that these funds "shall be used to pay compensation to Plaintiffs' Counsel ... [and] make incentive awards to the Class Representatives ...."  Id.  Any money that is not awarded by this court from the Fund A Escrow Account will

revert to Wyeth.  Id.  Wyeth is not permitted to take a position
on the allocation of the funds in this account.  Id.

As discussed in detail below, we have already awarded
from this fund in the Interim Distribution $38,430,727.82 in fees
and $4,218,244.08 in cost reimbursements.  See PTO Nos. 5327
(June 13, 2005), 5537 (Aug. 15, 2005).  The Joint Petitioners
estimate that as of December 31, 2007, approximately $19,750,000
in net interest will have accrued.  Thus the total available
balance in the Fund A Escrow Account was estimated to be
approximately $177,101,028.10 as of December 31, 2007.[21]

## B.   FUND B ATTORNEYS' FEES ACCOUNT

The Fund B Attorneys' Fees Account was also created
under the Settlement Agreement and is intended to provide
additional compensation for "all attorneys' fees and common
benefit fees and costs awarded by the Court in relation to Fund B
...."  Settlement Agreement §§ III.C.4.c, VIII.E.1.b.  The
principal sum of $229 million was transferred from Fund B into
the Fund B Attorneys' Fees Account, representing 9% of the $2.55
billion that Wyeth was responsible for paying into Fund B,
excluding accretions that are counted toward the Maximum
Available Fund B Amount.[22]  See id. § VIII.E.1.b.  To reimburse

---

21.  As explained in detail below, the available balance in the
Fund A Escrow Account will be $181,319,272.18 with the addition
of $4,218,244.08 from the Settlement Fund to reimburse the
previous disbursement from this account to attorneys for their
costs.

22.  The accretions toward the Maximum Available Fund B Amount
(continued...)

Fund B for the amount transferred to the Fund B Attorneys' Fees Account, the Trust deducts 9% from all Matrix Benefits paid to Class Members and deposits those deductions into Fund B which has now been consolidated with Fund A to form the Settlement Fund. Id.  If a Class Member is represented by an attorney, the deduction is made from the attorney's individual fee.  Otherwise it is deducted from the Class Member's benefits.  Id.  In the event that this court does not award the full $229 million to the Joint Fee Applicants, the balance will be refunded, pro rata, to the unrepresented Class Members and individual attorneys who paid the 9% assessment.  Id.

As discussed in detail below, we have already awarded $38,430,727.82 from this fund in the Interim Distribution.  The Joint Petitioners estimated that as of December 31, 2007 the account will have accrued net interest of approximately $22,930,000, for a total available balance as of that date of $213,499,272.18 in the Fund B Attorneys' Fees Account.

**C.   SUPPLEMENTAL CLASS SETTLEMENT FUND**

The Seventh Amendment to the Settlement Agreement did not establish a separate fund from which common benefit fees should be paid.  Instead this court is allowed to award a "Common Benefit Percentage" as "common benefit fees to attorneys for professional services that are found by [this] [c]ourt to be of 'common benefit' to Category One Class Members ...."  Seventh

---

22.(...continued)
are explained in detail in footnote 14.

Amendment § I.B.21.  The Seventh Amendment defines the "Common Benefit Percentage" as:

> [T]he percentage, if any, determined by the [c]ourt on a preliminary basis (to facilitate distribution of the Individual Payment Amounts without awaiting full adjudication of any fee application or dispute) or final basis before final distribution pursuant to Section XV.R., of the Individual Payment Amounts payable to Category One Class Members who are entitled to receive Benefits Subject to Medical Review ....[23]

Id.  The "Common Benefit Percentage Amount" is calculated by multiplying the gross "Individual Payment Amount" due to each Class Member by the "Common Benefit Percentage."  If a Class Member is represented by individual counsel, the "Common Benefit Percentage Amount" is deducted from the individual counsel's fee. Id. at § XV.T.1.  Otherwise the "Common Benefit Percentage" is deducted from the "Individual Payment Amount."

### D.   MDL 1203 FEE AND COST ACCOUNT

In PTO No. 467, this court created the MDL 1203 Fee and Cost Account.  PTO No. 467 (Feb. 10, 1998).  This account was established to "provide for reimbursement of costs and payment of attorneys' fees to the [PMC] and other attorneys who have been authorized by the PMC, pursuant to Pretrial No. [sic] 16, to perform work for the benefit of plaintiffs in MDL 1203 and in any state-court proceedings coordinated hereunder ...."  Id. ¶ 1. PTO No. 467 required that 9% of any payment made to a plaintiff

---

23.  The "Individual Payment Amounts" are the Grid Benefits payable to Category One Class Members.

whose case was transferred to MDL 1203 be set aside and placed in
the MDL 1203 Fee and Cost Account.  Id. ¶ 2.  As with the Fund B
Attorneys' Fees Account and the Supplemental Class Settlement
Fund, the assessment is taken from the fee of each plaintiff's
individual attorney, if the plaintiff is represented.  Id. ¶ 8.

     Prior to this court's signing of PTO No. 467,
California Judge Daniel S. Pratt ordered that a 6% assessment on
all payments made to diet drug plaintiffs in that jurisdiction be
deposited into the MDL 1203 Fee and Cost Account.  Id. ¶ 11.
Other state courts followed suit, adopting the 6% set-aside
(hereinafter "coordinated state cases").  In still other states,
the PMC entered into coordination agreements with plaintiffs'
firms that agreed to pay the 6% assessment.

     As described in more detail below, in the Interim
Distribution we awarded $11,484,152 in costs and $76,861,455.63
in fees from the MDL 1203 Fee and Cost Account.  We further
ordered that one-third of the 6% and 9% assessments paid into the
MDL 1203 Fee and Cost Account be refunded to the payors.  We
modified PTO No. 467 to reduce the assessment going forward to 4%
for the coordinated state cases and 6% for the federal MDL 1203
cases.  See PTO No. 2622.  As of December 31, 2007, the balance
available in the MDL 1203 Fee and Cost Account was
$111,284,194.31.[24]

---

24.  As we explain later, the available balance in the MDL 1203
Fee and Cost Account will be $120,520,553.94 with the addition of
$9,236,359.63 from the Settlement Fund to reimburse previous
                                        (continued...)

**E.    <u>INTERIM DISTRIBUTION</u>**

In PTO No. 16, this court set forth various procedures governing the recording and reimbursement of fees and expenses. <u>See</u> PTO No. 16 (Mar. 13, 1998).  Any counsel wishing to make an application for fees was required to submit time and expense reports to Alan Winikur, C.P.A., the court-appointed auditor. <u>See</u> PTO No. 1164 (Mar. 7, 2000).  PTO No. 2224 established a procedure "to provide for the orderly and efficient presentation and determination of requests for the award of attorneys' fees and reimbursement of litigation expenses ...."  PTO No. 2224 (Oct. 15, 2001).  Mr. Winikur was directed to audit any submitted time and expense reports and file a report with the Court detailing the results of his audit no later than December 31, 2001, (hereinafter "2001 Auditor's Report").  Mr. Winikur was further instructed to exclude certain time from the 2001 Auditor's Report, including time that was not reported in accordance with PTO No. 16 or not authorized by the PMC for common benefit work, time that was expended objecting to the Settlement Agreement, and time that appeared grossly excessive. <u>Id.</u> ¶ 4.

The 2001 Auditor's Report accounted for 354,152.29 hours of professional time submitted by 72 law firms or $101,027,494.54 worth of time when multiplied by the applicable

_____

24.(...continued)
disbursements to attorneys for their costs.

hourly rate.[25]   PTO No. 2622 at 16.   Mr. Winikur also reported
that 72 law firms had submitted $15,989,242.31 in reimbursable
expenses.   Id.   The professional time and reimbursable expenses
were eligible for inclusion in a joint fee petition.   The 2001
Auditor's Report disallowed the time submissions of 34 law firms,
totaling 47,451.98 hours, or $16,725,716.15 worth of time when
multiplied by the applicable hourly rate.   Id.

On February 15, 2002, the 2002 Joint Fee Petition was
filed.   It incorporated all time and expenses allowed in the 2001
Auditor's Report and requested a final award of fees and costs
totaling $567 million.   The $567 million was requested from the
three accounts available at that time, as follows:   (1) $200
million in attorneys' fees from the Fund A Escrow Account, (2)
$229 million from the Fund B Attorneys' Fees Account, and (3)
$138 from the MDL 1203 Fee and Cost Account.   The joint
petitioners acknowledged that there would be continuing work to
administer the Settlement Agreement and therefore suggested that

---

25.   The time sheets used by attorneys claiming common benefit
time required the applicant to state the hourly rate for each
attorney and paraprofessional.   See PTO No. 16.   Mr. Winikur
reviewed the hourly rates during the audit process.   In some
instances, he would reduce the hourly rates when determining
whether the time was allowable.   For example, in 2000 and 2001
Mr. Winikur reduced Arnold Levin's hourly rate from $525 and
$550, respectively, to $520.
     Moreover, PTO No. 7031 required that each fee presentation
include a "list of current and historical hourly billing rates
for each attorney and paraprofessional whose professional time is
the subject of the Fee Presentation, from the inception of this
litigation to the present."   PTO No. 7031 ¶ 6.C.   The Fee
Presentations have been filed with this court.

$14 million of the $429 million available in the Fund A Escrow Account and Fund B Attorneys' Fees Account be reserved for later payment.

Eleven objections were filed in response to the 2002 Joint Fee Petition.  Twelve individual fee petitions were also filed by law firms whose time was disallowed in the 2001 Auditor's Report.  Seven of the twelve were resolved or otherwise disposed of before this court could decide them.  In turn, the joint petitioners in the 2002 Joint Fee Petition objected to the individual fee petitions.

We allowed limited discovery to take place before holding a two-day hearing on the 2002 Joint Fee Petition and the remaining individual fee petitions.  Our decision was memorialized in PTO No. 2622.  We declined to award the full amount requested because of the continuing work that needed to be done and instead awarded interim fees and costs as follows:

> (1)  an interim award of counsel fees in the amount of $40,000,000 from the Fund A Legal Fee Escrow Account and in the amount of $40,000,000 from the Fund B Legal Fee Escrow Account ...;
>
> (2)  an interim award of counsel fees in the amount of $80,000,000 from the MDL 1203 Fee and Cost Account ...;
>
> (3)  an award of costs in the amount of $11,484,152 from the MDL 1203 Fee and Cost Account ... ($6,465,815 having been previously advanced with court approval);
> ....

Id. ¶¶ 1-3.

-26-

This court also established the Fee and Cost Allocation Committee ("FCAC") to "develop a plan of allocation and payment of the interim awards of counsel fees and costs among joint petitioners and those petitioners otherwise entitled." Id. at 48-51.  FCAC filed a proposed plan with the court.  In PTO No. 2859 we overruled objections to the plan filed by six groups of recipients and approved FCAC's proposal with one modification — we reduced Class Counsel's share by $6,277,088.75.[26]  Appeals of PTO Nos. 2622 and 2859 were taken, but they were dismissed for lack of appellate jurisdiction as interlocutory orders.  Diet Drugs, 401 F.3d 143 (3d Cir. 2005).

After the Interim Distribution took place, we were inundated with the flood of claims for Matrix Benefits and Downstream Opt-Out cases that lead to the Fifth through Seventh Amendments to the Settlement Agreement.  Now with the passage of more than ten years since fen-phen was withdrawn from the market and the calming of the litigation waters, we have reached a stage where closure is near and further delay in the award of counsel fees and costs would be unwarranted.  While some work will still be needed well into the future, we will make what is for all intents and purposes a final award of costs and fees, with some funds held in reserve for yet to come fees and costs.

---

26.  We concluded that $6,277,088.75 compensated Class Counsel for work performed after the deadline to submit time for the 2001 Auditor's Report.  As a result we likewise reduced the Interim Distribution by the same amount.

F.   **RENEWED JOINT PETITION FOR A FINAL AWARD OF COUNSEL FEES AND EXPENSE REIMBURSEMENTS PROCEDURE**

On January 5, 2007 this court issued PTO No. 6827 seeking suggestions from interested parties for a procedure and schedule in connection with petitions for a final award of attorneys' fees, litigation expenses, and costs.  The court held a hearing to consider such suggestions on March 1, 2007.

In response to PTO No. 6827, four memoranda were initially filed, with two responsive memoranda filed thereafter.[27]  Also, on February 1, 2007, Michael Fishbein, Esq., a member of Class Counsel, filed a notice of compendium of agreements with regard to the award and allocation of common benefit fees and expense reimbursements and the refund of certain amounts deposited into the Fund B Attorneys' Fees Account and MDL 1203 Fee and Cost Account ("Compendium of Agreements"). The purpose of the notice was to place on the record the Compendium of Agreements, which includes the following:  (1) The PMC/MDL Attorneys Agreement[28]; (2) The Seventh Amendment Liaison

---

27.  The initial memoranda were filed by:  (1) petitioners, Edward W. Cochran, Esq., Cummins & Cronin, LLC; Pritchard, McCall & Jones, LLC, Paul S. Rothstein, Esq., Robert W. Bishop, Esq., N. Albert Bacharach, Jr., Esq., George Cochran, Esq., Charles M. Thompson, Esq., Kearney D. Hutsler, III, Esq., R. Stephen Griffis, Esq., and Behrend & Ernsberger, P.C.; (2) class member, Cindy Pattison; (3) certain Illinois Counsel; and (4) Plaintiffs' Liaison and Co-Lead Counsel.  Responsive memoranda were filed by: (1) Class Counsel, Plaintiffs' Liaison Counsel, and Co-Lead counsel; and (2) certain Illinois Counsel.

28.  This agreement is executed by and between:  Levin, Fishbein, Sedran and Berman, individually and in its capacity as
(continued...)

Committee Agreement[29]; (3) the "Free States" Agreement[30]; (4) the

---

28.(...continued)
Plaintiffs' Liaison Counsel and Co-lead Counsel; Alley, Clark, Greiwe & Fulmer; Ashcraft & Gerel, L.L.P.; John T. Baker, P.C.; Law Offices of Roger P. Brosnahan, P.A.; Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A.; Cohen, Milstein, Hausfeld & Toll, P.L.L.C.; Cummings, Cummings & Dudenhefer; Gancedo & Nieves, L.L.P.; Harrison, Kemp & Jones, L.L.P.; Hutton & Hutton Law Firm, L.L.C.; Levin, Papantonio, Thomas, Mitchell, Echsner & Proctor P.A.; Lieff, Cabraser, Heimann & Bernstein, L.L.P.; Lopez, Hodes, Restaino, Milman & Skikos; Dennis S. Mackin, Sr.; Randall & Schumacher, successor in interest to Norum and Pearson, P.A.; Robinson, Calcagnie & Robinson; Robinson & Cole, L.L.P.; Roda Nast, P.C.; Law Offices of Sybil Shainwald, P.C.; Sherman & Salkow, P.C.; Slack & Davis, L.L.P.; Spangenberg, Shibley & Liber, L.L.P.; The Thistle Law Firm; Darryl J. Tschirn; Waite, Schneider, Bayless & Chesley Co., L.P.A.; Weisman, Kennedy & Berris Co., L.P.A.; and Williams, Love, O'Leary, Craine & Powers, P.C.

29.  This agreement is executed by and between:  Levin, Fishbein, Sedran and Berman, individually and on behalf of the PMC and Class Counsel; and Shrager, Spivey & Sachs, individually and on behalf of the Seventh Amendment Liaison Committee and each of its members, Alexander & Associates, P.C.; Baron & Budd, P.C.; James Doyle; Martinez, Barrera & Martinez, L.L.P.; and Shrager, Spivey & Sachs.

30.  This agreement is executed by and between:  Levin, Fishbein, Sedran, and Berman, individually and in its capacity as Plaintiffs' Liaison Counsel, Co-Lead Counsel and as one of the Class Counsel; Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C.; Berger & Montague, P.C.; Bernstein, Litowitz, Berger & Grossmann; Blume, Goldfaden, Berkowitz, Donnelly, Fried & Forte; Chimicles & Tikellis; Cohn, Lifland, Pearlman, Herrmann & Knopf, L.L.P.; Davis, Saperstein & Salomon, P.C.; David M. Taus, LLC (successor in interest to Francis J. Devito, P.A.); Eichen, Levinson & Crutchlow, L.L.P.; Epstein, Fitzsimmons, Brown, Ringle, Gioia & Jacobs, P.C.; Lawrence E. Feldman & Associates; Fibich, Hampton & Leebron, L.L.P.; Frankovitch, Anetakis, Colantonio & Simon; Garwin, Gerstein & Fisher, L.L.P.; Keefe-Bartels (successor in interest to Lynch-Martin): Locks Law Firm; Hill & Parker; Hill, Peterson, Carper, Bee & Deitzler, P.L.L.C.; Law Offices of Guy E. Hopkins; Samuel Issacharoff; Kohn, Swift & Graf, P.C.; Leebron & Robinson; Levy, Angstreich; Finney;

(continued...)

Agreement with the "Non-PMC Refund Counsel"[31]; (5) the Agreement with "the Remaining Individual Petitioners"[32]; (6) Letter-Agreement with Counsel for the Washington State Class[33]; (7) Letter-Agreement between Class Counsel and Ervin A. Gonzalez, Counsel for the Florida Class; (8) Letter-Agreement Between Class Counsel and Feldman, Shepard & Wohlgelernter, Counsel for Sub-Class 2(A); (9) Letter-Agreement Between Class Counsel and Strauss & Try, Counsel for Sub-Class 3; (10) the Fleming Agreement[34]; and, (11) the "Major Filers" Agreement.[35]   The "Major

---

30.(...continued)
Baldante, Rubenstein & Coren, P.C.; Law Offices of Donald B. Lewis; Lombardi & Lombardi, P.A.; the Masters Law Firm L.C.; Pellettieri, Rabstein & Altman; Powell Law Offices; Segal Law Office; Sheller, Ludwig & Badey, P.C.; Elwood S. Simon & Associates; Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano; Trief & Olk; Wilentz, Goldman & Spitzer, P.A.; and Williams Cuker & Berezofsky.

31.  This agreement is executed by and between:  Levin, Fishbein, Sedran and Berman individually, and in its capacity as Plaintiffs' Liaison Counsel and Co-Lead Counsel; Class Counsel; Krause Kalfayan Benink & Slavens, L.L.P.; G. Martin Meyers, P.C.; Chitwood Harley Harnes, L.L.P.; and Finkelstein, Thompson & Loughran.

32.  This agreement is executed by and between:  the PMC; Class Counsel; Johnson & Perkins; Plante & Hanley; Milberg Weiss Bershad Hynes & Lerach, L.L.P.; Kenneth B. Moll and Associates, Ltd.; Law Offices of Charles J. Piven, P.A.; and Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P.

33.  This agreement is executed by and between:  Levin, Fishbein, Sedran and Berman; Lieff, Cabraser & Heimann; Keller, Rohrback, L.L.P.; and Lukins & Annis, P.S.

34.  This agreement is executed by and between:  Levin, Fishbein, Sedran and Berman, individually and in its capacity as Plaintiffs' Liaison Counsel and Co-Lead Counsel and a Class
(continued...)

