IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS (PHENTERMINE/<br>FENFLURAMINE/DEXFENFLURAMINE)<br>PRODUCTS LIABILITY LITIGATION | ) <br> ) <br> ) | MDL NO. 1203 |
| _____ | ) | |
| THIS DOCUMENT RELATES TO: | ) <br> ) | |
| SHEILA BROWN, et al. | ) <br> ) | CIVIL ACTION NO. 99-20593 |
| v. | ) <br> ) | |
| AMERICAN HOME PRODUCTS<br>CORPORATION | ) <br> ) | 2:16 MD 1203 |

MEMORANDUM IN SUPPORT OF SEPARATE PRETRIAL ORDER NO. 8885

Bartle, J.                                    June 6, 2012

        Anita L. Myers ("Ms. Myers" or "claimant"), a class

member under the Diet Drug Nationwide Class Action Settlement

Agreement ("Settlement Agreement") with Wyeth,[1] seeks benefits

from the AHP Settlement Trust ("Trust").[2] Based on the record

developed in the show cause process, we must determine whether

claimant has demonstrated a reasonable medical basis to support

her claim for Matrix Compensation Benefits ("Matrix Benefits").[3]

_____

1.  Prior to March 11, 2002, Wyeth was known as American Home
Products Corporation.

2.  Joseph B. Myers, claimant's spouse, also has submitted a
derivative claim for benefits.

3.  Matrix Benefits are paid according to two benefit matrices
(Matrix "A" and Matrix "B"), which generally classify claimants
for compensation purposes based upon the severity of their
                                              (continued...)

To seek Matrix Benefits, a claimant must first submit a completed Green Form to the Trust.  The Green Form consists of three parts.  The claimant or the claimant's representative completes Part I of the Green Form.  Part II is completed by the claimant's attesting physician, who must answer a series of questions concerning the claimant's medical condition that correlate to the Matrix criteria set forth in the Settlement Agreement.  Finally, claimant's attorney must complete Part III if claimant is represented.

In October, 2004, claimant submitted a completed Green Form to the Trust signed by her attesting physician, Randall G. Johnson, M.D.  Based on an echocardiogram dated July 17, 2002, Dr. Johnson attested in Part II of claimant's Green Form that Ms. Myers suffered from moderate mitral regurgitation, an abnormal left atrial dimension, and a reduced ejection fraction

---

3.   (...continued)
medical conditions, their ages when they are diagnosed, and the presence of other medical conditions that also may have caused or contributed to a claimant's valvular heart disease ("VHD").  See Settlement Agreement §§ IV.B.2.b. & IV.B.2.d.(1)-(2).  Matrix A-1 describes the compensation available to Diet Drug Recipients with serious VHD who took the drugs for 61 days or longer and who did not have any of the alternative causes of VHD that made the B matrices applicable.  In contrast, Matrix B-1 outlines the compensation available to Diet Drug Recipients with serious VHD who were registered as having only mild mitral regurgitation by the close of the Screening Period or who took the drugs for 60 days or less or who had factors that would make it difficult for them to prove that their VHD was caused solely by the use of these Diet Drugs.

in the range of 50% to 60%.[4]  Based on such findings, claimant
would be entitled to Matrix A-1, Level II benefits in the amount
of $496,153.[5]

In the report of claimant's echocardiogram, the
reviewing cardiologist, Muhammad Yasin, M.D., stated that
Ms. Myers had "[m]ild to moderate mitral" regurgitation.
Dr. Yasin, however, did not specify a percentage as to claimant's
level of mitral regurgitation.  Under the definition set forth in
the Settlement Agreement, moderate or greater mitral
regurgitation is present where the Regurgitant Jet Area ("RJA"),
in any apical view, is equal to or greater than 20% of the Left
Atrial Area ("LAA").  See Settlement Agreement § I.22.

In September, 2005, the Trust forwarded the claim for
review by Karen K. Hamilton, M.D., F.A.C.C., one of its auditing
cardiologists.  In audit, Dr. Hamilton concluded that there was
no reasonable medical basis for Dr. Johnson's finding that
claimant had moderate mitral regurgitation because claimant's

---

4.  Dr. Johnson also attested that Ms. Myers suffered from New
York Heart Association Functional Class I symptoms.  This
condition is not at issue in this claim.