Filers" include fifty law firms, which together represent:  (1) 97% of the Downstream Opt-Out plaintiffs who filed lawsuits subject to MDL 1203 fee assessments; (2) 26,000 Level I and Level II Matrix Benefits claimants whose claims were ultimately disposed of as Category One Claims under the Seventh Amendment; and (3) half of all Class Members who have been paid Matrix Benefits by the Trust through May 31, 2007.  2007 Fishbein Aff. ¶ 45.  According to the Joint Petitioners, there are "four

---

34.(...continued)
Counsel; the PMC; and Fleming & Associates, L.L.P.

35.  This agreement is executed by and between:  Levin, Fishbein, Sedran and Berman, individually and in its capacity as Plaintiffs' Liaison Counsel, Co-Lead Counsel and Class Counsel; the PMC; AR&JO&MH, L.L.P.; D/B/A Law Offices of Heygood, Orr, Reyes & Bartolomei; Abraham, Watkins, Nichols, Sorrels, Matthews & Friend; Aleshire Robb & Sivils, P.C.; Alexander & Associates, P.C., L.L.O.; Armstrong & Guy Law Offices, L.L.C.; Aylstock, Witkin & Sasser, P.L.C.; Brian K. Balser & Co., L.P.A.; Baron & Budd, P.C.; Bartimus, Frickleton, Robertson & Gorny, P.C.; the Bertram Law Firm; Blackmon & Blackmon, P.L.L.C.; Blizzard, McCarthy & Nabers, L.L.P.; Childers, Buck & Schlueter, L.L.P.; Deal, Cooper & Holton, P.L.L.C.; Gerald J. Diaz, Jr. Law Firm; Driggs, Bills & Day, P.C.; John Arthur Eaves Law Offices; Ferrer, Poirot & Wansbrough; Frenkel & Frenkel, L.L.P.; Heninger Garrison Davis, L.L.C.; Goldberg & Osborne; Hariton & D'Angelo, L.L.P.; the Harris Firm, P.C.; Michael D. Hepperly Law Office; Law Offices of Michael Hodges; Hutton & Hutton Law Firm, L.L.C.; James W. Jeans, P.A.; the Langston Law Firm, P.A.; Law Offices of Ben C. Martin, L.L.C.; Martinez, Barrera & Martinez, L.L.P.; McKnight, Dehart & Crockett, L.L.P.; Miller & Associates; the Law Office of Patrick J. Mulligan, P.C.; Napoli Bern and Associates L.L.P.; the O'Quinn Law Firm; Petroff & Associates; Popham Law Firm, P.C.; the Schmidt Firm, L.L.P.; Shannon Law Firm, P.L.L.C.; Simien & Simien, L.L.C.; Summers & Johnson, P.C.; Susman Godfrey, L.L.P.; Law Offices of Richard Vandever; Verhine & Verhine, P.L.L.C.; Watts Law Firm; the Law Offices of White, Meany, & Wetherall, L.L.P.; Williams Bailey Law Firm, L.L.P.; and the Edward A. Williamson Law Firm.

significant elements" to the fee agreements contained in the
Compendium of Agreements:

- The Joint Fee Applicants agreed to apply
  for the award of common benefit fees as
  set forth in the ... Joint [Fee]
  Petition, and the Major Filers agree to
  join in that Petition and to refrain
  from making or pursuing any objections
  to such an award;

- The Joint Fee Applicants and the Major
  Filers agreed to jointly apply for an
  order directing a refund of certain
  amounts previously deposited in the Fund
  B Attorneys' Fees Account and the MDL
  1203 Fee and Cost Account as set forth
  in the ... Joint [Fee] Petition;

- The Joint Fee Applicants agreed to
  allocate the aggregate amounts awarded
  by the Court among themselves on a
  percentage basis such that the
  allocation agreement will be operative
  regardless of the dollar amount awarded
  by the Court from any given fund; and

- The Joint Fee Applicants agreed to
  creation of a Fee Reserve (also the
  "Reserve Fund") in the amount of
  [approximately] $30 million, to provide
  compensation for future common benefit
  services performed in this litigation.

Joint Petrs.' Br. 31.

The hearing pursuant to PTO No. 6827 went forward on
March 1, 2007.  On March 9, 2007 we issued PTO No. 7031
establishing a procedure for "the orderly and efficient
presentation and determination of requests for the award of
attorneys' fees and reimbursement of litigation expenses" from
the Settlement Agreement fee sources, that is, the Fund A Escrow
Account, Fund B Attorneys' Fees Account and the Supplemental

-32-

Class Settlement Fund, and the MDL 1203 Fee and Cost Account.
PTO No. 7031.  The details of the procedure are set forth in that
PTO.  In short Mr. Winikur was to submit a new report of the
professional time and expenses reported by counsel as being
eligible for payment as of March 31, 2007, hereinafter "March,
2007 Auditor's Report."[36]  Each law firm, lawyer, or other party
that submitted time or expense reports to Mr. Winikur was then
required to submit to Arnold Levin, Esq., Plaintiffs' Liaison
Counsel in MDL 1203, a "Fee Presentation."  PTO No. 7031 included
a detailed list of the information to be included in each Fee
Presentation.[37]  Mr. Levin was then charged with submitting a
"generic, consolidated, joint petition (the 'Joint Petition') for
an award of attorneys' fees and reimbursement of expenses ...
[that] encompass[ed] all timely Fee Presentations which
conform[ed] with [PTO No. 7031]."  Id. ¶ 7.  The Joint Petition
was to be filed and served no later than July 16, 2007.  The

---

36.  As was the case with Mr. Winikur's earlier reports, the
March, 2007 Auditor's Report was to include "eligible" time and
expenses in accordance with the applicable Orders of this court,
including PTO Nos. 16, 467, 517, 1415, 1434, and 5400, as well as
any time or expenses Mr. Winikur believed should be disallowed.
PTO No. 7031 ¶¶ 2, 3.

37.  We note that PTO No. 7031 ¶ 6H ordered that the Fee
Presentations include "[a]n itemized statement of the gross
recoveries by all individual Diet Drug Recipients in which the
Applicant had a direct or indirect fee interest ...."  Upon
motion of Wyeth for protection of confidential information
concerning private settlements, this court issued PTO No. 7229
(May 30, 2007), striking ¶ 6H of PTO No. 7031. The Fee
Presentations therefore did not include that information.

Joint Petition was in fact properly filed and served on that
date.

Any Applicant seeking an award of attorneys' fees or
reimbursement of expenses not included in the Joint Petition was
required to submit a separate petition to Mr. Levin no later than
July 23, 2007.  Mr. Levin was then to compile all separate
petitions and file the compilation with this court.  No separate
petitions were submitted to Mr. Levin.  However, a separate
renewed motion for incentive awards was filed by the named
plaintiffs in Bloom v. Am. Home Prods. Corp., No. 98-20047 (E.D.
Pa.), Nourse v. Am. Home Prods. Corp., No. 98-20377 (E.D. Pa.),
and Staten v. Am. Home Prods. Corp., No. 98-20460 (E.D. Pa.).

PTO No. 7031 also provided for a one month discovery
period, from August 15, 2007 until September 14, 2007.  Discovery
requests were initially handled by Special Discovery Master
Miller with a right to appeal any decision to this court.  PTO
No. 7031 ¶¶ 13, 14.  Only one discovery request was made.  The
law firms of Freedland Farmer Russo Behren & Sheller and Raymond
Valori, P.A., collectively, "Freedland and Valori," sought the
deposition of Michael D. Fishbein, Esq.[38]  Special Discovery
Master Miller made an initial determination which was then
appealed to this court.  After a telephone conference with
counsel, we issued an Order allowing Freedland and Valori to
depose Mr. Fishbein for no more than two hours and limiting the

---

38.  Mr. Fishbein is Mr. Levin's law partner.

-34-

questions at the deposition to those regarding "the [Major Filer] Agreement between Levin, Fishbein, Sedran and Berman, the Plaintiffs' Management Committee, and the Major Filers, its terms, and its meaning."  PTO No. 7437 (Sept. 25, 2007).  The deposition of Mr. Fishbein went forward as ordered, and no further discovery requests were made.

Pursuant to PTO No. 7031, any memorandum of law in opposition to the Joint Petition was required to be filed and served no later than October 1, 2007.  As of that deadline, two oppositions were filed — one from Freedland and Valori, and a second from Attorney Brian S. Riepen, Esq.[39]  Plaintiffs' Liaison Counsel filed reply memoranda to each of the oppositions. Attorney Stephen A. Sheller, Esq. also filed a reply to the Freedland and Valori opposition.

On November 15, 2007, this court held a one day hearing on the Joint Petition and renewed motion for incentive awards by the named plaintiffs in <u>Bloom</u>, <u>Nourse</u>, and <u>Staten</u>.

### III.   REIMBURSEMENT OF COSTS TO JOINT FEE APPLICANTS FROM THE SETTLEMENT FUND AND MDL 1203 FEE AND COST ACCOUNT

We will first consider the reimbursement of certain costs from the Settlement Fund and MDL 1203 Fee and Cost Account, as this determination will affect the amount of money available for any award of attorneys' fees.  According to the March, 2007

---

39.  Two untimely objections were filed:  one on November 15, 2007 by Charles Volz and the second on February 5, 2008 by pro se Class Members Nicholas Napora, Jennifer Ferguson, Sonia Howell, Judith Dahlke, and Sherry Soltis.

Auditor's Report, the Joint Fee Applicants have incurred $24,233,865.23 in expenses for the common benefit of the Class Members and the plaintiffs in MDL 1203.  We have already authorized the reimbursement of the majority of these expenses, as follows:

- $11,484,152 to the PMC/MDL Attorneys from the MDL 1203 Fee and Cost Account. See PTO No. 2622.

- $4,218,244.08 to counsel in the certified state court class actions from the Fund A Escrow Account.  See PTO Nos. 5327, 5537.

- $6,988,567.25 to the PMC/MDL Attorneys from the MDL 1203 Fee and Cost Account.[40]

Thus, all but $1,542,901.90[41] in eligible expenses have already been reimbursed.  In addition to requesting that the remaining expenses now be reimbursed, the Joint Petitioners also maintain that the prior reimbursements have, in some instances,

---

40.  These reimbursements have been made in a series of Pretrial Orders since the Interim Distribution.

41.  The remaining un-reimbursed expenses are:  (1) $107,925.99 for Alexander & Associates, P.C.; (2) $30,188.58 for Anapol, Schwartz, Weiss, Cohan, Feldman, & Smalley, P.C.; (3) $66,544.60 for Baron & Budd, P.C.; (4) $224,197.97 for Cummings, Cummings & Dudenhefer; (5) $11,742.15 for Harrison, Kemp & Jones; (6) $183,463.49 for Hill & Parker; (7) $2,120.54 for Keller, Rohrback, L.L.P.; (8) $1,288.94 for Kohn Swift & Graf, P.C.; (9) $540,292.38 for Levin, Fishbein, Sedran & Berman; (10) $73,740.63 for Lieff, Cabraser, Heimann & Bernstein, L.L.P.; (11) $48,355.27 for Locks Law Firm; (12) $51,831.57 for Martinez, Berrera & Martinez, L.L.P.; (13) $37,888.21 for Roda Nast, P.C.; (14) $78,665.16 for Shrager Spivey & Sachs; (15) $3,454.97 for Darryl J. Tschirn; (16) $34,249.61 for Waite, Schneider, Bayless & Chesley; (17) $46,951.84 for Williams, Love, O'Leary, Craine & Powers, P.C.

been paid from the incorrect source.  First they maintain that under the terms of the Settlement Agreement, the $4,218,244.08 paid from the Fund A Escrow Account should have been paid from the Settlement Fund which came into being as a result of the consolidation of Settlement Fund A and Settlement Fund B.  See PTO No. 2677.  Second, they contend that at least 50% of the $18,472,719.25 paid from the MDL 1203 Fee and Cost Account were for expenses incurred for work related to the Settlement Agreement, not the MDL, and therefore should be reimbursed from the Settlement Fund.  Class Counsel and Wyeth have executed a stipulation to this effect.[42]  Joint Pet. Ex. C.

We agree with the Joint Petitioners that the reimbursements made from the Fund A Escrow Account should actually have been made from the Settlement Fund.  The Settlement Agreement provides:  "The monies held by Fund A shall be available and shall be used to pay ... out-of-pocket and pre-settlement litigation expenses of Plaintiffs' Counsel approved by the Court for reimbursement in relation to Fund A ...."  Settlement Agreement § III.B.2.  As our orders reimbursing costs were interim in nature, we will direct the Trust to transfer $4,218,244.08 from the Settlement Fund to the Fund A Escrow Account.

---

42.  We note that the joint stipulation executed by Class Counsel and Wyeth contains different numbers for the reimbursement of costs than the Joint Petition.  The joint stipulation numbers appear to be erroneous.

As for the reimbursements made from the MDL 1203 Fee and Cost Account, we will honor the parties' agreement that 50% of the money already paid from that account was for expenses incurred for work on the Settlement Agreement.  Accordingly, we will direct the Trust to transfer $9,236,359.63 from the Settlement Fund to the MDL 1203 Fee and Cost Account.

Finally, with regard to the outstanding $1,542,901.90 in reimbursable expenses, half is for expenses incurred for work performed on the Settlement Agreement and half is for expenses incurred for work performed on the MDL.  We will therefore order the Trust and the MDL 1203 Escrow Agent each to pay $771,450.50 to the Joint Fee Applicants for outstanding expenses.

## IV. AWARD OF ATTORNEYS FEES UNDER THE SETTLEMENT AGREEMENT

We now turn our attention to the requested award from the Settlement Agreement.  In short, the Joint Fee Applicants request an attorneys' fees award of approximately $402,816,272.00 under the Settlement Agreement, in addition to the $76,861,455.62 awarded in the Interim Distribution for a total of $479,677,727.62.  The Joint Fee Applicants base this request on their calculation that approximately $7.5 billion in benefits were created and provided by the Settlement Agreement.

## A.   ATTORNEYS' FEE REQUEST

The Joint Petition seeks payment of attorneys' fees from the three fee sources under the Settlement Agreement:  (1) $161,569,272 from the Fund A Escrow Account in addition to the $38,430,728 Interim Distribution from that Account, for a total

-38-

of $200,000,000; (2) $159,000,000 from the Fund B Attorneys' Fees Account in addition to the $38,430,728 Interim Distribution from that Account, for a total of $197,430,728; and (3) 7% of all Individual Payment Amounts due to Category One Class Members under the Seventh Amendment.  No Interim Distribution was made from the Seventh Amendment Supplemental Fund which did not exist at that time.

If this court were to grant the full amount the Joint Petitioners request, the principal amount of $200,000,000 in Fund A Escrow Account would be exhausted and an estimated $19,750,000 in net interest would remain.  Including the $4,218,244.08 in expenses paid from the Fund A Escrow Account which should have been paid from the Settlement Fund itself, approximately $23,968,244.08 would be left in the Fund A Escrow Account.[43]

The Fund B Attorneys' Fees Account would also be significantly reduced.  The Interim Distribution plus the amount now requested is 86.21% of the principal amount of $229,000,000. Counting the Fund B Attorneys' Fees Account principal plus an estimated net interest as of December 31, 2007 of $22,930,000 the fee award would be 78.37% of the total available.  The Joint Petitioners suggest that the remaining $50,889,067 in the Fund B Attorneys' Fees Account should be refunded to Class Members under

---

43.  This amount would be available for the Reserve Fund the Joint Petitioners propose, that is, the account that would remain available for compensation of future common benefit work.  Under the terms of the Settlement Agreement, any money not distributed would revert to Wyeth.  Settlement Agreement § III.B.3.

the terms of the Settlement Agreement.  <u>See</u> Settlement Agreement §§ VIII.E.1.b-c.  The residual of almost $4 million would then be included in the Reserve Fund.

Wyeth agreed to pay $1.275 billion into the Supplemental Fund created by the Seventh Amendment to the Settlement Agreement for Category One Class Members.  The Joint Petitioners estimated that 7% of all Individual Payment Amounts due to Category One Class Members under the Seventh Amendment would be approximately $82,250,000.00 by December 31, 2007.  A joint petition for final distribution of Category One payments is currently pending.  The declaration and report by the Seventh Amendment Fund Administrator in support of the joint motion by the Fund Administrator, Class Counsel and Seventh Amendment Liaison Committee for final distribution of the Supplemental Fund, seeks a final distribution of $798,827,942.50 to these class members.  Assuming we grant the joint motion for final distribution, the $798,827,942.50 plus the $317,541,402.80 in partial distributions that were made pursuant to PTO Nos. 6875 (Jan. 23, 2007) and 7129 (Apr. 20, 2007) will bring the total Individual Payment Amounts distributed to $1,116,369,345.30.  Seven percent of that amount is $78,145,854.17.

**B.   <u>LEGAL ANALYSIS</u>**

"[A] thorough judicial review of fee applications is required in all class action settlements."  <u>In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.</u>, 55 F.3d 768, 819 (3d Cir. 1995).  This oversight function serves not only to

detect abuse but also to deal with potential public misunderstandings.  Id. at 820.  "[T]he district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper.  This duty of the court exists independently of any objection."  In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 730 (3d Cir. 2001) (quoting Zucker v. Occidental Petroleum Corp., 192 F.3d 1323, 1328-29 (9th Cir. 1999)).

There are two types of cases in which attorneys' fees are typically awarded and two corresponding methods for calculating attorneys' fees depending on the type of case.  Id. at 732.  First, the percentage of recovery method is generally used in common fund cases such as this.  In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 333 (3d Cir. 1998).  It "resembles a contingent fee in that it awards counsel a variable percentage of the amount recovered for the class."  GM Trucks, 55 F.3d at 819 n.38.  Second, the lodestar method has traditionally been applied in statutory fee-shifting actions.  Prudential, 148 F.3d at 333.  The lodestar value is calculated by multiplying the hours worked by counsel by a reasonable hourly fee.  Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000).

In considering the 2002 Joint Fee Petition for attorneys' fees and costs, we observed that there had been "much discussion about the proper methodology to employ when awarding counsel fees in a class action settlement."  Diet Drugs, 2002 WL

32154197 at *10 (E.D. Pa. Oct. 3, 2002) (citing In re Cendant
Corp. Litig., 264 F.3d 201, 255-56 (3d Cir. 2001)); GM Trucks, 55
F.3d at 821-22; In re Orthopedic Bone Screw Prods. Liab. Litig.,
2000 WL 1622741, at *4-5 (E.D. Pa. Oct. 23, 2000); Report of the
Third Circuit Task Force, Court Awarded Attorney Fees, 108 F.R.D.
237 (1985)).  In overruling certain objections, we noted that:
"The day of the lodestar has passed in class actions such as
this, save for perhaps its use as a cross-check in some cases.
It is now clear that in the Third Circuit the percentage of
recovery method should be utilized in common fund cases."  Id.
(internal citations omitted).  Since that time, our Court of
Appeals has repeatedly explained that the percentage of recovery
method is favored when evaluating a petition for attorneys' fees
and costs in a common fund case.  See e.g. In re Rite Aid Corp.
Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005); In re AT&T Corp.
Sec. Litig., 455 F.3d 160, 164 (3d Cir. 2006).  An abbreviated
version of the lodestar analysis, however, is recommended to
cross-check the reasonableness of the award.  Id.