5.  Under the Settlement Agreement, a claimant is entitled to
Level II benefits for damage to the mitral valve if he or she is
diagnosed with moderate or severe mitral regurgitation and one of
five complicating factors delineated in the Settlement Agreement.
See Settlement Agreement § IV.B.2.c.(2)(b).  As the Trust does
not contest the attesting physician's finding of an abnormal left
atrial dimension, which is one of the complicating factors needed
to qualify for a Level II claim, the only issue is claimant's
level of mitral regurgitation.

echocardiogram demonstrated only mild mitral regurgitation.  In
support of this conclusion, Dr. Hamilton stated that "[t]he
[mitral regurgitant] jets in this patient were very very small
and nowhere even close to 20% of [the left atrial] area.  No jets
were traced on the tape so I'm not sure where the attesting
[physician] measured."

        Based on the auditing cardiologist's finding of mild
mitral regurgitation, the Trust issued a post-audit determination
denying the claim.  Pursuant to the Rules for the Audit of Matrix
Compensation Claims ("Audit Rules"), claimant contested this
adverse determination.[6]  In contest, claimant argued that under
the reasonable medical basis standard, the attesting physician's
conclusions should be accepted unless they are "extreme or
excessive."  Claimant further contended that "[q]uantifying the
level of regurgitation shown on an echocardiogram is inherently
subjective."[7]  Claimant also submitted that the Trust did not
properly apply the "reasonable medical basis" standard

---

6.  Claims placed into audit on or before December 1, 2002 are
governed by the Policies and Procedures for Audit and Disposition
of Matrix Compensation Claims in Audit, as approved in Pretrial
Order ("PTO") No. 2457 (May 31, 2002).  Claims placed into audit
after December 1, 2002 are governed by the Audit Rules, as
approved in PTO No. 2807 (Mar. 26, 2003).  There is no dispute
that the Audit Rules contained in PTO No. 2807 apply to the claim
of Ms. Myers.

7.  In support of this argument, claimant submitted excerpts of
depositions of five physicians from other proceedings.  None of
the testimony submitted by Ms. Myers, however, specifically
addressed claimant's echocardiogram.

established in the Settlement Agreement as the auditing
cardiologist simply substituted her own opinion for that of the
attesting physician.[8]  In addition, Ms. Myers argued that
Dr. Johnson's conclusion of moderate mitral regurgitation was
reasonable because it was consistent with the findings of
Muhammad Yasin, M.D., the physician who interpreted the
echocardiogram in the Trust's Screening Program.  See Settlement
Agreement § IV.A.1.  Finally, claimant argued that because the
auditing cardiologist did not dispute that Ms. Myers had an
abnormal left atrial dimension, there is a reasonable medical
basis for her claim because "[a]n enlarged left atrium is one of
the possible complicating factors known to be caused by mitral
regurgitation."[9]

        The Trust then issued a final post-audit determination
again denying the claim.  Claimant disputed this final
determination and requested that the claim proceed to the show
cause process established in the Settlement Agreement.  See
Settlement Agreement § VI.E.7.; PTO No. 2807, Audit Rule 18(c).

---

8.   Claimant also contended that the Trust should ensure that its
auditing cardiologists do not have any "biases" against
claimants.  As there is no evidence of any "bias," this issue is
irrelevant for resolution of this claim.  Similarly, claimant
referenced, without any substantive discussion, a pleading in MDL
1203.  As claimant has not attempted to establish how this filing
entitles her to Matrix Benefits, it is not pertinent to the
disposition of this show cause claim.

9.   Claimant did not provide any expert submission in support of
this assertion.

-5-

The Trust then applied to the court for issuance of an Order to show cause why the claim should be paid.  On May 2, 2007, we issued an Order to show cause and referred the matter to the Special Master for further proceedings.  See PTO No. 7161 (May 2, 2007).