        To begin the percentage of recovery analysis, the court
must first make an assessment of the value of the settlement.  GM
Trucks, 55 F.3d at 822.  Then, as mentioned above, the court
awards a reasonable percentage of that value as attorneys' fees.
In setting a reasonable percentage award, the Third Circuit has
instructed courts to consider the following, commonly referred to
as the "Gunter Factors":

-42-

> (1) the size of the fund created and the
> number of persons benefitted; (2) the
> presence or absence of substantial objections
> by members of the class to the settlement
> terms and/or fees requested by counsel; (3)
> the skill and efficiency of the attorneys
> involved; (4) the complexity and duration of
> the litigation; (5) the risk of nonpayment;
> (6) the amount of time devoted to the case by
> plaintiffs' counsel; and (7) the awards in
> similar cases.

Gunter, 223 F.3d at 195 n.1; see Cendant PRIDES, 243 F.3d at 735-41.

Our Court of Appeals has also advised that three additional factors, commonly referred to as the "Prudential Factors," should be considered.  AT&T, 455 F.3d at 165-66.  The Prudential Factors are:  (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and (3) any innovative terms of settlement.  Prudential, 148 F.3d at 338-40.

These ten combined Prudential/Gunter Factors are by no means exhaustive.  We may also to consider "any other factors that are useful and relevant with respect to the particular facts of the case." AT&T, 455 F.3d at 166.  Moreover, the factors "need not be applied in a formulaic way," and the paramount focus should be evaluating "what class counsel actually did and how it

benefitted the class."  AT&T, 455 F.3d at 165-66 (quoting Rite Aid, 396 F.3d at 301; Prudential, 148 F.3d at 342).

        The lodestar cross-check is just that — a check to "ensure that the proposed fee award [under the percentage of recovery method] does not result in counsel being paid a rate vastly in excess of what any lawyer could reasonably charge per hour, thus avoiding a 'windfall' to lead counsel."  Cendant Corp., 264 F.3d at 285.  Performing the percentage of recovery analysis alone may result in suggested fees well in excess of the time they actually spent securing benefits for class members. The lodestar cross-check may demonstrate that the total award should be reduced to prevent a windfall.  Thus, this cross-check is an important part of any fee analysis.  Rite Aid, 396 F.3d at 306-07.

C.    **PERCENTAGE OF RECOVERY ANALYSIS**

        To undertake the percentage of recovery analysis, we begin by valuing the Settlement Agreement before moving on to analyze the Prudential/Gunter Factors.

        1.    **VALUATION**

        The determination of the value of the Settlement Agreement is more than a simple numerical calculation.  The money available for payment to Class Members under the terms of the Settlement Agreement is part of the valuation as well as any intangible benefits.  See G.M. Trucks, 55 F.3d at 822.  The Settlement Agreement here poses a novel question.  We must decide whether to value the Settlement Agreement as a whole or conduct

-44-

separate valuations of the benefits conferred by each of the three distinct funds established under it.[44]  As explained above, the Settlement Agreement, as it was originally adopted, created two distinct funds from which benefits were conferred — Fund A and Fund B.  With approval of the Fifth Amendment to the Settlement Agreement, these two funds were merged to create a single Settlement Fund from which benefits were paid.  See PTO No. 2677.  The Supplemental Class Settlement Fund established by the Seventh Amendment to the Settlement Agreement created yet another distinct fund from which benefits were paid.  See PTO No. 4567.  We have found no other case, and none has been cited to us, where such a situation exists.

The Joint Petitioners argue that the Settlement Agreement's funds should be valued and considered together.  In essence, they maintain that the Settlement Agreement confers a continuum of benefits upon Class Members.  Our Court of Appeals which has ruled that in deciding on the issue of attorneys' fees "the final award must depend on a full assessment of the extent of the benefits received by plaintiffs."  Prudential, 148 F.3d at 337 n.116.

---

44.  The MDL 1203 Fee and Cost Account stands apart from the three funds under the Settlement Agreement.  See In re Linerboard Antitrust Litig., 333 F. Supp. 2d 343, 348-52 (E.D. Pa. 2004). The purpose of the MDL 1203 Fee and Cost Account is to compensate for professional time devoted to adjudicating cases outside of the Settlement Agreement.  This includes time expended seeking compensation for federal and coordinated state plaintiffs who opted-out of the Class Settlement and individuals with PPH claims.  We will therefore discuss separately the award of attorneys' fees and costs from the MDL 1203 Fee and Cost Account.

On the other hand, the Freedland and Valori Objection argues that the Joint Petition "fails to allocate the burden of paying for each of [the] quantified benefits to those who received them," but instead "requests that the funds essentially be treated in aggregate and not distributed in accordance with these benefits."[45]  Freedland and Valori Objection 7.

We agree with the Joint Petitioners that the court must look to all benefits, tangible and intangible, as a whole when calculating the value of the Settlement Agreement and the appropriate award therewith.  The benefits conferred upon Class Members under the Settlement Agreement are not mutually exclusive.  Indeed, a single Class Member may receive benefits under Fund A and Fund B, which are now consolidated into the Settlement Fund, and the Supplemental Fund.  Such a Class Member, for example, could receive a free echocardiogram under Fund A, a Category One Class Member payment under the Supplemental Fund and unfortunately have his or her disease progress so that compensation for High Level Matrix Claim under Fund B is appropriate.  See Settlement Agreement § IV, Seventh Amendment §§ VII, IX.A.

The circumstances here are distinct from In re Rite Aid Corp. Sec. Litig., 396 F.3d 294 (3d Cir. 2005), in which district

_____

45.  Although we are mentioning the Freedland and Valori Objection here, while discussing the Settlement Agreement, their primary concern seems to be the distribution of the MDL 1203 Fee and Cost Account, and therefore, we will deal with those concerns more fully below.

courts were cautioned that they should "not conflate [] two distinct settlements ...." Id. at 302 n.11.  In that case, a securities class action, a first settlement agreement was negotiated between the class and certain defendants.  After court approval of the first settlement agreement, the non-settling defendants filed an appeal arguing that a provision barring claims by non-settling defendants against settling defendants was too broad.  Before the appeal could be heard, a second settlement agreement resolving the claims against the non-settling defendants was negotiated and ultimately approved by the court. Id. at 297-98.  In Rite Aid there were two distinct sets of parties that were affected by the two different settlement agreements.

        The Settlement Agreement here affects the rights and obligations of "Class Members" and "Released Parties," as defined in the Settlement Agreement.  Settlement Agreement §§ II.B, I.48. Although the benefits Class Members receive are diverse and Class Members' paths toward receiving benefits frequently diverge, the Settlement Agreement is intended to be fully integrated and plenary.  In performing the percentage of recovery analysis and lodestar cross-check, we will therefore value the Settlement Agreement as a whole.

        We will begin by summarizing the monetary value of the Settlement Agreement.  We have previously stated that the original Settlement Agreement, that is, the Settlement Agreement before the approval of the Seventh Amendment, created an

-47-

"aggregate global settlement fund of $3.75 billion ...." Diet Drugs, 226 F.R.D. at 503.  This number is reached by adding:

- $1 billion paid by Wyeth into the Fund A account to pay Fund A benefits.  See Settlement Agreement § III.B.1.

- $200 million paid by Wyeth into the Fund A Escrow Account to pay common benefit fees.[46]  See Settlement Agreement § III.B.3.

- $2.55 billion obligation of Wyeth to pay Fund B benefits.  See Settlement Agreement § III.C.[47]

---

46.  The money paid by Wyeth for common benefit fees is properly included in the Settlement Agreement valuation.  See G.M. Trucks, 55 F.3d at 802 (citing Manual for Complex Litigation, First Edition).

47.  Wyeth's $2.55 billion obligation to pay Fund B benefits is, however, adjustable based upon the Maximum Available Fund B Amount.  As of March 31, 2007 the Maximum Available Fund B Amount was slightly more than $1.267 billion and it is projected that at least $470 million more than Wyeth's original $2.55 billion Fund B obligation will be paid in Matrix Benefits over the next five years.
    The Napora Objection argues that the Maximum Available Fund B Amount, which will require Wyeth to make payments into the Settlement Fund for Fund B benefits in excess of the $2.55 billion, should not be considered in the Settlement Agreement valuation.  We agree.  The Settlement Agreement is indeed explicit that "only for the purposes of calculating payment of attorneys' fees, the net present value, as of the Final Judicial Approval Date, of the maximum amounts which AHP may be legally obligated to pay to Fund B for the benefit of the class is $2,550,000,000."  See Settlement Agreement § VIII.E.1.b.
    The Napora Objection also maintains that CAP 15 will "dynamically change the resources that the settlement will utilize in future claims resolution" and therefore the Trust may not pay the full $2.55 billion in Fund B benefits.  Napora Objection 2.  We disagree with this assessment.  At the time the Joint Petition was filed, it was estimated that approximately $732,000,000 was available in the Settlement Fund.  The Joint Petitioners estimate that at least $470 million more than Wyeth's
                                                    (continued...)

The face value of the original Settlement Agreement for the purpose of determining an award of attorneys' fees is therefore $3.75 billion.  The principal amount paid into Fund A and Fund B, that is $1.65 billion,[48] has also been earning interest.  As of March 31, 2007, the interest earned was $94,956,117.  Interest is properly included in the monetary value of the original Settlement Agreement.  See In re Ampicillin Antitrust Litig., 526 F. Supp. 494, 495 n.2 (D.D.C. 1981).

The approval of the Seventh Amendment to the Settlement Agreement in 2005 has significantly increased its monetary value. Wyeth paid the principal amount of $1.275 billion into the Supplemental Fund for the payment of Category One Benefits.  In addition, Wyeth agreed to fund Category Two benefits for all eligible Class Members.  As of March 31, 2007 Wyeth had paid

---

47.(...continued)
original $2.55 billion Fund B obligation will be paid in Matrix Benefits over the next five years.  This estimation is based upon the average amount of Matrix Benefits the Trust has paid per year since the approval of the Seventh Amendment, that is, approximately $240,000,000 per year, and assumes that no other expenses or benefits are paid from the money currently available, which will not in fact be the case.  CAP 15 will not substantially alter this estimation and may in fact result in additional claims being paid that have, as of now, been deemed unpayable.  Therefore, we have no doubt that Wyeth's full $2.55 billion funding obligation for Fund B benefits will be exhausted.

48.  Wyeth's original payment was:  (1) $1 billion to Fund A; and (2) $650 million to Fund B.  As discussed previously, Wyeth was not required to pay the entire $2.55 billion maximum into Fund B but only $650 million with additional payments as needed.

$167,255,399 in Category Two Benefits,[49] bringing the total value of the Category One and Two benefits as of that date to $1,442,255,399.  The face value of the Settlement Agreement including Funds A and B (now consolidated into one Settlement Fund), the Fund A Escrow Account, interest earned on the Settlement Fund, and the Supplemental Fund under the Seventh Amendment to the Settlement Agreement equals $5,287,211,516 or approximately $5.29 billion.

The Joint Petitioners further assert that the valuation of the Settlement Agreement should include an additional $2,300,000,000 which was paid to between 60,000 and 70,000 Class Members who exercised their Downstream Opt-Out rights and pursued actions against Wyeth in the tort system.  The Joint Petitioners argue that without the Settlement Agreement these claims would have been futile because they would have been barred under the applicable statutes of limitations.  According to the Joint Petitioners, the Settlement Agreement "revived the moribund compensation rights of all injured Class Members ...."  Joint Petrs.' Br. 56.  The Joint Petitioners note that the vast majority of states employs a one-year or two-year statute of limitations for tort claims.  Even if the discovery rule tolled the running of the applicable limitations periods, Class Members would have "discovered" their injuries at the latest in March, 2000 when the extensive Class notice campaign ended.  Therefore,

---

49.  This number has certainly risen in the past year.

the Class Members' claims would have been time barred in March, 2002, at the latest, two months after Final Judicial Approval of the Settlement Agreement and well before almost all Class Members had exercised their Downstream Opt-Out rights.  As a result, the Joint Petitioners maintain, "the opt-out provisions of the Settlement conferred a tangible benefit upon the '60,000 to 70,000' Class Members who took advantage of the claims preservation feature" and "it was the successful efforts of Class Counsel and the other Common Benefit Attorneys — both in litigating the underlying class action and in fashioning the terms of the Settlement — that were the primary force in bringing about payment of approximately $2.3 billion in compensation to these Class Members."  Id. at 61.

In support of their argument, the Joint Petitioners rely heavily on Prudential.  That was a class action arising from the purported deceptive sales practices of the defendant, an insurer.  The first individual and class action cases were filed against the defendant in early 1994.  148 F.3d at 290.  On April 25, 1995 the New Jersey Insurance Commissioner created the Multi-State Life Insurance Task Force to investigate defendant's alleged wrongdoing.  Id. at 290-91.  Just one day later, on April 26, 1995, defendant moved to consolidate the federal actions in the District of New Jersey.[50]  Id. at 292.  A

---

50.  Defendant's motion to consolidate was granted on August 3, 1995.  Subsequently, various state court actions were removed to federal court and consolidated in New Jersey.

settlement agreement was reached but not before the Multi-State Life Insurance Task Force had developed a remediation plan that was adopted by some states.  Id. at 294.  The settlement agreement required those states to modify the remediation plan to conform to it.  Id.  In reviewing a petition for attorneys' fees, the district court based its percentage of recovery award on "'the entire value of the settlement, including any portion which would have been provided to the class under the Task Force Plan' ... based on [its] conclusion that class counsel was a 'material factor in bringing about the regulators' Task Force Plan.'"  Id. at 336 (quoting 962 F. Supp. at 581).  Our Court of Appeals questioned whether class counsel was in fact a "material factor" in bringing about the task force's plan.  The Court doubted that "class counsel had so significant a role in the institution of the Task Force proceedings that the district court was justified in crediting counsel for all of the benefits created under the Task Force plan."[51]  Id. at 337.

The Joint Petitioners argue that under Prudential, "[t]here is no reason that the same principle should not apply when a court is presented with an obverse factual scenario — the value of a class settlement for fee recovery purposes should

_____

51.  Our Court of Appeals remanded the case to the district court on the issue of attorneys' fees.  On remand, the class counsel supplemented the record.  The district court concluded that "[t]he current amplified record ... makes crystal clear that Class Counsel were a material factor in creating the relief offered by the Task Force plan, as well as the substantial additional relief created by the settlement of this litigation." Prudential, 106 F. Supp. 2d 721, 724 (D.N.J. 2000).

-52-

include all benefits directly created by class counsel, even if other attorneys have capitalized on those efforts by involving themselves in the recovery process."  Joint Petrs.' Br. 59.

The factual situation in <u>Prudential</u>, however, is more analogous to the situation here than it is obverse.  Like the petitioners in <u>Prudential</u>, the Joint Petitioners are asking this court to include in the value of the Settlement Agreement payments to Class Members where their efforts are intertwined with those of others.  In our view the Joint Fee Applicants are not due the sole credit for the entire $2.3 billion paid to Downstream Opt-Out plaintiffs as they contend.  The efforts of the individual attorneys representing the 60,000 to 70,000 Downstream Opt-Out plaintiffs also contributed significantly to the $2.3 billion that was paid in settlement of those lawsuits as did the common benefit work of the PMC/MDL attorneys.  In <u>Prudential</u> our Court of Appeals clearly cautioned the courts that we must perform a thorough analysis when the efforts and successes of Class Counsel have been inextricably linked with others.

It is true that the Settlement Agreement provided claim preservation.  However, in some cases the limitations period itself may not have run.  While the Settlement Agreement probably removed any bar of the statute of limitations for most Downstream Opt-Out litigants, they would undoubtedly have argued equitable tolling or made other analogous arguments to circumvent any statute of limitations issue.  How all that would have played out

-53-

in the various courts throughout the country cannot really be known.  The Settlement Agreement did indeed confer an extremely important benefit on the Class Members who chose to exercise their Downstream Opt-Out rights by at least obviating the uncertainty regarding the viability of those cases and precluded Wyeth from asserting statute of limitations defenses.  Yet without the efforts of the Downstream Opt-Out attorneys, the $2.3 billion in settlement payments would not have been achieved.

We conclude that the value of the Downstream Opt-Out cases is therefore attributable to the efforts of both the common benefit attorneys under the Settlement Agreement and the efforts of the individual attorneys who took the cases to the state and federal courts across the country.  The equitable solution is to include in the value of the Settlement Agreement $1.15 billion, that is, one-half of the $2.3 billion paid to the Downstream Opt-Out plaintiffs.[52]

In summary, the value of the Settlement Agreement for the purpose of awarding a percentage for attorneys fees is the total of:  (1) $1,000,000,000, the principal deposited into Fund A; (2) $200,000,000, the principal deposited into the Fund A Escrow Account; (3) $2,550,000,000, Wyeth's initial funding obligation to Fund B; (4) $94,956,117, which represents the estimated interest on the Settlement Agreement Fund, the fund

---

52.  The remaining $1.15 billion will be considered below when considering an appropriate award from the MDL 1203 Fee and Cost Account.

which resulted from the consolidation of Funds A and B; (5)
$1,275,000,000, the principal deposited into the Supplemental
Fund for Category One payments under the Settlement Agreement;
(6) $167,255,399 in Seventh Amendment Category Two payments; and
(7) $1,150,000,000 paid to Downstream Opt-Out plaintiffs in
settlement of their lawsuits.[53]   The value of the Settlement
Agreement is therefore $6,437,211,516.

## 2.   PRUDENTIAL/GUNTER FACTORS

We now turn our attention to the ten Prudential/Gunter
Factors which will guide us in our determination of the
appropriate percentage of recovery award.

---

53.   In the 2002 Joint Fee Petition, the joint petitioners argued
that the value of the Settlement Agreement should include health
preservation benefits because it was the impetus for early
screening and diagnosis of VHD.  They estimated that the economic
value of health preservation benefits to Class Members was at
least $3.45 billion.  In the present renewed petition, the Joint
Petitioners acknowledge that it is difficult to place a monetary
value on these benefits and thus "do not currently advocate
including any estimate of the economic value of those benefits in
calculating the value of the Settlement ...."  Joint Petrs.' Br.
62.
     We agree with the Joint Petitioners that valuing the health
preservation benefits would be exceedingly difficult.  Such a
valuation would be based less upon the value of the actual
benefits conferred than on the costs that have been avoided by
including medical monitoring in the Settlement Agreement.  There
is no doubt that the tremendous screening efforts that occurred
because of the Settlement Agreement benefitted the Class greatly,
but to place a dollar value on those benefits would be too
speculative and therefore we will decline to do so.

### a.   SIZE OF THE FUND CREATED AND THE NUMBER OF PERSONS BENEFITTED

The size of the fund created, we reiterate, is approximately $6.44 billion.  The number of people who have benefitted from the Settlement Agreement, that is, the Class Members, is enormous.  In summary:

- 204,684 Class Members received free echocardiograms and interpretive office visits with cardiologists under the medical Screening Program.

- 386,351 Class Members received refunds for the purchase price of their Diet Drugs.

- 5,098 Class Members received Matrix Benefits.