Once the matter was referred to the Special Master, the Trust submitted its statement of the case and supporting documentation.  Claimant then served a response upon the Special Master.  The Trust submitted a reply on August 16, 2007, and claimant submitted a surreply on September 5, 2007.  The Show Cause Record is now before the court for final determination. See Audit Rule 35.

The issue presented for resolution of this claim is whether claimant has met her burden in proving that there is a reasonable medical basis for the attesting physician's finding that she had moderate mitral regurgitation.  See id. Rule 24. Ultimately, if we determine that there is no reasonable medical basis for the answer in claimant's Green Form that is at issue, we must affirm the Trust's final determination and may grant such other relief as deemed appropriate.  See id. Rule 38(a).  If, on the other hand, we determine that there is a reasonable medical basis for the answer, we must enter an Order directing the Trust to pay the claim in accordance with the Settlement Agreement. See id. Rule 38(b).

-6-

In support of her claim, Ms. Myers reasserts the
arguments that she made in contest.[10]  Claimant also contends
that it is not uncommon for two cardiologists to review the same
echocardiogram and to find different levels of regurgitation and,
as such, "[n]either diagnosis is correct or incorrect; both fall
within the realm of having a 'reasonable medical basis.'" She
states that the "district court has made three plain errors in
its rulings, regarding the proper interpretation of
echocardiograms under the Settlement Agreement which have
effectively barred the auditing cardiologist from using 'normal
clinical judgment' or 'accepted medical standards.'"  Finally,
claimant submits that the court's determinations that the level
of mitral regurgitation can only be determined through the use of
color flow Doppler and that a single measurement of the level of
mitral regurgitation is not sufficient to recover Matrix Benefits
are erroneous and have "made it impossible for the Claimant to
have her echocardiogram audited under 'normal clinical judgment'
and 'accepted medical standards.'"[11]

_____

10.  In further support of the argument made during contest that
the Trust did not properly apply the "reasonable medical basis"
standard, claimant refers to Dr. Hamilton's conclusion in
connection with another show cause claim.  As the issue is
whether Ms. Myers has established a reasonable medical basis for
her claim, Dr. Hamilton's conclusion as to a different claimant
is irrelevant.

11.  In addition, claimant asserts that the Trust's reliance on
PTO No. 5229 (May 18, 2005) is misplaced.  As we do not base our
(continued...)

-7-

In her surreply, claimant reiterates that the definition of "reasonable medical standard" requires the auditing cardiologist to consider "all the Doppler modalities in their findings."  In addition, Ms. Myers asserts that the geographic proximity of the attesting physician's office to claimant's home is irrelevant to whether the echocardiogram was properly interpreted.[12]

After reviewing the entire Show Cause Record, we find claimant's arguments are without merit.  First, claimant does not adequately contest Dr. Hamilton's finding of mild mitral regurgitation.  Despite the opportunity in contest to present additional evidence in support of her claim, Ms. Myers rests only on Dr. Johnson's check-the-box diagnosis on her Green Form.  She does not respond to Dr. Hamilton's specific determination that the mitral regurgitant jets were "very very small and nowhere even close to 20%."  Claimant never identified any particular error in Dr. Hamilton's conclusions.  Mere disagreement with the auditing cardiologist without identifying any specific errors by

---

11.  (...continued)
decision on the reviewing cardiologist's use of the word "mild" in the echocardiogram report, we need not reach this argument.

12.  Claimant also asserts that she should be allowed discovery as to whether the Trust provides instructions to auditing cardiologists regarding the use of continuous wave Doppler.  We disagree.  See Audit Rule 41.  Further, the issue of continuous wave Doppler is irrelevant as claimant never asserts that the use of continuous wave Doppler reveals the requisite level of mitral regurgitation.

the auditing cardiologist is insufficient to meet a claimant's burden of proof.  On this basis alone, claimant has failed to meet her burden of demonstrating that there is a reasonable medical basis for her claim.