- 40,000 Class Members have received or will receive Category One Benefits from the Supplemental Fund.

- 81,723 Class Members have received Category Two Benefits under the Seventh Amendment to the Settlement Agreement.

- 47,442 Class Members received Cash/Medical Services Benefits.

- 60,000 to 70,000 Class Members who exercised their Downstream Opt-Out rights and received compensation for their injuries.

Joint Petrs.' Br. 67-68.

Needless to say, the vast number of people who have benefitted from the Settlement Agreement and the level of participation among Class Members is a testament to the strength and efficacy of the Settlement Agreement.

-56-

### b.   PRESENCE OR ABSENCE OF SUBSTANTIAL OBJECTIONS BY MEMBERS OF THE CLASS TO THE SETTLEMENT TERMS AND/OR FEES REQUESTED BY COUNSEL

Gunter advises that this court should consider "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel." Gunter, 223 F.3d at 195 n.1.  The Joint Petitioners argue that the absence of numerous and substantial objections to the Settlement Agreement, the 2002 Joint Fee Petition and the present Joint Petition, "augurs the appropriateness of the fee award requested in the instant Petition."  Joint Petrs.' Br. 75.  Given that there were approximately six million Class Members, the dearth of objections is quite remarkable.

With regard to the Settlement Agreement, less than thirty objections were filed.  See PTO No. 1415 at 137.  The objections were either overruled by this court with no further appeal or appealed to the Third Circuit and dismissed.  Several objections were filed to the Fifth and Sixth Amendments to the Settlement Agreement, but all were overruled.  See PTO No. 2677 at 13-17, aff'd, 93 Fed. Appx. 338 (3d Cir. Feb 23, 2004); PTO No. 2778 at 8-15, aff'd, 385 F.3d 386, 392-96 (3d Cir. 2004).  Twelve law firms filed objections to the Seventh Amendment to the Settlement Agreement.  See Diet Drugs, 226 F.R.D. at 517.  The objections to the Seventh Amendment were likewise overruled and appeals discontinued with prejudice.  See id. at 523-24.

Eleven objections were filed to the 2002 Joint Fee Petition.[54]  Now, with the renewed petition, only four objections have been filed.  As mentioned before, one objection was untimely and later withdrawn.  The two timely objections to the Joint Fee Petition which remain before the court were filed by Attorney Brian S. Riepen ("Riepen Objection") and Freedland Farmer Russo Behren & Sheller and Raymond Valori P.A. ("Freedland and Valori Objection").  One objection by pro se plaintiffs Nicholas Napora, Jennifer Ferguson, Sonia Howell, Judith Dahlke, and Sherry Soltis ("Napora Objection") was untimely filed on February 5, 2008.  We have and will address the arguments advanced in each of these objections in other parts of this memorandum but take a moment here briefly to summarize their positions.

The Riepen Objection makes two major arguments, only one of which is applicable here.[55]  The Riepen Objection contends that this court's Interim Distribution was "grossly excessive" and, therefore, it and any award we may make presently should be reduced.  The Freedland and Valori Objection argues that the

---

54.  Two of the objections were filed by what the Joint Petitioners characterize as "professional objectors."  Two more objections, filed on behalf of groups of attorneys, objected to the extent that the joint petition did not include them; however, these objections have since been withdrawn.  The seven remaining objections represented Initial Opt-Out plaintiffs and complained only to the extent that fees would be paid from the assessments levied in PTO Nos. 467 and 517.

55.  The Riepen Objection takes aim primarily at the PMC and the award to the PMC that would be made if we were to grant the Joint Petition.  As this argument pertains to any award from the MDL 1203 Fee and Cost Account, we will not discuss it here.

burden of common fund fees is not properly allocated to those who benefitted.[56]  The Freedland and Valori Objection also maintains that the entire fee request, from the Fund A Escrow Account, the Fund B Attorneys' Fees Account, the Common Benefit Percentage from the Supplemental Fund, and the MDL 1203 Fee and Cost Account, is excessive.  Specifically, they assert that the lodestar multiplier when performing the lodestar cross-check demonstrates that this court should "reconsider the calculation with an eye toward reducing the award."  Freedland and Valori Objection 15.

The Napora Objection states that the Joint Fee Petition is unduly speculative when valuing the Maximum Available Fund B Amount for purposes of valuing Fund B.  Specifically, the Joint Petitioners, in the view of that objection, overstate the number of Matrix Benefit claims that will be submitted to the Trust in the coming years and that CAP 15 which approved a new procedure for reviewing Matrix Benefit claims in the show cause process will "dynamically change the resources that the settlement will utilize in future claims resolution."  Napora Objection 2.  We have addressed these arguments in footnote forty-seven, above.

---

56.  This argument pertains primarily to the fee request from the MDL 1203 Fee and Cost Account but the objection does not make any distinction between arguments against an award for work under the Settlement Agreement versus an award for work in the MDL.  As with the Riepen Objection, however, we will discuss this argument later when considering an award from the MDL 1203 Fee and Cost Account.

The paucity of objections filed in response to the original and renewed petitions for attorneys' fees and costs does not necessarily establish that the requests in the Joint Petition are proper.  Indeed, some objectors may not have been forthcoming because this court is obligated to "exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper ... independently of any objection."  Cendant PRIDES, 243 F.3d at 730 (quoting Zucker, 192 F.3d at 1328-29).  On the other hand, fashioning a single Joint Petition with the approval of the Major Filers, and with so few objections, is a remarkable accomplishment and signifies that the requested award has been viewed by interested parties to this action as fair.

### c.   SKILL AND EFFICIENCY OF THE ATTORNEYS INVOLVED

We have repeatedly acknowledged the skill of the Joint Fee Applicants.  As stated in PTO No. 1415, "[e]ach of the Class Counsel [is] experienced in the conduct of class litigation, mass tort litigation and complex personal injury litigation involving products liability, medical malpractice, drugs and medical devices."  PTO No. 1415 at 100-01.  Moreover, in granting the Interim Distribution we wrote:  "[T]he Joint Petitioners have engaged in a herculean effort.  Without question, they have accomplished a significant amount of necessary and commendable work over a number of years with respect to the class settlement ...."  See PTO No. 2622 at 24.  We reiterate those sentiments here.  Indeed, we would not be where we are today in this

-60-

litigation if the Joint Fee Applicants did not possess and
exhibit the utmost skill as well as fortitude.

Although this has been a protracted litigation with
numerous unexpected twists and turns, the Joint Fee Applicants
have been efficient.  As detailed below, they have overcome many
hurdles in securing and implementing the Settlement Agreement.
The raw time expended has been tremendous, but we have no reason
to believe it has been unnecessary.

### d.   COMPLEXITY AND DURATION OF THE LITIGATION

The complexity and duration of this litigation are
relevant in our analysis.  Our Court of Appeals has stated:
"[C]omplex and/or novel legal issues, extensive discovery,
acrimonious litigation, and tens of thousands of hours spent on
the case by class counsel" are "the factors which increase the
complexity of class litigation."  Cendant PRIDES, 243 F.3d at
741.

To say that this litigation was complex is seriously to
understate the fact.  The story of this Class Action Settlement
as summarized in this memorandum attempts to convey to the reader
some idea of the complicated nature of this matter and the
constant challenges, many of them novel, which the Joint
Petitioners as well as this court encountered year in and year
out, and often day in and day out.  It was nothing short of a
herculean effort spanning almost a decade.

There is no way to detail every issue and dispute that
has arisen over the many years.  We have summarized the

chronology in the background section of this memorandum and will touch upon the highlights again here.  The Settlement Agreement was the culmination of hard-fought negotiations.  As set forth later in more detail with regard to the innovative terms of the Settlement Agreement, the jurisprudential landscape was not encouraging, and it was uncertain whether a global resolution for the putative class could be reached.  Despite the daunting task before them, Class Counsel embarked on negotiations with Wyeth.

The Settlement Agreement with exhibits was ultimately 520 pages long.  It reflected the countless hours of work that went into understanding, analyzing, and resolving the issues surrounding VHD and PPH, the demographics of the diet drug recipient population, the science of damage modeling and claim-forecasting, media-communications,[57] and claims administration. Once the Settlement Agreement was drafted, Class Counsel had to present the proposal at the ten-day fairness hearing held by this court.  At the hearing, Class Counsel presented fifteen witnesses and introduced numerous exhibits into evidence.  Class Counsel also submitted proposed findings of fact that formed the basis of

---

57.  An understanding of media communications was necessary to develop the Settlement Agreement notice program.  The notice program included a television commercial that was broadcasted 106 times over five weeks on network television and 781 times over six weeks on cable networks.  A summary notice for print media was also prepared.  It appeared in twelve different magazines, four national newspapers, 77 local newspapers, three newspapers in the U.S. territories, four newspapers targeting the Hispanic market, and a number of publications aimed at healthcare providers.  Internet banner advertisements were also used.  See PTO No. 1415 at 80-83.  A media analysis demonstrated that the plan was extremely successful.  Id. at 83.

PTO No. 1415.  After PTO No. 1415 was signed by Judge Bechtle,
Class Counsel undertook to defend sixteen appeals of that order.

        The adoption of the Settlement Agreement was just the
beginning of the Joint Fee Applicants' efforts.  They still had
to administer, enforce and defend the Settlement Agreement.  As
we have previously stated:  "The administration of ... [the]
Settlement Agreement ... is turning out to be as complex and
demanding as the litigation that preceded it."  PTO No. 2622 at
22.  Moreover, when granting the Interim Distribution some five
years ago we noted that "[m]any issues regarding interpretation
of the Settlement Agreement, the operation and funding of the
Trust, and the payment of benefits to Class Members remain to be
resolved" and that "[t]he court is still faced with a continual
flow of contested motions and hearings on a variety of matters
which could affect the value and efficacy of the settlement."
Id.  The flow of such motions has now waned but not without
immense effort from all parties involved.

        The Joint Fee Applicants were not merely faced with the
administration of the Settlement Agreement as it was originally
constructed.  Additional challenges arose as the second wave of
litigation in this case began and the viability of the Settlement
Agreement was tested.  As mentioned previously, numerous
attorneys, some with nefarious intentions, operated
echocardiogram mills to develop a vast inventory of claimants
seeking Matrix Benefits or to exercise Downstream Opt-Outs.  This
flood of claims was unexpected and out of step with the learned

-63-

projections based on epidemiologic and demographic evidence.
Class Counsel in conjunction with Wyeth and the Trust needed to
find a creative and viable solution.  As a result of
negotiations, they successfully preserved the Settlement
Agreement through the adoption of the Fifth,[58] Sixth,[59] and
Seventh Amendments to the Settlement Agreement.  Of these three
amendments, the Seventh Amendment, which created the Supplemental
Class Settlement Fund, required the most time of Class Counsel
and the Seventh Amendment Liaison Committee.  Negotiation and
drafting sessions took 121 days, and included Wyeth as well as
counsel representing large groups of Class Members.  To garner
support for the amendment, Class Counsel and the Seventh
Amendment Liaison Committee held meetings with many attorneys to
explain how the amendment would affect their clients.  Class
Counsel and the Seventh Amendment Liaison Committee also drafted
the motion for approval of the Seventh Amendment and supporting

---

58.  The Fifth Amendment to the Settlement Agreement was the
result of twenty-two days of negotiating and drafting sessions
between Class Counsel and Wyeth.  Class Counsel also drafted a
motion with supporting brief asking this court to approve the
amendment.  Finally, before the amendment could be approved, this
court held a hearing at which Class Counsel appeared to argue the
merits of their motion.

59.  The Sixth Amendment to the Settlement Agreement was the
result of sixteen days of negotiating and drafting sessions
between Class Counsel and Wyeth.  As with the Fifth Amendment to
the Settlement Agreement, Class Counsel filed a motion and
supporting brief with this court urging its approval and appeared
at a hearing to argue the merits of that motion.  An appeal was
taken from the Order approving the Sixth Amendment to the
Settlement Agreement and Class Counsel participated in the
appellate briefing and arguments.

brief, appeared at a two-day hearing regarding the motion, submitted further post-hearing briefing, and defended appeals from this court's Order approving the Seventh Amendment. Subsequently, the Eighth[60] and Ninth[61] Amendments to the Settlement Agreement were negotiated and then approved by the court.

To implement further the Settlement Agreement, the Joint Fee Applicants have:

- Negotiated and drafted Court Approved Procedures ("CAP") where a court ordered process has been necessary to facilitate the Settlement Agreement.[62]

- Assisted the Trust in processing the claims of thousands of Class Members and securing the benefits to which those Class Members were rightfully entitled.

- Established and operated the Class Counsel Claims Office ("CCCO") from April, 2001 until August, 2002, for the Parallel Processing Program ("PPP").[63]

---

60. Class Counsel and the Seventh Amendment Liaison Committee participated in several days of negotiating and drafting sessions for the Eighth Amendment and drafted the motion and supporting brief that were submitted to this court.

61. Class Counsel participated in twenty-one days of negotiating and drafting sessions with Wyeth and the Trust for the Ninth Amendment. Class Counsel also drafted the motion and supporting brief that were submitted to this court.

62. To date there have been fifteen CAPs approved by this court.

63. In brief, PPP provided expeditious processing of Matrix Benefits Claims. The CCCO was staffed by four lawyers and three paralegals, with part-time assistance from ten additional lawyers and paralegals. The CCCO attorneys would review each Class Member's Matrix Benefits claim and determine if the claim was
(continued...)

- Maintained the CCCO from August, 2002 to aid pro se claimants through the claim process for Matrix Benefits.

- Reinstated the CCCO's primary role in PPP for High Level Matrix Claims, that is, claims for Matrix Benefits that were Level III, Level IV, or Level V.  See PTO No. 3882 (Aug. 26, 2004).

- Conferenced with the Trust, Wyeth, the Fund Administrator, and private counsel to categorize properly Class Members under the Seventh Amendment.

- Worked with the Supplemental Fund Administrator to prepare applications for distributions to Category One Class Members.

This laundry list of tasks the Joint Fee Applicants performed merely seeks to quantify the complexity of this case through the efforts expended by counsel.  It certainly is not exhaustive.  We realize that many day-to-day issues arose throughout the implementation of the Settlement Agreement that were resolved through the hard work of the Joint Fee Applicants, in conjunction with Wyeth and the Trust, without ever reaching this court.

---

63.(...continued)
complete.  If it was not, the CCCO would work with the Class Member, or the Class Member's counsel if represented, to complete the claim.  If the CCCO viewed the claim as complete, it would then be forwarded to Wyeth for review.  However, the CCCO and Wyeth often haggled over the definition of "complete."  Once the CCCO and Wyeth agreed that a claim was in fact complete, Wyeth would perform a substantive review of the claim.  At that point Wyeth would deem the claim payable or select the claim for audit by the Trust.

Beyond administering the Settlement Agreement, the Joint Fee Applicants were often left to defend it.  Certain Major Filers moved to:  (1) disqualify and discharge Class Counsel; (2) circumvent the preclusive effect of the Settlement Agreement for Class Members with Pulmonary Hypertension ("PH"); (3) obtain relief from the Settlement Agreement on the basis that Class Members were denied adequate representation; and (4) alter or amend approval of the Settlement Agreement pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.  See PTO Nos. 2958, 3085, & 3849; Diet Drugs, 434 F. Supp. 2d 323 (E.D. Pa. 2006). The acrimony at times was daunting.

In total, according to the Joint Petitioners, Class Counsel conducted 51 depositions, used nine experts, participated in evidentiary hearings for seventeen days, obtained 175 significant decisions from this court, defended thirty-three appeals to the Third Circuit, and worked on litigating 53 motions that were withdrawn with prejudice before a decision by this court — all after Final Judicial Approval of the Settlement Agreement.  Joint Petrs.' Br. 119.

As we said at the outset, there is no doubt that this litigation was complex and at times hotly contested.  After reflecting on the sheer volume of work done by the Joint Fee Applicants and the results obtained by them, we believe that the complexity is indeed unparalleled.  The Settlement Agreement has provided substantial relief to Class Members who have opted to avail themselves of its benefits and the shear breadth of the

Settlement Agreement and its many moving parts created a virtual labyrinth through which the Joint Fee Applicants were forced to navigate to ensure those benefits were properly delivered.   The Joint Fee Applicants were successful in this endeavor and ultimately, as a result of extraordinary skill, served the Class Members well.

          Turning now to the duration of this litigation, the Joint Fee Applicants maintain that this litigation has endured substantially longer than other "super-mega-fund" cases, that is, cases with valuations larger than one billion dollars.  A decade has passed since this litigation's inception, and the Joint Fee Applicants point out that this is more than three years longer than the longest super-mega-fund case, Visa Check/Mastermoney, which lasted seven years.  See In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 523-24 (E.D.N.Y. 2003). See also In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (4-year duration); Shaw v. Toshiba Am. Info. Sys., 91 F. Supp. 2d 942, 945 (E.D. Tex. 2000) (approximately 1-year duration); In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig., 268 F. Supp. 2d 907, 915-18 (N.D. Ohio 2003) (2-year duration); DeLoach v. Phillips Morris Cos., 2003 WL 23094907 at *11 (M.D.N.C. Dec. 19, 2003) (3-year duration); In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 353-54 (S.D.N.Y. 2005) (3-year duration); In re AOL Time Warner, Inc. Sec. Litig., 2006 WL 3057232 at *1 & *18-*19 (S.D.N.Y. Oct. 25, 2006) (4-year duration).

The first PTO, which scheduled a status conference, was signed by Judge Bechtle on December 23, 1997.  And indeed, much water has passed under the bridge since that time.  On October 3, 2002, we granted the Interim Distribution related to the Settlement Agreement in the amount of $80,000,000.[64]  Nonetheless Joint Fee Applicants have now waited more than five years since the Interim Distribution for what can be characterized as a final award of attorneys' fees.

### e.   RISK OF NONPAYMENT

Another Prudential/Gunter Factor is the risk of non-payment, which is closely related to the duration of the litigation.  The risk of non-payment must be judged as of the inception of the action and not through the rosy lens of hindsight.  See NASDAQ, 187 F.R.D. at 488, (citing Harman v. Lyphomed, Inc., 945 F.2d 969, 976 (7th Cir. 1991)).  The Joint Fee Applicants were taking a calculated risk when they began their efforts that they would ultimately be successful in achieving relief for the Class and thus compensation for themselves.

We have previously stated that the Joint Fee Applicants, "faced significant risk at the beginning of the litigation ...."  PTO No. 2622 at 41.  The Joint Fee Applicants

---

64.  This $80 million award was reduced by approximately $3,138,545 in PTO No. 2859.  As discussed previously, we determined that $6,277,088.75 awarded in the Interim Distribution compensated Class Counsel for work done after the deadline to submit time for the 2001 Auditor's Report.  The reduction was split between the Settlement Agreement and MDL fee awards.

risked being unable to establish liability and causation or to achieve class certification under Rule 23 of the Federal Rules of Civil Procedure.  In addition they faced substantial risk because of the large number of individuals, that is, some six million, who had been exposed to diet drugs.  If a Settlement Agreement had not been structured to avoid a ruinous outcome for Wyeth, the efforts of the Joint Fee Petitioners would have been for naught.[65]

The risk of non-payment did not end with the approval of the Settlement Agreement.  The "second wave" of litigation increased the liability exposure Wyeth faced and endangered the entire Settlement Agreement.  The Joint Fee Applicants renewed and redoubled their efforts at this point, not knowing whether the Settlement Agreement could be saved.  Fortunately it was, but during this time it again appeared uncertain whether the Joint Fee Applicants could reach a point in this litigation where they would be compensated for all of their efforts.  At the inception, and throughout this litigation, there was a substantial risk that the efforts of the Joint Fee Applicants would not be successful.