We also disagree with claimant's characterization of the reasonable medical basis standard.  We are required to apply the standards delineated in the Settlement Agreement and the Audit Rules.  The context of these two documents leads us to interpret the "reasonable medical basis" standard as more stringent than claimant contends, and one that must be applied on a case-by-case basis.[13]  Here, Dr. Hamilton determined in audit, and Ms. Myers does not adequately dispute, that the attesting physician's finding of moderate mitral regurgitation was unreasonable.  Contrary to claimant's argument, Dr. Hamilton properly applied the reasonable medical basis standard established under the Settlement Agreement.[14]

Moreover, as we previously explained in PTO No. 2640, conduct "beyond the bounds of medical reason" can include:

_____

13.  For this reason as well, we reject claimant's assertion that an attesting physician's finding should always be accepted unless it constitutes medical malpractice.

14.  We find that this is not merely conflicting "subjective" diagnoses between the attesting physician and the auditing cardiologist.  Nor has Dr. Hamilton merely substituted her opinion for that of the attesting physician.  Instead, Dr. Hamilton specifically determined claimant's echocardiogram did not support the attesting physician's finding of moderate mitral regurgitation.

-9-

(1) failing to review multiple loops and still frames;
(2) failing to have a Board Certified Cardiologist properly
supervise and interpret the echocardiogram; (3) failing to
examine the regurgitant jet throughout a portion of systole;
(4) over-manipulating echocardiogram settings; (5) setting a low
Nyquist limit; (6) characterizing "artifacts," "phantom jets,"
"backflow" and other low velocity flow as mitral regurgitation;
(7) failing to take a claimant's medical history; and
(8) overtracing the amount of a claimant's regurgitation.  See
PTO No. 2640 at 9-13, 15, 21-22, 26.  Here, Dr. Hamilton
determined in audit, and Ms. Myers does not adequately dispute,
that the attesting physician's finding of moderate mitral
regurgitation was based on incorrectly characterizing "very very
small" regurgitant jets "nowhere even close to 20% of [the left
atrial] area" as moderate mitral regurgitation.  Such an
unacceptable practice cannot provide a reasonable medical basis
for the resulting diagnosis and Green Form representation of
moderate mitral regurgitation.

        Finally, we reject claimant's assertion that she is
entitled to Matrix Benefits because the echocardiogram that forms
the basis of the claim for Matrix Benefits was conducted in the
Screening Program for Fund A Benefits under the Settlement
Agreement.  See Settlement Agreement § IV.A.  The Settlement
Agreement clearly provides that the sole benefit that a class

member is entitled to receive based on an echocardiogram performed in the Screening Program is a limited amount of medical services or a limited cash payment:

> All Diet Drug Recipients in Subclass 2(b) and those Diet Drug Recipients in Subclass 1(b) who have been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period, will be entitled to receive, at the Class Member's election, either (i) valve-related medical services up to $10,000 in value to be provided by the Trust; or (ii) $6,000 in cash.

Id. § IV.A.1.c.  Thus, by the plain terms of the Settlement Agreement, a Screening Program echocardiogram does not automatically entitle a claimant to Matrix Benefits.

Indeed, this conclusion is confirmed by the Settlement Agreement provisions concerning claimants eligible for Matrix Benefits.  Specifically, claimants receiving a diagnosis of FDA Positive or mild mitral regurgitation merely become eligible to seek Matrix Benefits.  See id. § IV.B.1.  Further, adopting claimant's position would be inconsistent with Section VI.E. of the Settlement Agreement, which governs the audit of claims for Matrix Benefits, as well as this court's decision in PTO No. 2662 (Nov. 26, 2002), which mandated a 100% audit requirement for all claims for Matrix Benefits.  As nothing in the Settlement Agreement supports the conclusion that a favorable Screening Program echocardiogram for purposes of Fund A Benefits results in

-11-

an immediate entitlement to Matrix Benefits, we decline
claimant's request to interpret the Settlement Agreement in this
fashion.

      For the foregoing reasons, we conclude that claimant
has not met her burden of proving that there is a reasonable
medical basis for finding that she had moderate mitral
regurgitation.  Therefore, we will affirm the Trust's denial of
both the claim of Ms. Myers for Matrix Benefits and the related
derivative claim submitted by her spouse.