---

65.  Our Court of Appeals has noted that, in general, a nationwide class settlement benefits claimants because they do not need to fear that "the defendant will undertake a scorched earth defense that consumes assets otherwise available for compensation, or simply turn off the spigot by filing for bankruptcy."  Diet Drugs, 369 F.3d at 297.

**f.   AMOUNT OF TIME DEVOTED TO THE CASE BY PLAINTIFFS' COUNSEL**

Our analysis of the eligible time devoted to this case by the Joint Fee Applicants is made possible by the reports of Alan Winikur, the court-appointed auditor.[66]  Mr. Winikur has now filed three reports with this court.[67]  In his March, 2007 Auditor's Report, he has summarized the time expended in this litigation from inception through March 31, 2007 and has found that 553,020.53 hours of eligible professional time have been expended.  The report does not include the 25,027.85 hours of time of thirteen law firms that were disallowed under the 2001 Auditor's Report but that we ultimately allowed in PTO 2622.  In total, 578,048.38 hours of eligible time have been expended.  Just to put this time into perspective, it is the equivalent of approximately 24,000 days, or almost 66 years, of around-the-clock work on this litigation.

The March, 2007 Auditor's Report is, however, an imperfect measure of the time the Joint Fee Applicants expended specifically on the Settlement Agreement because it includes time

---

66.  The details of how Mr. Winikur determines what time is eligible versus ineligible has already been discussed, <u>supra</u>, but in short comports with the requirements set forth in PTO Nos. 16, 467, 517, 1415, 1434, and 5400.

67. The first report, that is, the 2001 Auditor's Report, which informed our Interim Distribution, tabulated the time expended from inception of this litigation through June 30, 2001.  The second report accounted for time from July 1, 2001 through February 28, 2006.  The third report includes "new" professional time from March 1, 2006 through March 31, 2007, as well as the cumulative professional time from the first two reports.

expended on common benefit work in MDL 1203.  Nevertheless, it is beyond doubt that an extraordinary amount of time has been devoted to the Settlement Agreement and the litigation surrounding it.

### g.   AWARDS IN SIMILAR CASES

We next compare the award sought in this case to awards in other, similar cases.  Although the other Prudential/Gunter Factors can be quite abstract, this factor affords the court the opportunity to use as a guide the decisions of our fellow federal judges across the country.  While not binding, they are one of many factors to consider in our analysis.  See Cendant PRIDES, 243 F.3d at 736.  The Joint Petitioners have presented in table form the awards in nine super-mega-fund settlements, that is, settlements of one billion dollars or more.  We have recreated that table here in relevant part.

| Case | Fund Value | Percent Award | Hours | Duration |
|---|---|---|---|---|
| NASDAQ., 187 F.R.D. 465 (S.D.N.Y. 1998) | $1.07 billion | 14% | 129,629 | 4 years |
| Shaw v. Toshiba Am. Info. Sys., Inc., 91 F. Supp. 2d 942 (E.D. Tex. 2000) | $1 to $1.1 billion | 15% | not available | 1 year |
| Sulzer, 268 F. Supp. 2d 907 (N.D. Ohio 2003) | $1.045 billion | 4.8% | 50,987 | 2 years |
| DeLoach v. Philip Morris Cos., 2003 WL 23094907 (M.D.N.C. Dec. 19, 2003) | >$1 billion | 5.9% | not available | 3 years |
| Visa Check/Mastermoney, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) | $3.383 billion | 6.5% | not available | 7 years |
| In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319 (S.D.N.Y. 2005) | $6.133 billion | 5.5% | 277,862 | 3 years |
| In re AOL Time Warner, Inc. Sec. & ERISA Litig., 2006 WL 3057232 (S.D.N.Y. 2006) | $2.65 billion | 5.9% | 135,186 | 3 years |
| In re Royal Ahold N.V. Sec. & ERISA Litig., 461 F. Supp. 2d 383 (D. Md. 2006) | $1.1 billion | 12% | 147,896.05 | 3 years |
| In re Tyco Int'l, Ltd., 2007 WL 4462593 (D. N.H. Dec. 19, 2007) | $3.3 billion | 14.5% | 488,000 | 5 years |
| Average | $2.3 billion | 8.26% | 148,416 | 3.28 years |

The percentage awards range from 4.8% to 15%.  The wide range of awards illustrates that it is not a particular benchmark that should guide the courts when deciding on what percentage of recovery should be awarded in attorneys' fees.  Instead we must look at the totality of the circumstances to determine an appropriate award.  The lowest and highest percentages do serve as guideposts when making this determination, and we would be extremely skeptical of the requested award if the percentage was clearly an outlier.  In this case, however, we are not confronted with such a problem.  The Joint Petitioners have requested $479,680,727.63 or 6.32% of their $7.5 billion valuation of the Settlement Agreement, which includes as a component $2.3 billion for Downstream Opt-Out cases.  The requested award under our $6,437,211,516.00 Settlement Agreement valuation, which includes $1.15 billion for the Downstream Opt-Out cases is 7.45%.  Under this court's valuation, the 7.45% request is slightly below the average of 8.26% in the above super-mega-fund cases.

### h.    VALUE OF BENEFITS ACCRUING TO CLASS MEMBERS ATTRIBUTABLE TO THE EFFORTS OF CLASS COUNSEL AS OPPOSED TO THE EFFORTS OF OTHER GROUPS, SUCH AS GOVERNMENT AGENCIES CONDUCTING INVESTIGATIONS

In valuing the benefits available to Class Members we must deduct any benefits that were created by "the efforts of other groups, such as governmental agencies conducting investigations," as opposed to the Joint Fee Applicants.  AT&T, 455 F.3d at 165.  The Joint Fee Applicants should therefore not receive fees based upon efforts that are not their own.

-74-

"Allowing private counsel to receive fees based on the benefits created by public agencies would undermine the equitable principles which underlie the concept of the common fund, and would create an incentive for plaintiffs [sic] attorneys to 'minimize the costs of failure ... by free riding on the monitoring efforts of others.'" Prudential, 148 F.3d at 337 (quoting Coffee, Understanding the Plaintiff's Attorney, 86 Colum. L. Rev. 669, 681 (May 1986)).

In this case, the Joint Fee Applicants argue that there was no public agency effort on which they could free ride and that governmental efforts actually undermined their efforts because Wyeth raised the FDA's approval of Pondimim and Redux as a defense.  See PTO No. 2622 at 41.  They maintain that this is not a case, like an antitrust or securities litigation, where governmental agencies more often than not blaze a trail for private litigation.  See Prudential, 148 F.3d at 290-92.

We do agree that this case is quite different from the typical antitrust or securities litigation where government prosecutions frequently lay the groundwork for private litigation.  The Joint Fee Applicants are also correct that Wyeth attempted to use the FDA's approval of Pondimin and Redux as a defense.  The Joint Fee Applicants were aided, however, by the efforts of the Mayo Clinic in Rochester, Minnesota, which began observing a link between fenfluramine and/or dexfenfluramine and a particular kind of VHD.  See PTO No. 1415 at 8-9.  The Mayo Clinic's initial results were released to the public on July 8,

-75-

1997,[68] the same day that the FDA issued a public health advisory.  The FDA also sent letters to physicians across the country requesting information on patients who had ingested diet drugs and may have had the uncommon VHD observed by the Mayo Clinic.  As a result of the information the FDA compiled, the FDA requested that the diet drugs be removed from the market.  Three epidemiological studies published in the New England Journal of Medicine in September 1998 confirmed the causal relationship between valvular heart disease and the use of dexfenfluramine and fenfluramine.  See Hershel Jick, et al., "A Population Based Study of Appetite-Suppressant Drugs and the Risk of Cardiac-Valve Regurgitation," N. Eng. J. Med., 339(11):719-24 (Sept. 10, 1998); Mehmood A. Kahn, et al., "The Prevalence of Cardiac Valvular Insufficiency Assessed by Transthoracic Echocardiography in Obese Patients Treated with Appetite-Suppressant Drugs," N. Eng. J. Med., 339(11):713-18 (Sept. 10, 1998); Neil J. Weisman, et al., "An Assessment of Heart-Valve Abnormalities in Obese Patients Taking Dexfenfluramine, Sustained-Release Dexfenfluramine, or Placebo," N. Eng. J. Med., 339(11):725-32 (Sept. 10, 1998).  Yet these studies were but the first of many steps.  There was still a great deal of effort to be undertaken, including voluminous discovery spearheaded by the PMC Discovery Committee, to reach a point where settlement negotiations were viable.

---

68.  The Mayo Clinic's initial results were ultimately published in the New England Journal of Medicine.  Heidi M. Connolly, et al., "Valvular Heart Disease Associated with Fenfluramine-Phentermine," N. Eng. J. Med., 337(9):581-88 (Aug. 28, 1997).

We again note the efforts of the individual attorneys that represented the Downstream Opt-Out plaintiffs.  However, we have resolved this issue by reducing the Joint Petition evaluation of the Settlement Agreement by $1.15 billion.

In sum, we cannot underestimate the essential and significant role played by the Joint Fee Applicants in creating the value of this Settlement Agreement.  They did not rely on the Government or other public agencies to do their work for them as has occurred in some cases.

### i. PERCENTAGE FEE THAT WOULD HAVE BEEN NEGOTIATED HAD THE CASE BEEN SUBJECT TO A PRIVATE CONTINGENT FEE AGREEMENT AT THE TIME COUNSEL WAS RETAINED

In making a common benefit award, we must try to ascertain what the market would pay for the attorneys' efforts. That is, we must consider "the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained."  AT&T, 455 F.3d at 165.  While not an easy calculation, it is an important exercise because "the goal of the fee setting process [is] to 'determine what the lawyer would receive if he were selling his services in the market rather than being paid by Court Order.'" In re Linerboard Antitrust Litig. ("Linerboard II"), 333 F. Supp. 2d 343, 351 (E.D. Pa. 2004) (quoting In re Continental Ill. Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992)).

To calculate the value of the attorneys' services on the free market, the Joint Petitioners urge this court to look no further than the Major Filers Agreement filed as part of the

Compendium of Agreements leading up to the Joint Petition.  The
Major Filers:  (1) represent about 97% of the Class Members who
exercised Downstream Opt-Outs and filed lawsuits subject to the
MDL 1203 fee assessments; (2) filed 26,000 Level I and Level II
Matrix Benefit claims that became Category One Claims under the
Seventh Amendment; and (3) represent about half of the Class
Members who have had Matrix Benefits claims processed by the
Trust.  2007 Fishbein Aff. ¶ 45.  Under the agreement the Major
Filers stipulated that the requested award is "proper under
governing law, including consideration of all the factors
described in In re AT&T Corp. Securities Litig., 455 F.3d 160 (3d
Cir. 2006) and In re Rite Aid Corp. Securities Litig., 296 F.3d
294 (3d Cir. 2005)" and agreed to support the amount of fees
sought by the Joint Fee Applicants.  Compendium of Agreements,
Ex. K.  This agreement, according to the Joint Petitioners, is
the sort of ex post arms-length negotiation that has been cited
by our court in the past as support for granting a requested
award.  See Linerboard II, 33 F. Supp. 2d at 351.

        In Linerboard II, attorneys representing class members
who opted out of a MDL class action settlement reached agreement
with class counsel to pay $3 million for common benefit services.
Id. at 348.  The court stated that it relied on this stipulation
when evaluating the reasonableness of the requested fee.  Id. at
351.  Our colleague, Judge Jan E. DuBois also noted that the
stipulation avoided costly and time consuming further litigation
over the issue.  Id.

The Major Filers Agreement is noteworthy.  It is a barometer of the perceived value of the Joint Fee Applicants' services since the Major Filers were, in essence, the market for the Joint Fee Applicants' services.  The Major Filers were not only the Joint Fee Applicants' colleagues in this litigation but also beneficiaries of the Joint Fee Applicants' efforts.  The ultimate "market" for the Joint Fee Applicants' services was obviously comprised of the Class Members who were injured by the diet drugs and, as a result, were compensated by the Settlement Agreement.  It would be impossible, however, to gauge with accuracy the value of the Joint Fee Applicants' services relying on that market definition.  In this case, therefore, we believe the opinion of the Major Filers is an adequate substitute.

Moreover, the Major Filers do have an interest in lowering the final award since they stand to gain if all of the funds available for payment of fees and costs are not disbursed.  Specifically, any money not paid from the Fund B Attorneys' Fees Account is refunded, pro rata, to the Class Members' individual attorneys.  See Settlement Agreement § VIII.E.1.b.  Similarly, since the Common Benefit Percentage Amount, that is, the amount each Class Member must pay to the Supplemental Fund under the Seventh Amendment for common benefit fees, is paid by Category One Class Members' individual attorneys, those attorneys would pay a lesser assessment if the award from that account was less than what is requested.  Seventh Amendment § XV.T.1.

Not all of the Major Filers, however, are absolutely adverse to the Joint Fee Applicants in this regard.  Major Filer, Levin, Fishbein, Sedran and Berman stands to reap substantial fees under the terms of the PMC/MDL Attorneys Agreement.  Major Filers, Alexander & Associates, P.C., L.L.O., Baron & Budd, P.C., and Martinez, Barrera & Martinez, L.L.P., will likewise receive fees under the Seventh Amendment Liaison Committee Agreement. Hutton & Hutton Law Firm, L.L.C., will collect fees under the PMC/MDL Attorneys Agreement.  The other Major Filers, however, are not parties to any of the other agreements contained in the compendium of agreements or otherwise.  In response to a question the court asked at the November 15, 2007 fee hearing, we have been advised that no side deals have been reached.  At the hearing on November 15, 2007 we asked Mr. Fishbein:

> The Court:      ... I take it that all the
>                 agreements among counsel on
>                 both sides are part of the
>                 record here.
>
> Mr. Fishbein:   They are.
>
> The Court:      There are no side agreements
>                 of any kind?
>
> Mr. Fishbein:   There are no side agreements.

Hr'g Tr., Nov. 15, 2007 at 95.

We conclude that the agreement of the Major Filers to this Joint Fee Petition indicates that the present petition is not seeking attorneys' fees in excess of the market value for the Joint Fee Applicants' efforts.  If the Major Filers believed that

the Joint Fee Applicants were seeking an inordinate award, we do not believe that their consent would have been obtained.

### j.   INNOVATIVE TERMS OF THE SETTLEMENT

The Joint Petitioners maintain that negotiating and reaching a settlement was, in itself, an innovation.  We agree. At the time of the initial negotiations our Court of Appeals had rejected class certification in a case that sought to establish medical monitoring of the adverse health consequences from tobacco exposure.  See Barnes v. American Tobacco Co., 161 F.3d 127 (3d Cir. 1998), cert. denied, 526 U.S. 1114 (1999). Moreover, precedent from the Supreme Court and our Court of Appeals called into question the ease with which a mandatory settlement class would be certified in personal injury cases in the future.  See Oritz v. Fibreboard Corp., 527 U.S. 815 (1999)[69]; Georgine v. Amchem Prods., Inc., 83 F.3d 610 (3d Cir. 1996), aff'd, Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997).[70]  Faced with emerging decisions from the Supreme Court

---

69.  Oritz involved asbestos litigation.  A group of named plaintiffs filed suit in the Eastern District of Texas, seeking class certification for settlement purposes.  Oritz at 825.  The Supreme Court held:  "The record on which the District Court rested its certification of the class for the purpose of the global settlement did not support the essential premises of mandatory limited fund actions."  Id. at 848.  Specifically, the Supreme Court questioned the District Court's review of the numbers used by the parties to define the fund, the inclusiveness of the class and the equity among class members, and the fact that the fund was smaller than the assets available from the defendant to pay class members' claims.  Id. at 848-61.

70.  Amchem too was an asbestos litigation.  In affirming our
(continued...)

and our Court of Appeals challenging certification for settlement
in cases such as this one, the Joint Fee Applicants were
nevertheless successful in structuring the Settlement Agreement
to deal with the concerns raised while at the same time providing
extensive relief to Class Members.

We agree with the Joint Petitioners that the Settlement
Agreement was a feat in itself.  As outlined in detail in PTO No.
1415, which certified and approved the Settlement Agreement,
Class Counsel was able to bring together multiple subclasses
within the umbrella of "Class Members" and to secure benefits for
those various groups for the injuries they had suffered and could
suffer in the future.  Our Court of Appeals has likewise noted
the pioneering efforts of Class Counsel in crafting the
Settlement Agreement.  It has observed:  "The settlement approved
and supervised by the District Court in this case is a landmark
effort to reconcile the rights of millions of individual
plaintiffs with the efficiencies and fairness of a class-based
settlement."  Diet Drugs, 369 F.3d 293, 317 (3d Cir. 2004).
Moreover, Judge Ambro, in his opinion concurring with the
majority's dismissal of the appeal of the Interim Distribution,

_____

70.(...continued)
Court of Appeals' decision, the Supreme Court approved of a
somewhat rigorous "predominance" test under Rule 23(b)(3) of the
Federal Rules of Civil Procedure and rejected the notion that
named parties "will fairly and adequately protect the interests
of the class" as required under Rule 23(a)(4) where the divergent
medical conditions of the class members create discrete
subclasses.  521 U.S. at 622-29 (quoting Fed. R. Civ. P.
23(a)(4)).

stated:  "Not only is the Nationwide Class Action Settlement Agreement (the "Settlement Agreement") of record-setting scale and scope, but it also contains numerous innovative features that have potential significance for future class actions."  Diet Drugs, 401 F.3d at 162.  The original Settlement Agreement did require a number of amendments to meet subsequent exigencies. Nonetheless, it did thread the needle of emerging precedent and secured benefits that we concluded were more than fair for the Class Members.[71]

The Joint Fee Applicants point to a number of innovative features within the Settlement Agreement, namely:  (1) Accelerated Implementation Option[72]; (2) multiple Downstream Opt-Out rights[73]; (3) the Class Notice[74];  (4) legal techniques to address release and bar of contribution and indemnity claims by non-settling joint tortfeasors, Medicare reimbursement claims, and subrogation claims[75]; (5) medical diagnostic services[76]; and

---

71.  See Richard A. Nagareda, "Autonomy, Peace, and Put Options in the Mass Tort Class Action," 115 Harv. L. Rev. 747, 756 (2002).

72.  See Settlement Agreement § V.

73.  See Settlement Agreement § IV.D.

74.  See Settlement Agreement § VIII.C.

75.  See Settlement Agreement §§ VII.C., VII.D.

76.  See Settlement Agreement §§ IV.A.1., IV.A.2.

(6) the medical research program.[77]  Moreover, the Joint Fee Applicants cite to multiple cases that they believe have modeled their settlement agreements, at least in part, on the fen-phen Settlement Agreement.  See In re Orthopedic Bone Screw Prods. Liab. Litig., 246 F.3d 315, 327 n.11 (3d Cir. 2001); In re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig., 2002 WL 31472781 at *17, *30-31 (N.D. Ohio June 19, 2002); In re Phenylpropanolamine (PPA) Prods. Liab Litig., 227 F.R.D. 553, 558 & 568 (W.D. Wash. 2004).

It is impossible to know how many features of the Settlement Agreement will be used in similar cases in the future. However, we cannot deny that the Settlement Agreement provisions cited by the Joint Fee Applicants were indeed innovative at the time they were drafted and have already served as models for other cases.  We also note one more "innovation" that was not cited by the Joint Fee Applicants but that we consider significant.  The Seventh Amendment to the Settlement Agreement which, as we have discussed previously, essentially saved the settlement and safeguarded benefits for deserving Class Members was ground-breaking.  Faced with such substantial uncertainty, the Joint Fee Applicants were able to negotiate with Wyeth to create the Supplemental Fund.  Without such innovation it is difficult to imagine where this litigation would be today.

---

77.  See Settlement Agreement § IV.A.3.

### 4. <u>REASONABLE PERCENTAGE AWARD</u>

This has been a long, hard fought, and extremely complex class action settlement and related litigation. The Joint Fee Applicants have faced many novel challenges which have been handled with extraordinary skill. While this ten year process, like life itself, has not been without its problems, the paramount focus here, as it has been throughout this litigation, is the benefits that have been conferred upon the Class Members. There is no doubt that the Class Members have been served well by the counsel who were designated to represent them. Although the original Settlement Agreement was placed in peril by the second wave of litigation, the Settlement Agreement was saved and arguably improved through the Seventh Amendment. The diet drugs inflicted a great deal of hardship, injury, and pain on tens of thousands of individuals who ingested them, but through counsel's hard work substantial relief has been given to those who have suffered. A wide variety of benefits was created in the Settlement Agreement, and the total value of those benefits so far as we know has exceeded any Class Action settlement.

Given the foregoing discussion of the Prudential/Gunter Factors, we conclude that a 6.75% award from the funds available for the payment of common benefit fees for the Settlement Agreement valued at $6.4 billion is fair and appropriate. It represents a higher percentage award than for any previous class action settlement worth in excess of $1.1 billion. Accordingly, the total award of attorneys' fees as a result of the Settlement

Agreement will be $434,511,777.33.  Since there has already been an interim distribution of $76,861,456.00, we will now award an additional $357,650,321.33.

**D.   LODESTAR CROSS-CHECK**

We must perform the lodestar cross-check to gauge whether the percentage of recovery award creates a windfall for the Joint Fee Applicants.  That is, if the award under the percentage of recovery analysis compensates the Joint Fee Applicants well in excess of the time they actually spent on this litigation, the lodestar cross-check may counsel this court to reduce the award.

The lodestar cross-check is performed by multiplying the hours reasonably expended on the matter by the reasonable hourly billing rate which then provides the court with the "lodestar calculation."  The court then must divide the proposed fee award under the percentage of recovery method by the lodestar calculation.  AT&T, 455 F.3d at 164.  The resulting number is called the "lodestar multiplier."  The lodestar multiplier does not need to fall within a specific range, but a comparison to the lodestar multipliers in similar cases may provide additional guidance to the court.  Rite Aid, 396 F.3d at 307.  Nevertheless, "the lodestar cross-check does not trump the primary reliance on the percentage of common fund method."  Id. at 307.

We need not review the actual billing records of the attorneys but may instead rely on summaries in determining the number of hours reasonably worked.  Id. at 306-07.  Because the

-86-

lodestar cross-check is not a full lodestar inquiry, this less detailed review of the billing records is acceptable.  Id. at 306 n.16.  We must also decide upon a reasonable hourly billing rate which takes into consideration "the given geographical area, the nature of the services provided, and the experience of the attorneys."  Id. at 305.  The hourly billing rate must be a blended rate, that is, the rate should "approximate the fee structure of all the attorneys who worked on the matter," not just the fees of the most experienced attorneys.  Id. at 306 (emphasis added).

According to the March, 2007 Auditor's Report, since the inception of this litigation 553,020.53 hours of eligible time[78] have been performed.  Using a historical billing rate, the lodestar calculation of that time is $156,849,257.24.  This does not include time expended by thirteen law firms that was disallowed in the 2001 Auditor's Report but that we deemed eligible in the Interim Distribution.  Those thirteen law firms performed 25,027.85 hours of eligible time with a lodestar value of $9,986,082.  Therefore, 553,020.53 hours in eligible time, with a lodestar calculation of $166,835,339.24 have been expended on this litigation.  The lodestar multiplier in this case is therefore 2.6.

The following table lists the lodestar multiplier in other super-mega-fund settlements:

---

78.  Eligible time is defined in PTO Nos. 16, 467, 517, 1415, 1434, and 5400.

| Case | Fund Value | Percentage Award | Lodestar Multiplier |
|------|-----------|------------------|---------------------|
| NASDAQ, 187 F.R.D. 465 (S.D.N.Y. 1998) | $1.07 billion | 14% | 3.97 |
| Shaw, 91 F. Supp. 2d 942 (E.D. Tex. 2000) | $1 to $1.1 billion | 15% | not available |
| Sulzer, 268 F. Supp. 2d 907 (N.D. Ohio 2003) | $1.045 billion | 4.8% | 2.4 |
| DeLoach, 2003 WL 23094907 (M.D.N.C. Dec. 19, 2003) | >$1 billion | 5.9% | 4.45 |
| Visa Check/Mastermoney, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) | $3.383 billion | 6.5% | 3.5 |
| WorldCom, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) | $6.133 billion | 5.5% | 4 |
| AOL Time Warner, 2006 WL 3057232 (S.D.N.Y. 2006) | $2.65 billion | 5.9% | 3.69 |
| Royal Ahold, 461 F. Supp. 2d 383 (D. Md. 2006) | $1.1 billion | 12% | 2.57 |
| Tyco, 2007 WL 4462593 (D. N.H. Dec. 19, 2007) | $3.3 billion | 14.5% | 2.697 |
| Average | $2.3 billion | 8.26% | 3.41 |

The lodestar cross-check does not take the place of the percentage of recovery analysis.  See Rite Aid, 396 F.3d at 307. Therefore, the lodestar multipliers in similar cases do not provide a benchmark for the present case but do allow us to draw comparisons.  The lodestar multiplier here is less than the average in the other super-mega-fund cases.  As a result, we can safely conclude that the Joint Fee Applicants will not be receiving a windfall for their services in furtherance of the

Settlement Agreement, and we need not consider reducing the award under the percentage of recovery analysis.

Nor do we believe that the 2.6 lodestar multiplier counsels us to increase the award under the percentage of recovery analysis.  This lodestar multiplier is artificially low.  As we have stated before, the time in the March, 2007 Auditor's Report includes common benefit time expended on the MDL.  Therefore, if we were able to separate out that time from the 2007 Auditor's Report, a task that would be at the very least extremely difficult and expensive, the lodestar multiplier would be higher.

The imprecise nature of the lodestar multiplier in this case does not, however, concern this court.  The purpose of the lodestar cross-check in common fund cases is to "ensure that the proposed fee award does not result in counsel being paid a rate vastly in excess of what any lawyer could reasonably charge per hour ...." Cendant Corp., 264 F.3d at 285.  Our calculation has provided us with such an assurance.  If we were able to separate the time expended toward the Settlement Agreement from the time expended toward the MDL, we do not believe that it would be so high as to require a reduction in the percentage award.  For the lodestar multiplier to reach 4.5, which would be beyond the outer limits of multipliers in the other super-mega fund cases, only $96,335,906 of the $166,835,339.24 total time expended on this litigation would have been performed in furtherance of the Settlement Agreement.  Having observed first had the extremely

complicated nature of this Settlement Agreement and the related litigation, we cannot imagine that to be the case.  We therefore conclude that a 6.75% award of the total Settlement Agreement value for attorneys' fees remains appropriate.

## E.  ALLOCATION OF AWARD AMONG SETTLEMENT FUNDS AND SUPPLEMENTAL FUND

We next must determine from what funds the 6.5% award should be paid.  We conclude the full remaining principal in the Fund A Escrow Account should be awarded as attorneys' fees.  That Fund was established "to pay compensation to Plaintiffs' Counsel ... [and] make incentive awards to the Class Representatives." Settlement Agreement § III.B.3.  The initial deposit in the Fund A Escrow Account was $200,000,000.  We made an interim distribution of $38,430,728 from that Account and will now allot an additional $161,569,272, making a total award of $200,000,000. This award does not, however, fully exhaust the money available in the Fund A Escrow Account.  The $4,218,244.09 in attorneys' costs that have been previously paid from this account but that we have now determined should be refunded will remain as well as the estimated $19,750,000 in interest that accrued on the account as of December 31, 2007.  This remaining money will be part of a Reserve Fund for use in connection with future work under the Settlement Agreement, after the payment of incentive awards to Class Representatives.

An award of the full $200,000,000 principal comports with the recommendation of the State Court Judicial Advisory

Committee.  In PTO No. 5402 (July 1, 2005) we requested that the Committee convene.  After the meeting The Honorable Frederick E. Edwards wrote to this court stating:

> We ... understand ... that the opportunities for paying fees to the state court lawyers from sources other than Fund A are limited by agreements reached with MDL counsel at the beginning of this litigation .... It is for that reason that we urge distribution of the full [\$200] million[79] in fees potentially available to the state court lawyers from Fund A.  In light of their obligation to look primarily to that fund for compensation—even for work performed in connection with the broader national litigation—we fear that a smaller distribution will deprive deserving state court lawyers of full and fair compensation.

Letter from The Honorable Frederick E. Edwards to The Honorable Harvey Bartle III (Nov. 2, 2005).

Unlike the two other fee sources under the Settlement Agreement, any money from the Fund A Escrow Account that is not awarded to the Joint Fee Applicants will, under the terms of the Settlement Agreement, revert to Wyeth.  As a result, it is proper to award the maximum amount of the total award from the Fund A Escrow Account.

We further conclude that \$163,064,138.60 should be distributed from the Fund B Attorneys' Fees Account.  Since we have already made an interim distribution of \$38,430,728.00 from that account, we will now allot an additional \$124,633,410.60.

---

79.  The letter from Judge Edwards actually reads "the full \$100 million in fees."  However, we believe this was a typographical error, and he intended to say "the full \$200 million in fees."

This sum represents 6.39% of the Fund B value, that is, $2.55 billion.  The Joint Petitioners have requested that approximately $4 million remaining in the account be set aside for the Reserve Fund.  Since approximately $20 million from the Fund A Escrow Account has been set aside for a Reserve Fund, it is not necessary to retain any additional money from the Fund B Attorneys' Fees Account for future awards.  Any money remaining in the Fund B Attorneys' Fees Account will therefore be distributed as a partial refund of amounts previously deposited into the Fund B Attorneys' Fees Account to Class Members or counsel for Class Members as required under the Settlement Agreement.  See Settlement Agreement § VIII.E.1.c.

The Common Benefit Percentage to be assessed for attorneys' fees from the Category One payments under the Supplemental Fund will be 6.4%, approximately the same percentage as used in connection with the distribution from the Fund B Attorneys' Fees Account.  We see no reason for any significant difference in this regard.  The Individual Payment Amounts to be distributed from the Supplemental Fund are $1,116,369,345.30.  Therefore a 6.4% assessment amounts to $71,447,638.10.  This brings the total award of attorneys' fees to $434,511,777.33.

## F.    RESERVE FUND

The Joint Petitioners request that a Reserve Fund be created to compensate class-related work performed after March 31, 2007.  They propose a Reserve Fund consisting of the interest earned on the principal amounts deposited in the Fund A

Escrow Account, the Fund B Attorneys' Fees Account, and some residual money from the MDL 1203 Fee and Cost Account.[80]  As stated above, what remains in the Fund A Escrow Account will be held as a Reserve Fund.  We find it unnecessary to hold back any money from the Fund B Attorneys' Fees Account.

There has been common benefit work performed in connection with the Settlement Agreement since March 31, 2007 and inevitably there will be more in the future.  The Joint Petitioners have proposed a sound plan to deal with yet to come fee requests.  The plan requires monthly submissions of time by applicants.  Mr. Winikur would then perform a periodic audit of the submissions in accordance with the PTO Nos. 16, 467, 517, 1415, 1434, and 5400.  An annual report summarizing Mr. Winikur's audit results with an accompanying joint petition for attorneys' fees would then be filed with this court for consideration.

We believe this procedure will minimize any future conflict over the Reserve Fund.  Accordingly, we will order the implementation of this procedure for future distributions of attorneys' fees.

## G.   **MOTIONS FOR INCENTIVE AWARDS**

There are two pending motions for incentive awards from the Fund A Escrow Account.  The Joint Petition requests a $10,000 incentive award for each of the representative plaintiffs in Jeffers v. Am. Home Prods. Corp., No. 98-20626 (E.D. Pa.) and

---

80.  We will discuss below what if any money from the MDL 1203 Fee and Cost Account should be deposited into the Reserve Fund.

<u>Brown v. Am. Home Prods. Corp.</u>, C.A. No. 99-20593 (E.D. Pa.).  A
renewed petition for incentive awards has also been filed on
behalf of four lead plaintiffs in three class actions.  Carol
Bloom and Jerrie Rawls, the named plaintiffs in <u>Bloom v. Am. Home
Prods. Corp.</u>, No. 98-20047 (E.D. Pa.), each request a $10,000
incentive award.  Jean Staten, the named plaintiff in <u>Staten v.
Am. Home Prods. Corp.</u>, No. 98-20460 (E.D. Pa.), and Jean Nourse,
the named plaintiff in <u>Nourse v. Am. Home Prods. Corp.</u>, No. 98-
20377 (E.D. Pa.), each request a $5,000 incentive award.

> The Settlement Agreement provides:

> [T]he funds in the Fund A Escrow Account may
> be used to make incentive awards to the Class
> Representatives in the following State and
> Federal Court class actions involving
> Pondimin® and Redux™:  United States District
> Court for the Eastern District of
> Pennsylvania, <u>Brown v. American Home Products
> Corp.</u>, C.A. No. 99-20593; <u>Jeffers v. American
> Home Products Corp.</u>, C.A. No. 98-CV-20626
> (E.D. Pa.) (In re Diet Drug Products
> Liability Litigation, MDL 1203); New Jersey
> (<u>Vadino et al. v. AHP</u>, Docket No. MID-L-425-
> 98)l New York (<u>New York Diet Drug Litigation</u>,
> Index No. 700000/98); Pennsylvania
> (<u>Pennsylvania Diet Drug Litigation</u>, Master
> Docket No. 9709-3162 C.C.P. Phila.);
> Washington (<u>St. John v. AHP</u>, 97-2-06368-4);
> Illinois (<u>Rhyne v. American Home Products</u>, 98
> CH 4099); and Texas (<u>Earthman v. AHP</u>, No. 97-
> 10-03970 CV, Dist. Ct. Montgomery Co. Texas).

Settlement Agreement § III.B.3.  It further states that "the
Court ... may award Class Action Representative Incentive Fees to
the certified State and Federal Court Class Representatives in
accordance with applicable principles of law ...."  <u>Id.</u> at
§ VIII.E.1.

The Settlement Agreement clearly contemplates that such an award may be made to the representative plaintiffs in Jeffers and Brown.  In PTO No. 865 (Aug. 26, 1999), Jeffers was certified as a nationwide medical monitoring class action.  Brown was certified as a class action for purposes of the Settlement Agreement.  Both the Jeffers and Brown class actions played vital roles in this litigation.  The Joint Petitioners cite a number of cases awarding incentive fees to representative plaintiffs ranging from $2,000 to $25,000.  Compare Tenuto v. Transworld Systems, Inc., No. 99-4228, 2002 WL 188569, at *5 (E.D. Pa. Jan. 31, 2002) with In re Linerboard Antitrust Litig., No. MDL 1261, 2004 WL 1221350, at *19 (E.D. Pa. June 2, 2004).  Here the Joint Petitioners have requested $10,000 for each of the following plaintiffs:  Barbara Jeffers, Johnna Day, Brenda Chambers, Donna Jarrell, Vivian Naugle, Quinton Layer, Joan S. Layer, Isabel Connor, Lynn Vadino, Karol DeBerardinis, Deneen Giantonnio, William Earthman, Hilda Hawkins, Gwen Jefferson, Carol Maclaskey, Tammye Markle, Betty McCrary, Cynthia Poole, Valerie Stewart, Karen Rhyne, Martin Applebaum, Michael Ciocco, Venessa Braddock, Fred St. John, Kathy Azzinnaro, Dave Paschall, Renee Anderson, Mary Ann Hubner, Debbie Duncan, Maureen Harris, Christine Gazzillo, Dennis McBride, Marjorie Green, Eddie Flanagan, Ken Morgan, and Christine Lessard.  We believe such awards are appropriate, and we will order the Trust to pay $10,000 to each of the aforementioned representative plaintiffs from the Fund A Escrow Account.

The named plaintiffs in <u>Bloom</u>, <u>Staten</u>, and <u>Nourse</u> maintain that their efforts aided in the creation of prescription refund benefits in Fund A of the Settlement Agreement, with an estimated value of $239,954,447.  Renewed Incentive Award Br. 5. According to plaintiffs Bloom, Rawls, Staten and Nourse, a modest incentive award of $30,000 from the Fund A Escrow Account is therefore appropriate.  Bloom, Rawls, Nourse and Staten were not included among the plaintiffs listed in section III.B.3, nor were their cases certified as state or federal class actions.  Under the terms of the Settlement Agreement they are therefore not entitled to incentive awards.

Nevertheless, these individuals contend that this court should modify the Settlement Agreement and make an incentive award to them.  We are not persuaded.  The Supreme Court has stated:  "Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but ... does not authorize the court to require the parties to accept a settlement to which they have not agreed." <u>Evans v. Jeff D.</u>, 475 U.S. 717, 726 (1986).  When passing upon a proposed settlement agreement of a class action this court either has to accept the settlement agreement or reject it.  We have no power to modify any terms and force acceptance on the parties to the agreement.  <u>See, e.g.</u>, <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1026 (9th Cir. 1998). Thus, just as we could not modify the Settlement Agreement when considering whether or not to approve it, we cannot modify it now when making an award of attorneys' fees.  Accordingly, we will

-96-

deny the renewed motion of plaintiffs, Bloom, Rawls, Nourse and
Staten, for incentive awards.

### IV. AWARD OF ATTORNEYS' FEES
### FROM MDL 1203 FEE AND COST ACCOUNT

We must also resolve the issue of attorneys' fees from
the MDL 1203 Fee and Cost Account.  Any award from this Account
is to compensate the Plaintiffs Management Committee ("PMC") and
the other authorized common benefit attorneys for their efforts
to coordinate MDL 1203, to perform numerous administrative tasks
that would have otherwise fallen on this court, and to conduct
generic discovery.

PTO No. 467 established an assessment on every federal
and coordinated state case in the MDL to create a fund from which
the common benefit attorneys could recover attorneys' fees and
costs.  The assessment for federal cases was originally set at 9%
whereas the assessment for coordinated state cases was 6%.  In
the Interim Distribution, we awarded $76,861,455[81] in fees to the
joint petitioners.  We also reduced the federal assessment at
that time to 6% and the state assessment to 4%.  Accordingly,
one-third of the prior assessments was refunded to the individual
attorneys or to the plaintiffs if pro se.

After the award of fees and costs from the MDL 1203 Fee
and Cost Account and the one-third refunds, approximately

---

81.  In PTO No. 2622 we awarded $80,000,000 from the MDL 1203 Fee
and Cost Account for attorneys' fees.  We reduced that amount to
$76,861,455 in PTO No. 2859 after determining that $3,138,545 of
the original award was compensation for work performed after the
applicable deadline.  PTO No. 2859 at 22-23.

$5,600,000[82] remained for any future award of fees.  Since that time, assessments have continued to be levied on the federal cases in the MDL and coordinated state cases at the 6% and 4% levels, respectively.  The amount in the MDL 1203 Fee and Cost Account has swelled to $111,284,194.31 as of December 31, 2007 and will grow to $120,520,553.94 when $9,236,359.63 is transferred from the Settlement Fund to the MDL 1203 Fee and Cost Account to reimburse it for previous disbursements for attorneys' costs.  We have already determined that $771,450.50 of the outstanding attorneys' costs will be paid from the MDL 1203 Fee and Cost Account.  Thus, the total sum available for attorneys' fees will be $119,749,103.44.

The Joint Petitioners' now seek $56,300,000 in attorneys' fees from the MDL 1203 Fee and Cost Account in addition to the Interim Distribution of $76,861,455 for a total award of $133,161,455.  The Joint Petitioners have proposed the following arrangement for payment of this award:

- $37 million of the $56.3 million requested award is equal to the 6% federal assessment and 4% coordinated state assessment from Initial Opt-Out and PPH cases.  No refund would be made to the lawyers or litigants who paid the assessments in the Initial Opt-Out and PPH cases.

- $19.3 million of the $56.3 million requested award is drawn from the 6%

_____

82.  In PTO No. 2622 we stated that the amount reserved in the MDL 1203 Fee and Cost Account would be $2,500,000.  With our later decision in PTO No. 2859, however, that amount grew to $5,638,545.

federal assessment paid by the lawyers
or litigants in the Downstream Opt-Out
cases.

- $3,546,900 would be drawn from the 6%
  federal assessment paid by the lawyers
  or litigants in the Downstream Opt-Out
  cases to pay common benefit expense
  reimbursements.  The $3,546,900 is equal
  to $100 per case.

- The balance of the 6% federal
  assessments paid in the Downstream Opt-
  Out cases would be refunded to the
  lawyers or litigants that paid them with
  interest.

- The entire 4% coordinated state
  assessment paid by the lawyers or
  litigants in the Downstream Opt-Out
  cases would be refunded with interest.

- Any amount remaining in the MDL 1203 Fee
  and Cost Account would be added to the
  Reserve Fund for payment of future fees
  or costs.

Joint Petrs.' Br. 159-60.

The Joint Petitioners treat the Initial Opt-Out and PPH
cases differently from the Downstream Opt-Out cases for purposes
of requesting attorneys' fees from the MDL 1203 Fee and Costs
Account.  They seek payment of the full 6% and 4% assessments
from the former while urging the court to refund the assessments
from the federal Downstream Opt-Out cases in excess of $24.8
million and all of the assessments from the coordinated state
Downstream Opt-Out cases.[83]  The Joint Petitioners agreed to the

---

83.  The Joint Petitioners request that $19,300,000 from the
assessments paid in the federal Downstream Opt-Out cases
nevertheless be awarded in fees, as well as $3,546,900, or $100
per federal Downstream Opt-Out case, for costs.  The federal
                                              (continued...)

refunds on the ground that they have included the value of the Downstream Opt-Out cases in the Class Action Settlement Agreement.  Under their analysis, any attorneys' fees paid to the Joint Fee Applicants should be awarded from the Settlement Agreement attorneys' fees funds.  Thus, they should not recover more fees from the MDL Fee and Cost Account for otherwise it would be double counting.

We have included only $1.15 billion of the $2.3 billion value of the Downstream Opt-Out cases as part of the value of the Settlement Agreement for purposes of awarding attorneys' fees. Nonetheless, the Joint Petitioners have agreed that $56,300,000 in attorneys' fees in addition to the $76,861,455 already paid in the Interim Distribution would be fair compensation for their work in connection with MDL 1203.  We must thus determine whether this additional request should be honored.

## A.   <u>LEGAL ANALYSIS</u>

The applicable legal analysis for an award of attorneys' fees from the MDL 1203 Fee and Cost Account is not as well settled as it is in common fund cases.  In PTO No. 2622 we stated:

---

83.(...continued)
assessments have been one-third higher than the coordinated state assessments because of the additional management services that at the PMC provided the federal MDL cases.  <u>See</u> PTO No. 2622 at 37. The Joint Petitioners maintain that we should therefore award one-third of the federal Downstream Opt-Out assessments to compensate for the "litigation management services on the part of the PMC, independent of the services involved in creating the claim recoveries in those cases."  Joint Petrs.' Br. 171.

> While no specific rules exist in determining how MDL assessments should be awarded, the court's decision must be fair and reasonable. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).  The Gunter factors discussed earlier do not strictly apply to the MDL because we are not dealing with a class settlement fund. Nonetheless, the court believes that the reasoning and analysis that led to their establishment when the percentage of recovery method gained favor in the Third Circuit applies equally well here due to the size of the MDL fund created and the extent of the benefits conferred.  See In re Cendant Corp. Litig., 264 F.3d 201, 255-56 (3d Cir. 2001); In re Orthopedic Bone Screw Prods. Liab. Litig., 2000 WL 1622741, at *4-5 (E.D. Pa. Oct. 23, 2000).  We will thus consider the following modified version of Gunter factors when determining what is reasonable and fair: the benefits conferred by the PMC, including the risks faced at the inception of the litigation and the skill of the attorneys involved; the size of the fund created; and assessments in similar cases.

PTO No. 2622 at 37-38.

There has been no intervening court decision brought to our attention that has called into question the analysis we employed in the Interim Distribution.

**B.   MODIFIED PRUDENTIAL/GUNTER FACTORS**

Accordingly, we shall use a modified version of the Prudential/Gunter Factors as described in the Interim Distribution to guide us in determining the proper award.

**1.   BENEFITS CONFERRED**

There is no doubt that the PMC and the authorized common benefit attorneys conferred significant benefits on the individuals in the MDL.  In the Interim Distribution we discussed at length the work done by the PMC, which included:

- Opening and operating an office in Philadelphia to track the status of each MDL case, distributing this court's Orders to individual litigants, and explaining applicable practices and procedures to attorneys representing litigants in the MDL.[84]

- Negotiating and drafting agreements and pretrial orders that govern discovery.

- Creating a document depository in its Philadelphia office for use by attorneys and transferor courts in the MDL.

PTO No. 2622 at 38-40.

Upon its creation, the PMC Discovery Committee took on the immense task of conducting generic discovery.  To that end, the PMC Discovery Committee:

- Drafted a comprehensive set of interrogatories and document requests.

- Culled 5,000 documents from more than 9 million pages of documents for deposition preparations.

- Completed nearly 100 depositions of general fact witnesses.

- Created a Generic Expert Witness Committee to:  (1) review scientific literature on VHD and PPH; (2) retain experts to present generic expert testimony on issues of liability, standard of care, causation of injury, and medical monitoring; and (3) analyze reports of the 31 defense experts.[85]

Id. at 40-41.

---

84.  The PMC office remains open to this day.  It is currently staffed by two attorneys, seven legal assistants, and one clerical employee.

85.  The Generic Expert Witness Committee ultimately deposed seventeen defense experts.

Since the Interim Distribution, the work of the PMC and the other authorized common benefit attorneys. As the focus of the MDL cases has shifted to case-specific discovery, the PMC has helped to draft a revised fact sheet for plaintiffs to complete in lieu of answering interrogatories and document production requests, to develop medical authorizations to be signed by plaintiffs, and to set limitations on discovery. The PMC has also continued to play a significant role in the administration of the MDL, including tracking the individual cases, answering attorneys' and litigants' questions, and distributing this court's Orders as necessary.

### 2.   RISKS AT THE INCEPTION OF MDL 1203

In our analysis of the application of the Prudential/Gunter Factors to the Settlement Agreement, we discussed at length the risks at the inception of this litigation. Those risks apply equally to the work of the PMC and the authorized common benefit attorneys. We need not repeat them here. See also PTO No. 2622 at 41.

### 3.   SKILL OF THE ATTORNEYS

We previously concluded in the Interim Distribution that the Joint Fee Applicants "performed their duties with admirable skill, diligence, and efficiency." PTO No. 2622 at 42. Since that time, they have continued to exhibit such skill, diligence, and efficiency while shepherding claims through the MDL and coordinating discovery.

-103-

### 4.   SIZE OF THE FUND CREATED

"Size of the fund created" is somewhat of a misnomer. No fund was created by the Joint Fee Applicants' MDL work. Individual litigants in the MDL have, however, received considerable payments from Wyeth.  A substantial amount of money has been paid to the Initial Opt-Out and PPH cases.  The individual litigants in the Downstream Opt-Outs have received approximately $2.3 billion, $1.15 billion of which we have determined should be valued under the Settlement Agreement for purposes of setting an attorneys' fee award.  The payments to the 60,000 to 70,000 Downstream Opt-Outs have largely been the result of the Global Settlement Process that Wyeth undertook to resolve those cases.  This court had no involvement in the Global Settlement Process, and it was wholly independent from the Class Action Settlement.  The Joint Fee Applicants certainly cannot claim sole credit for every dollar paid to each individual who opted to pursue a lawsuit in the federal or state tort system. The individual attorneys representing the plaintiffs in those actions played a significant part in obtaining relief for their clients.  The Joint Fee Applicants' efforts did, however, substantially aid the attorneys who took on those cases by providing valuable generic discovery and, in the case of the federal Downstream Opt-Out cases, management services.

### 5.   ASSESSMENTS IN SIMILAR CASES

The assessments in MDL cases across the country are substantially similar to the assessments we have imposed here.

The Joint Petitioners have cited assessments in a number of cases, including:  (1) 6% assessment both for federal and state cases in MDL 1396, In re St. Jude Med., Inc., No. MDL 1396, 2002 WL 1774232, *2 (D. Minn. Aug. 1, 2002); (2) 9% assessment for federal cases and 6% assessment for state cases in MDL 1387, In re Protegen Sling and Vesica System Prods. Liab. Litig., No. MDL 1387, 2002 WL 31834446, *1 & *3 (D. Md. Apr. 12, 2003); and (3) 3% or 6% assessment in federal and state cases depending on the date the case was filed or the date of the coordination agreement, In re Vioxx Prods. Liab. Litig., No. MDL 1657, Slip. Op. at 2-5 (E.D. La. Aug. 4, 2005).  The current assessments in this case, 6% in federal cases and 4% in state cases, are therefore well within the normal range for MDL's.

### 6.  **OBJECTIONS**

Only two objections to the Joint Fee Petition have been filed — the Freedland and Valori Objection[86] and the Riepen Objection.[87]  Although both object to the overall award, the

---

86.  The Freedland and Valori objectors filed a supplemental paper after the November 15, 2007 hearing on the Joint Petition listing their clients who have standing to object to the petition (Doc. # 3430).  Class Counsel filed a response questioning their clients' standing to object (Doc. #3440) and Freedland and Valori replied (Doc. #3477).  We do not believe it is necessary to address the inevitably complicated question of standing at length.  This court has an independent duty to review petitions for attorneys' fees.  Regardless of whether the Freedland and Valori objectors have standing, we will consider their arguments as part of our role in making an independent determination of counsel fees and costs.

87.  Class Counsel has also questioned whether or not Attorney
(continued...)

objections are primarily concerned with the assessments in the MDL cases and the requested fee award from the MDL 1203 Fee and Cost Account.

The Freedland and Valori Objection makes two primary arguments.[88]  First, they argue that under the Joint Petitioners' proposal the burden to pay the assessments does not correspond to the benefits conferred.  The Freedland and Valori objectors also maintain that the proposed allocated burden, that is, a 7% assessment on Fund B Benefits under the Settlement Agreement and Category One Benefits under the Supplemental Fund, and the current assessments of 6% for federal MDL cases and 4% for coordinated state MDL cases, is "overly simplistic."  They contend that "Class [Members] received the benefit of having their entire claim resolved," while MDL claimants "only received the benefit of work product and discovery and were left to prove their entire case."  Freedland and Valori Objection 8.

This argument is without merit based on our review of the relevant Prudential/Gunter Factors and the necessity to

_____

87.(...continued)
Riepen has standing to object.  For the same reasons that we decline to determine whether the Freedland and Valori objectors have standing, it is unnecessary to rule whether Attorney Riepen has standing.

88.  Attorney Stephen A. Sheller, Esq. filed a limited reply to the Freedland and Valori Objection stating that he is neither a principal nor partner in either firm and does not in any way approve of the objection (Doc. #3369).  Moreover, Attorney Sheller states that he signed the Free States Agreement which is included in the Compendium of Agreements.  Plaintiffs' Liaison Counsel also filed a reply to the Freedland and Valori Objection (Doc. #3374).

consider separately any awards under the Class Action Settlement and any award from the MDL 1203 Fee and Cost Account.  The Class Action Settlement and the MDL play significantly different roles and cannot really be compared.  Moreover, even if we grant the extra award of $56.3 million requested by the Joint Petitioners from the MDL 1203 Fee and Cost Account, more than half of the money in that Account will still be available to provide for significant refunds.

The Riepen Objection makes two arguments:  (1) attorney Brian Riepen should not be required to pay any assessment for his federal cases because he did not use any of the MDL work product that was generated by the PMC; and (2) the $160 million paid to the PMC in the Interim Distribution was excessive.[89]

---

89. Since the November 15, 2007 hearing on the Joint Petition and the objections thereto, a number of supplemental notices and responses have been filed by Attorney Riepen.  These papers are: (1) Notice of Filing Affidavit and Declaration Regarding Representation of Objector Randy Hague (Doc. #3425); (2) Notice of Filing Excerpt of Wyeth Form 10-K for Year Ended December 31, 2006 (Doc. #3434); (3) Riepen's Response Re Oral Argument and to Class Counsel's Memo Re Riepen Affidavit and Hague Declaration (Doc. #3462); (4) Notice of Filing Deposition of Michael Fishbein (Doc. #3464); and (5) Notice by Objector Randy Hague of New Legal Authority Relating to Joint Petition for a Final Award of Attorneys' Fees (Doc. #3512).  Class Counsel filed responses to some of Attorney Riepen's filings (Doc. #3433, Doc. #3467).  In the case of Doc. #3512, Class Counsel filed a motion to strike (Doc. #3514) to which Attorney Riepen filed a response (Doc. #3523).

It is not necessary to address these filings at length. We will briefly mention Attorney Riepen's notice of new authority which cites to In re High Sulfur Content Gasoline Prods. Liab. Litig., No. 07-30384, 2008 WL 287347 (5th Cir. Feb. 4, 2008). This new case has no bearing here.  The Fifth Circuit held that the district court erred by considering a proposed fee allocation
(continued...)

We have previously rejected the first argument advanced
by Attorney Riepen and do not see the need to revisit this
position at length.  <u>See</u> PTO No. 2622 at 44-47.  Suffice it to
say that the PMC is requesting attorneys' fees for generating
work product <u>and</u> performing administrative duties.  Compensation
for both efforts is necessary in a multidistrict litigation "for
the good of the public as a whole."  <u>Id.</u> at 46.

With regard to Attorney Riepen's second argument, we
point out that the $160 million award in attorneys' fees in the
Interim Distribution was not solely for the benefit of the PMC —
the Interim Distribution awarded only $76,861,455 from the MDL
1203 Fee and Cost Account.  Furthermore, Attorney Riepen's
statement that the Interim Distribution was made "with the
promise of much more in attorneys' fees to come later" is simply
not true.  This court never promised anything with regard to
attorneys' fees, let alone "much more" in fees.  Addressing
Attorney Riepen's argument more generally, our award
determination is supported with ample evidence from the record.

---

89.(...continued)
at an ex parte hearing where "[n]o sworn testimony was taken, no
depositions were offered, and no affidavits were filed."  <u>Id.</u> at
*5.  Thereafter, the district court placed under seal an exhibit
listing the allocation and placed a gag order on all involved.
No statements of the attorneys' time and expenses were placed in
the record.  We will not repeat the extensive procedures put in
place here to consider all petitions for attorneys' fees but in
no way is the situation here like that in <u>High Sulfur</u>.

C.   **APPROPRIATE AWARD**

The Joint Fee Applicants created extraordinarily valuable work product for all of those who chose to pursue their claims in the tort system.  For the federal cases, they also provided invaluable management services.[90]

We conclude that an award of $56,300,000 from the MDL 1203 Fee and Cost Account as requested plus the $76,861,455 from the Interim Distribution, for a total of $133,161,455, is fair and reasonable.  This award, along with the reimbursement of expenses that we have authorized above, will leave approximately $62,193,445.71 in the MDL 1203 Fee and Cost Account.

Based on the record before us, however, we cannot determine how the money remaining in the MDL 1203 Fee and Cost Account after the award of attorneys' fees and costs should be

---

90.  The Joint Petitioners suggest numbers from which we could perform a lodestar cross-check.  As a preliminary matter, we do not believe a lodestar cross-check is necessary.  Unlike in common fund cases, our Court of Appeals has expressed no viewpoint on this issue.  Moreover, we do not believe that any lodestar cross-check would be particularly useful.  The Joint Petitioners state that the hours expended in the MDL have a lodestar value of $64,282,821.00 for work done prior to PTO No. 2622 and $45,553,697.50 for work done after that PTO.  Joint Petrs.' Br. 158-59.  These values are presumably culled from the 2007 Auditor's Report.  However, as we have mentioned before, the time summaries provided in the 2007 Auditor's Report include time expended on the Settlement Agreement and the MDL.  It would be an arduous and likely impossible task to separate the time now especially considering many of the Joint Fee Applicants wore multiple hats in connection with the Settlement Agreement and MDL 1203.  In short, the genie is already out of the bottle.  We do not say this to fault the Joint Fee Applicants or the Auditor's Report.  The procedure for submitting time sheets was memorialized in PTO No. 16.  Little did anyone know then the extent of the work that would be done.

refunded.  The Joint Petitioners urge us to return a significant portion of the assessments for the federal Downstream Opt-Out cases and to return all assessments for the state Downstream Opt-Out cases without reducing the assessments for the Initial Opt-Out and PPH cases.  Without knowing exactly how much of the money currently available in the MDL 1203 Fee Account came from assessments levied against federal Initial Opt-Out and PPH cases, state Initial Opt-Out and PPH cases, federal Downstream Opt-Out cases, and state Downstream Opt-Out cases, we cannot determine the fair and equitable way to allocate the award and modify, if appropriate, the assessments.  We will therefore direct Plaintiffs' Liaison Counsel to supplement promptly the record before us with the above information as of December 31, 2007 so that we can make such a determination.

**D.   MOTIONS FOR EXEMPTION FROM ASSESSMENTS**

Four motions for exemption from the MDL assessments have also been filed:  (1) motion for relief from PTO Nos. 467 and 517 filed by Freedland and Valori on behalf of plaintiffs in Civ. A. Nos. 05-20500, 05-20499, 05-20495, 05-20497, 05-20498, and 05-20496 (Doc. #207296); (2) motion for exemption from MDL fees filed by the law firm of Garrison Scott, P.C. pertaining to 169 plaintiffs (Doc. #208459); (3) motion of Rhonda Russell motion for exemption from MDL fee assessment (Civ. A. No. 06-20120); and (4) motion for reimbursement of MDL assessment or, in the alternative, motion to reduce MDL assessment filed on

behalf of 316 plaintiffs in MDL 1203 and coordinated California cases (Doc. #208583).

We have rejected Attorney Riepen's argument that only those who used the work product created by the PMC should be forced to pay the MDL 1203 assessments.  We stand by our previous conclusion in the Interim Distribution that such a case by case analysis was untenable.  See PTO No. 2622 at 44-47.  Likewise we will deny the above motions seeking exemption from the MDL 1203 assessments.  We will not wade into the morass of determining which of the hundreds of lawyers used, did not use, or used only to a limited extent, the materials and services available through the work of the common benefit attorneys.  Such a process would undermine one of the key purposes of an MDL — effecting the efficient litigation of tens of thousands of related cases.

## V.  CONCLUSION

Now that we have determined the awards of attorneys' costs and fees, the Joint Petitioners must propose an allocation of the total award of attorneys' fees among the Joint Fee Applicants.  We urge the Joint Petitioners to continue in this endeavor in good faith with the hope that we may bring to a happy conclusion one of the few remaining major matters in this class action and this multidistrict litigation.  We will direct Plaintiffs' Liaison Counsel to calculate the portion of the award to which each Eligible Fee Applicant is entitled under the Compendium of Agreements and file those calculations with this

-111-

court so that the court can order specific payments of fees to
eligible attorneys.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS                 :      MDL DOCKET NO. 1203
(PHENTERMINE, FENFLURAMINE,       :
DEXFENFLURAMINE) PRODUCTS         :
LIABILITY LITIGATION              :
                                  :
THIS DOCUMENT RELATES TO:_____:_____
_____   :
SHEILA BROWN, et al.              :
                                  :
            v.                    :
                                  :
AMERICAN HOME PRODUCTS            :
CORPORATION                       :      CIVIL ACTION NO. 99-20593

PRETRIAL ORDER NO.

AND NOW this 8th day of April, 2008, upon consideration
of the renewed Joint Petition for a final award of attorneys'
fees and expense reimbursements and partial refunds from certain
fee accounts and objections thereto, it is hereby ORDERED that:

1.   As used herein, the "Joint Fee Applicants" means:

     a.   Alley, Clark, Greiwe & Fulmer; Ashcraft & Gerel,

          L.L.P.; John T. Baker, P.C.; Law Offices of Roger P.

          Brosnahan, P.A.; Climaco, Lefkowitz, Peca, Wilcox &

          Garofoli, Co., L.P.A.; Cohen, Milstein, Hausfeld &

          Toll, P.L.L.C.; Cummings, Cummings & Dudenhefer;

          Gancedo & Nieves, L.L.P.; Harrison, Kemp & Jones,

          L.L.P.; Hutton & Hutton Law Firm, L.L.C.; Levin,

          Fishbein, Sedran & Berman; Levin, Papantonio, Thomas,

          Mitchell, Echsner & Proctor, P.A.; Lieff, Cabraser,

          Heimann & Bernstein, L.L.P.; Lopez, Hodes, Restaino,

Milman & Skikos; Dennis S. Mackin, Sr.; Pearson, Randall & Schumacher (Successor in Interest to Norum and Pearson, P.A.); Robinson, Calcagnie & Robinson; Robinson & Cole, L.L.P.; Roda Nast, P.C.; Law Offices of Sybil Shainwald, P.C.; Sherman & Salkow, P.C.; Slack & Davis, L.L.P.; Spangenberg, Shibley & Liber, L.L.P.; The Thistle Law Firm; Darryl J. Tschirn; Waite, Schneider, Bayless & Chesley, LLP; Weisman, Kennedy & Berris Co., L.P.A.; and Williams, Love, O'Leary, Craine & Powers, P.C. (collectively the "PMC/MDL Attorneys"); and

b. Alexander & Associates, P.C.; Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C.; Baron & Budd, P.C.; Beeler, Schad & Diamond, P.C.; Berger & Montague, P.C.; Bernstein, Litowitz, Berger & Grossman; Blume, Goldfaden, Berkowitz, Donnelly, Fried & Forte; Burke & Burke, Ltd.; Chimicles & Tikellis; Chitwood Harley Harnes, L.L.P.; Cohn, Lifland, Pearlman, Herrmann & Knopf, L.L.P.; Davis, Saperstein & Salomon, P.C.; James Doyle; Eichen, Levinson & Crutchlow, L.L.P.; Epstein, Fitzsimmons, Brown, Ringle, Gioia & Jacobs, P.C.; Lawrence E. Feldman & Associates; Feldman, Shepard & Wohlgelernter; Fibich, Hampton & Leebron, L.L.P.; Finkelstein Thompson, L.L.P. (f/k/a Finkelstein, Thompson & Loughran); Frankovitch, Anetakis, Colantonio & Simon; Garwin, Gerstein & Fisher, L.L.P.; Ervin A.

-2-

Gonzalez; Hill & Parker; Hill, Peterson, Carper, Bee &
Deitzler, P.L.L.C.; Law Offices of Guy E. Hopkins;
Samuel Issacharoff; Johnson & Perkinson; Edward T.
Joyce & Associates, P.C.; Keefe-Bartels (Successor in
Interest to Lynch-Martin); Keller, Rohrback, L.L.P.;
Kohn, Swift & Graf, P.C.; Krause Kalfayan Benink &
Slavens, L.L.P.; Leebron & Robinson; Levy, Angstreich,
Finney, Baldante, Rubenstein & Coren, P.C.; Law Offices
of Donald B. Lewis; Locks Law Firm; Lombardi &
Lombardi, P.A.; Lukins & Annis, P.S.; Martinez, Barrera
& Martinez, L.L.P.; The Masters Law Firm L.C.; G.
Martin Meyers, P.C.; Milberg Weiss Bershad Hynes &
Lerach, L.L.P.; Kenneth B. Moll and Associates, Ltd.;
Nisen & Elliott, L.L.C.; Pellettieri, Rabstein &
Altman; Law Offices of Charles J. Piven, P.A.; Plante &
Hanley; Powell Law Offices; Segal Law Office; Sheller,
Ludwig & Badey, P.C.; The Law Office of Patrick J.
Sherlock; Shrager, Spivey & Sachs; Elwood S. Simon &
Associates; Strauss & Troy; David M. Taus, L.L.C.
(Successor in Interest to Francis J. Devito, P.A.);
Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby &
Graziano; Trief & Olk; Wilentz, Goldman & Spitzer,
P.A.; Williams, Cuker & Berezofsky; and Wolf,
Haldenstein, Adler, Freeman & Herz, L.L.P.

2.   The Court hereby approves the reimbursement of
$24,233,865.23 in litigation expenses incurred by the Joint

-3-

Fee Applicants, including amounts previously approved by the Court or advanced pursuant to order of the Court, to be paid, reimbursed and/or allocated as follows:

a.   Within forty-five days from the date of this Order, the AHP Settlement Trust shall transfer $4,218,244.08 from the Settlement Fund to the Escrow Agent for the Fund A Escrow Account to reimburse that Account for expense reimbursements previously paid from that Account which should ultimately be paid by the Settlement Fund under Sections III.B.2., III.C.3. and VII.E.1. of the Settlement Agreement;

b.   Prior expense reimbursements in the amount of $9,236,359.63 shall be attributed to the MDL 1203 Fee and Cost Account as having been properly and finally allocated to that account for payment;

c.   Within forty-five days from the date of this Order, the AHP Settlement Trust shall transfer $9,236,359.63 to the Escrow Agent for the MDL 1203 Fee and Cost Account to reimburse that Account for expense reimbursements previously paid from that Account which should ultimately be paid by the Settlement Fund under Sections III.B.2., III.C.3. and VII.E.1. of the Settlement Agreement; and

d.   Within forty-five days from the date of this Order, the AHP Settlement Trust shall pay the following amounts from the Settlement Fund and the Escrow Agent for the

-4-

MDL 1203 Fee and Cost Account shall pay the following amounts from the MDL 1203 Fee and Cost Account to the following Joint Fee Applicants to reimburse them for previously unreimbursed litigation expenses incurred and paid by them:

i.      Alexander & Associates, P.C. shall be paid $53,963.00 from the Settlement Fund and $53,963.00 from the MDL 1203 Fee and Cost Account;

ii.     Anapol, Schwartz, Weiss, Cohan, Feldman, & Smalley, P.C. shall be paid $15,094.29 from the Settlement Fund and $15,094.29 from the MDL 1203 Fee and Cost Account;

iii.    Baron & Budd, P.C. shall be paid $33,272.30 from the Settlement Fund and $33,272.30 from the MDL 1203 Fee and Cost Account;

iv.     Cummings, Cummings & Dudenhefer shall be paid $112,098.98 from the Settlement Fund and $112,098.98 from the MDL 1203 Fee and Cost Account;

v.      Harrison, Kemp & Jones, LLP, shall be paid $5,871.08 from the Settlement Fund and $5,871.08 from the MDL 1203 Fee and Cost Account;

vi.       Hill & Parker shall be paid $91,731.75 from the Settlement Fund and $91,731.75 from the MDL 1203 Fee and Cost Account;

vii.      Keller, Rohrback, L.L.P. shall be paid $1,060.27 from the Settlement Fund and $1,060.27 from the MDL 1203 Fee and Cost Account;

viii.     Kohn, Swift & Graf, P.C. shall be paid $644.47 from the Settlement Fund and $644.47 from the MDL 1203 Fee and Cost Account;

ix.      Levin, Fishbein, Sedran & Berman shall be paid $270,146.19 from the Settlement Fund and $270,146.19 from the MDL 1203 Fee and Cost Account;

x.       Lieff, Cabraser, Heimann & Bernstein, L.L.P. shall be paid $36,870.32 from the Settlement Fund and $36,870.32 from the MDL 1203 Fee and Cost Account;

xi.      Locks Law Firm shall be paid $24,177.64 from the Settlement Fund and $24,177.64 from the MDL 1203 Fee and Cost Account;

xii.      Martinez, Barrera & Martinez, L.L.P. shall be paid $25,915.78 from the Settlement Fund and $25,915.78 from the MDL 1203 Fee and Cost Account;

xiii.    Roda Nast, P.C. shall be paid $18,944.10 from the Settlement Fund and $18,944.10 from the MDL 1203 Fee and Cost Account;

xiv.    Shrager Spivey & Sachs shall be paid $39,332.58 from the Settlement Fund and $39,332.58 from the MDL 1203 Fee and Cost Account;

xv.    Darryl J. Tschirn shall be paid $1,727.48 from the Settlement Fund and $1,727.48 from the MDL 1203 Fee and Cost Account;

xvi.    Waite, Schneider, Bayless & Chesley, LLP, shall be paid $17,124.80 from the Settlement Fund and $17,124.80 from the MDL 1203 Fee and Cost Account; and

xvii.    Williams, Love, O'Leary, Craine & Powers, P.C. shall be paid $23,475.92 from the Settlement Agreement and $23,475.92 from the MDL 1203 Fee and Cost Account.

3.    In addition to the amounts awarded in Pretrial Order No. 2622, and as modified in Pretrial Order No. 2859, the Court hereby awards attorneys' fees to the Joint Fee Applicants as follows:

a.    $161,569,272.00 to be paid from the Fund A Escrow Account;

b.    $124,633,410.60 to be paid from the Fund B Attorneys' Fees Account; and

-7-

     c.    An amount equal to 6.4% of the Individual Payment Amounts payable to Category One Class Members under the Seventh Amendment to the Settlement Agreement, which shall be paid from the Supplemental Class Settlement Fund and shall be the "Common Benefit Percentage" under the Seventh Amendment to the Settlement Agreement.  It is estimated that 6.4% of the Individual Payment Amounts made through interim distributions as well as the Final Distribution of the Supplemental Fund will be $71,447,638.10.

4.    As soon as practicable but no later than thirty days after the entry of this Order, the Trustee for the AHP Settlement Trust shall file and serve a plan for the distribution of any money remaining in the Fund B Attorneys' Fees Account after the award of attorneys' fees as a partial refund of amounts previously deposited into the Fund B Attorneys' Fees Account to Class Members or counsel for Class Members in the manner provided by Sections VIII.E.1.b and VIII.E.1.c of the Settlement Agreement.  Any objections to said plan will be filed and served within fifteen days of its filing.  The Trustee shall file and serve a response to any objections within fifteen days following.

5.    In addition to the amounts awarded in Pretrial Order No. 2622, and as modified in Pretrial Order No. 2859, the Court hereby awards attorneys' fees in the total amount of

-8-

$56,300,000.00 to be paid from the MDL 1203 Fee and Cost Account.

a.  Within thirty days of the date of this Order, Plaintiffs' Liaison Counsel shall file with this court a memorandum detailing the actual amounts that were paid into the MDL 1203 Fee and Cost Account since entry of PTO No. 2622 through December 31, 2007 by each of the following groups:  (1) federal Initial Opt-Out and PPH plaintiffs; (2) state Initial Opt-Out and PPH plaintiffs; (3) federal Downstream Opt-Out plaintiffs; and (4) state Downstream Opt-Out plaintiffs.  The interest earned on the MDL 1203 Fee and Cost Account shall be listed separately.

b.  Said memorandum shall summarize the amounts paid into the MDL 1203 Fee and Cost Account in the aggregate so as not to disclose confidential settlement information.

c.  This court shall thereafter determine what if any refunds should be made to those who have paid assessments into the MDL 1203 Fee and Cost Account, and shall determine any modification of the assessments that will be levied in the future.  The assessment refunds will in no way affect the additional $56,300,000 attorneys' fee award we have made here.

6.  The amounts remaining in the Fund A Escrow Account, the Fund B Attorneys' Fees Account and the MDL 1203 Fee and Cost Account after distribution of the expense reimbursements,

-9-

incentive awards, attorneys' fee awards and refunds authorized in paragraphs 2 through 5 of this Order shall remain in their respective funds and shall constitute "Reserve Funds" that will be available as a source to award fees for compensable services performed after March 31, 2007 and to provide MDL 1203 expense reimbursements for appropriate costs expended after March 31, 2007.

7.  Applications for awards of attorneys' fees from the Reserve Funds, attorneys' expenses from the Settlement Fund, and attorneys' expenses from the MDL 1203 Fee and Cost Account, shall be governed by the following procedures:

    a.  The terms of Pretrial Order No. 5400 shall remain in effect;

    b.  On or before the fifteenth day of March, 2009, and on or before the fifteenth day of March in each succeeding year thereafter, Alan B. Winikur, the court-appointed auditor, shall file a report on the time and expenses submitted for examination under Pretrial Order No. 5400.  The Audit Report required to be filed on or before March 15, 2009 shall report on professional time expended and expenses incurred for the period from April 1, 2007 through December 31, 2008.  Each succeeding Audit Report shall report on professional time expended and expenses incurred during the calendar year immediately preceding the filing of the Report.

-10-

c.  No more than once per calendar year and within thirty days of the filing of each Auditor's Report, Class Counsel, Plaintiffs' Liaison Counsel and any Eligible Fee Applicant who expended professional time or incurred expenses pursuant to the written request and direction of Class Counsel or Plaintiffs' Liaison Counsel, which are included in each such Auditor's Report, may file a petition for the award of attorneys' fees from the Reserve Funds for the period covered by each such Audit Report and for the reimbursement of expenses from the Settlement Fund and/or the MDL 1203 Fee and Cost Account, whichever may be appropriate.  To the extent possible, such applications shall be consolidated into a single Joint Application. Plaintiffs' Liaison Counsel shall coordinate the filing of each such Joint Application.

8.  Within forty-five days of the entry of this Order, Plaintiffs' Liaison Counsel shall calculate the portion of the awards from the Fund A Escrow Account, the Fund B Attorneys' Fees Account, the Supplemental Class Settlement Fund and the MDL 1203 Fee and Cost Account that is to be allocated and paid to each of the Joint Fee Applicants pursuant to the applicable agreements among them and shall file and serve a schedule setting forth the calculation thereof.  At the same time, Plaintiffs' Liaison Counsel shall submit for the Court's consideration proposed

-11-

procedures to effectuate the distribution of each Joint Fee Applicant's allocable share of the fee awards made herein. Responses to the submission by Plaintiffs' Liaison Counsel as required by this paragraph shall be due within fifteen days of the date on which the submission by Plaintiffs' Liaison Counsel is filed and shall be limited, in substance, to any argument that Plaintiffs' Liaison Counsel has improperly calculated the allocable share of the aggregate fee awards made herein to any Joint Fee Applicant under the terms of the applicable agreements among the Joint Fee Applicants regarding fee allocation and any argument regarding the distribution procedures proposed by Plaintiffs' Liaison Counsel.

9.   The Court hereby makes and authorizes incentive awards to be paid from the Fund A Escrow Account within thirty days of the date of this Order in the amount of $10,000 to each of the following Class Representatives:  Barbara Jeffers, Johnna Day, Brenda Chambers, Donna Jarrell, Vivian Naugle, Quinton Layer, Joan S. Layer, Isabel Connor, Lynn Vadino, Karol DeBerardinis, Deneen Giantonnio, William Earthman, Hilda Hawkins, Gwen Jefferson, Carol Maclaskey, Tammye Markle, Betty McCrary, Cynthia Poole, Valerie Stewart, Karen Rhyne, Martin Applebaum, Michael Ciocco, Venessa Braddock, Fred St. John, Kathy Azzinnaro, Dave Pashall, Renee Anderson, Mary Ann Hubner, Debbie Duncan, Maureen Harris,

Christine Gazzillo, Dennis McBride, Marjorie Green, Eddie Flanagan, Ken Morgan, and Christine Lessard.

10. The renewed motion of plaintiffs Bloom, Rawls, Nourse and Staten for incentive awards is DENIED.

11. The motion of Class Counsel to strike the notice by objector Randy Hague of new legal authority relating to the joint petition for a final award of attorneys' fees is DENIED as moot.

12. The motion of Freedland and Valori for relief from PTO Nos. 467 and 517 on behalf of plaintiffs in Civ. A. Nos. 05-20500, 05-20499, 05-20495, 05-20497, 05-20498, and 05-20496 is DENIED.

13. The motion of Garrison Scott, P.C. pertaining to 169 plaintiffs for exemption from the MDL fee assessment is DENIED.

14. The motion of Rhonda Russell for exemption from the MDL fee assessment is DENIED.

15. The motion of 316 plaintiffs in MDL 1203 and coordinated California cases for reimbursement of the MDL assessment or, in the alternative, motion to reduce the MDL assessment is DENIED.

BY THE COURT:


/s/ Harvey Bartle III
                                    C.J.


-13-