IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: DIET DRUGS (PHENTERMINE/ FENFLURAMINE/DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION | MDL NO. 1203 |
| THIS DOCUMENT RELATES TO: SHEILA BROWN, et al. v. AMERICAN HOME PRODUCTS CORPORATION | CIVIL ACTION NO. 99-20593 2:16 MD 1203 |

MEMORANDUM IN SUPPORT OF SEPARATE PRETRIAL ORDER NO. 9146

Bartle, J.                                                September 23, 2013

Mel S. Martin ("Mr. Martin" or "claimant"), a class member under the Nationwide Class Action Settlement Agreement ("Settlement Agreement") with Wyeth,[1] seeks benefits from the AHP Settlement Trust ("Trust").[2] Based on the record developed in the show cause process, we must determine whether claimant has demonstrated a reasonable medical basis to support his claims for Matrix Compensation Benefits ("Matrix Benefits").[3]

---

1. Prior to March 11, 2002, Wyeth was known as American Home Products Corporation. In 2009, Pfizer, Inc. acquired Wyeth.

2. Paula B. Martin, Mr. Martin's spouse, also has submitted a derivative claim for benefits.

3. Matrix Benefits are paid according to two benefit matrices (Matrix "A" and Matrix "B"), which generally classify claimants for compensation purposes based upon the severity of their medical conditions, their ages when they are diagnosed, and the presence of other medical conditions that also may have caused or
(continued...)

To seek Matrix Benefits, a claimant must first submit a completed Green Form to the Trust. The Green Form consists of three parts. The claimant or the claimant's representative completes Part I of the Green Form. Part II is completed by the claimant's attesting physician, who must answer a series of questions concerning the claimant's medical condition that correlate to the Matrix criteria set forth in the Settlement Agreement. Finally, claimant's attorney must complete Part III if claimant is represented.

In November, 2007, claimant submitted a completed Green Form to the Trust signed by his attesting physician, Robert E. Fowles, M.D., F.A.C.C. Based on an echocardiogram dated September 12, 2007,[4] Dr. Fowles attested in Part II of claimant's Green Form that Mr. Martin suffered from severe mitral regurgitation and had surgery to repair or replace the aortic

---

3. (...continued)
contributed to a claimant's valvular heart disease ("VHD"). See Settlement Agreement §§ IV.B.2.b. & IV.B.2.d.(1)-(2). Matrix A-1 describes the compensation available to Diet Drug Recipients with serious VHD who took the drugs for 61 days or longer and who did not have any of the alternative causes of VHD that made the B matrices applicable. In contrast, Matrix B-1 outlines the compensation available to Diet Drug Recipients with serious VHD who were registered as having only mild mitral regurgitation by the close of the Screening Period or who took the drugs for 60 days or less or who had factors that would make it difficult for them to prove that their VHD was caused solely by the use of these Diet Drugs.

4. Because claimant's September 12, 2007 echocardiogram was performed after the end of the Screening Period, claimant relied on an echocardiogram dated August 1, 2002 to establish his eligibility to receive Matrix Benefits.

-2-

and/or mitral valve(s) following the use of Pondimin® and/or Redux™.[5] Based on such findings, claimant would be entitled to Matrix A-1, Level III benefits in the amount of $745,441.[6]

In the report of claimant's August 1, 2002 echocardiogram, the reviewing cardiologist, Allan J. Stahl, M.D., F.A.C.C., stated that claimant had "mild [mitral regurgitation] occupying about 18% of the atrium."[7] Under the Settlement Agreement, mild mitral regurgitation is defined as "(1) either the RJA/LAA ratio is more than five percent (5%) or the mitral regurgitant jet height is greater than 1 cm from the valve orifice, and (2) the RJA/LAA ratio is less than twenty percent (20%)." The Settlement Agreement requires the payment of reduced Matrix Benefits to a claimant who is diagnosed with mild mitral

---

5. Dr. Fowles also attested that claimant suffered from an abnormal left atrial dimension, a reduced ejection fraction in the range of 50% to 60%, and New York Heart Association Functional Class III symptoms. These conditions are not at issue in this claim.

6. Under the Settlement Agreement, a claimant is entitled to Level III benefits if he or she suffers from "left sided valvular heart disease requiring ... [s]urgery to repair or replace the aortic and/or mitral valve(s) following the use of Pondimin® and/or Redux™." Settlement Agreement § IV.B.2.c.(3)(a).

7. Dr. Fowles submitted a Gray Form wherein he attested that claimant's August 1, 2002 echocardiogram demonstrated moderate mitral regurgitation. The Gray Form was used to report the results of an echocardiogram which is relied upon by a claimant to establish his or her eligibility for Matrix Benefits. See Settlement Agreement §§ VI.C.2.e.-f. Under the definition set forth in the Settlement Agreement, moderate or greater mitral regurgitation is present where the Regurgitant Jet Area ("RJA") in any apical view is equal to or greater than 20% of the Left Atrial Area ("LAA"). See id. § I.22.

-3-

regurgitation by an echocardiogram, like claimant's
August 1, 2002 echocardiogram here, which was performed between
the commencement of Diet Drug use and the end of the Screening
Period. See Settlement Agreement § IV.B.2.d.(2)(a). As the
Trust does not contest claimant's entitlement to Level III
benefits, the only issue before us is whether claimant is
entitled to payment on Matrix A-1 or Matrix B-1.

In April, 2008, the Trust forwarded the claim for
review by Alan J. Bier, M.D., F.A.C.P., F.A.C.C., F.A.S.E., one
of its auditing cardiologists. Dr. Bier accepted the attesting
physician's findings. Pursuant to Court Approved Procedure
("CAP") No. 11, the Consensus Expert Panel subsequently reviewed
Mr. Martin's claim and determined the claim should be re-audited
because the "[d]egree of [mitral regurgitation] [on qualifying
echo dated 8/1/2002] appears less than moderate by Singh
criteria. Excessive color gain should be taken into account,
along with the need to correlate findings on still frame images
with corresponding full video loops."[8] In June, 2008, the Trust
informed Mr. Martin that it had accepted the Consensus Expert
Panel's recommendation that his claim be re-audited.

---

8. The Consensus Expert Panel consists of three cardiologists,
one designated by each of Class Counsel, the Trust, and Wyeth.
See Pretrial Order ("PTO") No. 6100 (Mar. 31, 2005). We approved
creation of the Consensus Expert Panel to "monitor the
performance of the Auditing Cardiologists and to develop
procedures for quality assurance in the Audit of Claims for
Matrix Compensation Benefits." Id.

-4-

In July, 2008, the Trust forwarded the claim for review by another auditing cardiologist, Waleed N. Irani, M.D. In audit, Dr. Irani concluded that there was no reasonable medical basis for finding that claimant's August 1, 2002 echocardiogram demonstrated moderate mitral regurgitation. Dr. Irani explained, "[The echocardiogram] report states mild [mitral regurgitation]. My measurement of ratio corroborate this finding."

Based on Dr. Irani's finding that claimant had mild mitral regurgitation between the commencement of Diet Drug use and the end of the Screening Period, the Trust issued a post-audit determination that Mr. Martin was entitled only to Matrix B benefits. Pursuant to the Rules for the Audit of Matrix Compensation Claims ("Audit Rules"), claimant contested this adverse determination.[9] In contest, Mr. Martin argued that the auditing cardiologist did not refute the specific and credible medical evidence provided by Dr. Fowles in support of his finding of moderate mitral regurgitation on claimant's August 1, 2002 echocardiogram and that the auditing cardiologist failed to explain the basis for his determination.[10]

---

9. Claims placed into audit on or before December 1, 2002 are governed by the Policies and Procedures for Audit and Disposition of Matrix Compensation Claims in Audit, as approved in PTO No. 2457 (May 31, 2002). Claims placed into audit after December 1, 2002 are governed by the Audit Rules, as approved in PTO No. 2807 (Mar. 26, 2003). There is no dispute that the Audit Rules contained in PTO No. 2807 apply to Mr. Martin's claim.

10. Mr. Martin also argued that the auditing cardiologist did not consider the February 7, 2008 report of Dr. Fowles.

-5-

In support, Mr. Martin relied on a supplemental report of Dr. Fowles dated December 7, 2008. In his supplemental report, Dr. Fowles stated, in pertinent part:

> In the Martin echocardiogram, the Nyquist limit of 51 is assuredly a conventional and usual setting. We usually want to keep this limit above 50, so the study is within the standard examination technique. No technical artifact is present based on the Nyquist setting.
>
> . . . .
>
> In the Martin examination the gain settings are not too high. The accepted technique for gain setting is to adjust the setting until the image pixels are fully evident, then back down on the setting to avoid artificial "blooming" of the image and background speckling. Color gain should be increased just until random color pixels begin to appear, for example in tissue areas, and then the gain reduced just slightly.
>
> . . . .
>
> ... The regurgitant jet in Martin is true, real, substantial, consistent and persistent. It is not low, but high velocity, and is not artificial. The regurgitant jet is not overtraced and no black pixels are included. The technical settings are appropriate. With the two-dimensional plane of examination somewhat more appropriately and anteriorly oriented but still in the apical four-chamber view, the Regurgitant Jet Area (RJA) is by my measurement 5.1 cm2. Several ultrasound examinations of the regurgitant jet, with competent and accurate imaging, are seen in series 31 (RJA=4.5cm2; RJA/LAA=20.2%), but equally well in series 32 (RJA=4.6cm2; RJA/LAA=20.6%), series 34 (RJA=4.9cm2; RJA/LAA=22%) and series 35 (frame #48, RJA=5.6cm2; RJA/LAA=25.1%). The regurgitant jet is not 'backflow' or a 'phantom' jet or a false image or artifact. The regurgitant jet is imaged strictly according to the technical requirements and standards outlined in the

preceding paragraphs .... The proper echocardiographic examination cannot be a "spot-check" of one loop or to sub-select one loop or frame. That is why the several above loops are included in my analysis.

My measurement of the Regurgitant Jet Area (RJA) is 5.1 cm2, based on the representative echocardiographic data, which correlate with the real time loops. My measurement is based on repetitive and careful review of multiple video loops and freeze frame images. My measurement is representative of the overall severity of the mitral regurgitation in this case. My measurement and analysis is not derived from the only part of the cardiac cycle, nor is the analyzed regurgitation a phenomenon occurring during abnormal cardiac rhythm, such as premature atrial or ventricular beats or atrial fibrillation. As noted in the preceding paragraph ..., I also find that the mitral regurgitation jet is somewhat anteriorly-directed; this feature is clearly evident in the long axis views. Because of the anterior angulation of the mitral regurgitant jet, the plane of examination in the apical 4-chamber view will affect how much regurgitation is detected; this is the reason that some of the planes might show a smaller regurgitant jet: such views missed the plane of the maximum-area regurgitant jet. It is standard -indeed mandatory--to image regurgitant jets to the fullest extent, while maintaining appropriate ultrasound technique. This requirement has been satisfied. My calculation of the ratio of the Regurgitant Jet Area to the Left Atrial Area (RJA/LAA) is therefore 5.1 cm2 / 22.3 cm2 = 23%. This falls into the MODERATE range on the Green Form. Furthermore, my measurements and calculations are coherent with those detailed in the above paragraph, comprising six samples overall. This is a fair assessment of the data and is certainly representative of the severity of
Mr. Martin's condition on 1 August 2002.

. . . .

Also, the [Consensus Expert Panel] does not identify how the color gain in the Martin

study is excessive or how the technical
settings in the study are inappropriate and
not in conformity [with] the applicable
standards. My specific review and analysis
of the Martin study lead me to conclude that
no low velocity non-mitral regurgitant flow
is included in my measurements of the RJA.

Although not required to do so, the Trust forwarded the claim for a second review by the auditing cardiologist. Dr. Irani submitted a declaration wherein he again concluded that claimant's August 1, 2002 echocardiogram revealed only mild mitral regurgitation. Dr. Irani stated, in relevant part:

9. In accordance with the Trust's request, I again reviewed the entirety of Claimant's August 1, 2002 echocardiogram tape, as well as Claimant's Contest Materials.

10. Based on my review, I again confirm my findings at audit that there is no reasonable medical basis for the Attesting Physician's finding that Claimant's eligibility echocardiogram demonstrates moderate mitral regurgitation.

11. In his *Supplemental Report on Echocardiogram Dated 8/1/0-2* [sic] *of Mel Martin*, Claimant's Attesting Physician, Dr. Robert Fowles, noted that "[b]ecause of the anterior angulation of the mitral regurgitant jet, the plane of examination in the apical 4-chamber view will affect how much regurgitation is detected; this is the reason that some of the planes might show a smaller regurgitant jet: such views missed the plane of the maximum area regurgitant jet." Dr. Fowles opined that Claimant's August 2002 echocardiogram showed moderate mitral regurgitation.

While Dr. Fowles' statement regarding angulation is not incorrect, the use of multiple imaging planes at various

-8-

>     angles generally eliminates the
>     possibility of missing an eccentric jet.
>     This is the case in this patient with no
>     suggestion of an eccentric jet that is
>     not fully imaged.
>
> 12. I again reviewed and read the entirety
>     of Claimant's eligibility echocardiogram
>     and, in so doing, observed three images
>     of legitimate regurgitant jet ratios
>     measuring 13.9%, 16% and 17%, readings
>     which are consistent with a finding of
>     mild mitral regurgitation....
>
> 13. In addition, the color images of the
>     eligibility echocardiogram show certain
>     colors which are not true mitral
>     regurgitant but, if included in the
>     measurement of mitral regurgitation,
>     would serve to exaggerate it.  Likewise,
>     the inclusion of the deep red hues seen
>     on the color images (represents
>     pulmonary vein inflow) or the turbulent
>     flow on the ventricular side of the
>     mitral valve leaflets (which is
>     convergence of flow toward the
>     regurgitant orifice) would increase the
>     value of the regurgitant jet area.
>
> 14. Although Claimant speculates that I did
>     not review Dr. Fowles' first report in
>     connection with my audit, that is not
>     the case.  Moreover, the content of such
>     report would not have altered my reading
>     of Claimant's echocardiogram.

The Trust then issued a final post-audit determination, again determining that Mr. Martin was entitled only to Matrix B-1, Level III benefits.  Claimant disputed this final determination and requested that the claim proceed to the show cause process established in the Settlement Agreement.  See Settlement Agreement § VI.E.7.; PTO No. 2807, Audit Rule 18(c). The Trust then applied to the court for issuance of an Order to show cause why this claim should be paid.  On April 22, 2009, we

issued an Order to show cause and referred the matter to the Special Master for further proceedings. See PTO No. 8155 (Apr. 22, 2009).

Once the matter was referred to the Special Master, the Trust submitted its statement of the case and supporting documentation. Claimant then served a response upon the Special Master. The Trust submitted a reply on August 3, 2009. Under the Audit Rules, it is within the Special Master's discretion to appoint a Technical Advisor[11] to review claims after the Trust and claimant have had the opportunity to develop the Show Cause Record. See Audit Rule 30. The Special Master assigned a Technical Advisor, Gary J. Vigilante, M.D., F.A.C.C., to review the documents submitted by the Trust and claimant and to prepare a report for the court. The Show Cause Record and Technical Advisor Report are now before the court for final determination. See id. Rule 35.

The issue presented for resolution of this claim is whether claimant has met his burden of proving that there is a reasonable medical basis for finding that he had moderate mitral regurgitation on his August 1, 2002 echocardiogram. See Audit Rule 24. Ultimately, if we determine that there is no reasonable

---

11. A "[Technical] [A]dvisor's role is to act as a sounding board for the judge--helping the jurist to educate himself in the jargon and theory disclosed by the testimony and to think through the critical technical problems." Reilly v. United States, 863 F.2d 149, 158 (1st Cir. 1988). In a case such as this, where conflicting expert opinions exist, it is within the discretion of the court to appoint a Technical Advisor to aid it in resolving technical issues. Id.

medical basis for the answer that is at issue, we must affirm the Trust's final determination and may grant such other relief as deemed appropriate. See id. Rule 38(a). If, on the other hand, we determine that there is a reasonable medical basis for the answer, we must enter an Order directing the Trust to pay the claim in accordance with the Settlement Agreement. See id. Rule 38(b).

In support of his claim, claimant reasserts the arguments he made during contest. In particular, claimant asserts that the reports of Dr. Fowles establish a reasonable medical basis for his finding that claimant had moderate mitral regurgitation. Claimant also argues that the Trust improperly relies upon the findings of the auditing cardiologist, which claimant asserts are insufficient to rebut the opinions of Dr. Fowles. Further, claimant argues that, despite the Trust's assertions, the attesting physician's findings are based on a review of the entirety of claimant's August 1, 2002 echocardiogram, and he only measured true mitral regurgitation. Finally, claimant contends that the auditing cardiologist provided insufficient detail as to the basis of his opinion. Thus, according to claimant, he should prevail because the opinions of Dr. Fowles are "the most credible."[12]

In response, the Trust asserts that claimant failed to establish a reasonable medical basis for the attesting

---

12. Claimant also contends the Trust did not include Dr. Bier's audit report with its supporting documentation.

-11-

physician's finding of moderate mitral regurgitation on Mr. Martin's August 1, 2002 echocardiogram. In particular, the Trust asserts that the attesting physician exaggerated the level of mitral regurgitation by improperly including low velocity flow, as well as engaging in overtracing, in the determination of the level of mitral regurgitation. Finally, the Trust contends that the auditing cardiologist provided sufficient detail as to his findings and that the auditing cardiologist complied with the Settlement Agreement and the Audit Rules.

The Technical Advisor, Dr. Vigilante, reviewed claimant's August 1, 2002 echocardiogram and concluded that there was no reasonable medical basis for finding that it demonstrated moderate mitral regurgitation. Specifically, Dr. Vigilante stated, in pertinent part:

> I reviewed a CD of the Claimant's August 1, 2002 echocardiogram.... There were 39 images or loops noted on this study. There were the usual echocardiographic views obtained. There was a borderline low Nyquist limit of 51 cm per second. In addition, there was inappropriate excessive color gain with color artifact seen even outside of the blood pool. This was most evident in the apical views. Therefore, there was inappropriate demonstration of the supposed mitral regurgitant jet. In spite of the inappropriate color Doppler evaluation, I was able to accurately evaluate this mitral regurgitant jet in the mid portion of systole.
>
> .... Very mild mitral regurgitation was suggested in the parasternal long axis view. In the apical views, mild mitral regurgitation was also suggested. This mitral regurgitant jet was a [sic] central to slightly anteriorly directed jet. The mitral

-12-

regurgitation appeared most impressive in the
apical four chamber view. I planimetered the
largest representative RJA's in the apical
four chamber and two chamber views. The
largest representative RJA was 3.9 cm2. This
was noted in the apical four chamber view.
The largest representative RJA in the apical
two chamber view was much less. All of the
cardiac cycles in loops 16, 17, 31 and 35
were measured. The LAA in the apical four
chamber view was 22.2 cm2. Therefore, the
largest RJA/LAA ratio was less than 18%. All
of the other RJA/LAA's ratios were less than
16%. There was no RJA/LAA ratio that reached
20%.

The sonographer obtained RJA measurements of
3.97 cm2, 4.18 cm2, and 3.48 cm2. These
measurements included a small amount of low
velocity, non-mitral regurgitant flow. The
correct largest representative RJA was
3.9 cm2. In addition, the sonographer
measured a LAA of 22.52 cm2. This was
slightly larger than my measurement of 22.2
cm2 as it included a small amount of area
below the mitral valve leaflet tips. My
measurements were very similar to those of
Dr. Irani. I am unable to determine how Dr.
Fowles obtained RJA measurements of 4.5 cm2,
4.6 cm2, 4.9 cm2 and 5.6 cm2.

. . . .

. . . . [T]here is no reasonable medical basis
for the Attesting Physician's answer to
Question 6.a. on the Gray Form. That is, the
echocardiogram of August 1, 2002 demonstrated
mild mitral regurgitation with comments as
above. An echocardiographer could not
reasonably conclude that moderate mitral
regurgitation was present on this study even
taking into account inter-reader variability.

In response to the Technical Advisor Report, claimant argues that the Technical Advisor "fails to address Dr. Fowles' analysis with respect to specific frames where he made his measurements and such failure is a material insufficiency in

-13-

light of the testimony in the record by Claimant's treating physician, Dr. Fowles." According to claimant, "the Technical Advisor's Report is fatally incomplete without any assessment of the specific frames where Dr. Fowles expressly states he made his measurements."[13]

After reviewing the entire Show Cause Record, we find claimant's arguments are without merit. The Settlement Agreement requires that a claim for benefits based on mitral valve surgery be reduced to Matrix B-1 if the claimant had mild mitral regurgitation diagnosed by an echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period. Settlement Agreement § IV.B.2.d.(2)(a).

We disagree with claimant that the opinion of Dr. Fowles provides a reasonable medical basis for his representation that Mr. Martin's August 1, 2002 echocardiogram demonstrates moderate mitral regurgitation. We are required to apply the standards delineated in the Settlement Agreement and the Audit Rules. The context of those two documents leads us to interpret the "reasonable medical basis" standard as more stringent than claimant contends, and one that must be applied on a case by case basis. For example, as we previously explained, conduct "beyond the bounds of medical reason" can include:

---

13. Claimant also objected to the Special Master's refusal to permit Dr. Fowles to provide a rebuttal to the Technical Advisor Report. The Audit Rules, however, specifically preclude such an additional submission. See, e.g., Mem. in Supp. of PTO No. 9041 n.11 (Apr. 5, 2013).

-14-

(1) failing to review multiple loops and still frames;
(2) failing to have a Board Certified Cardiologist properly supervise and interpret the echocardiogram; (3) failing to examine the regurgitant jet throughout a portion of systole; (4) over-manipulating echocardiogram settings; (5) setting a low Nyquist limit; (6) characterizing "artifacts," "phantom jets," "backflow" and other low velocity flow as mitral regurgitation; (7) failing to take a claimant's medical history; and (8) overtracing the amount of a claimant's regurgitation. See Mem. in Supp. of PTO No. 2640 at 9-13, 15, 21-22, 26 (Nov. 14, 2002).

Here, Dr. Fowles argued that claimant's August 1, 2002 echocardiogram had appropriate Nyquist and gain settings and that the anterior angulation of the mitral regurgitant jet might make it appear smaller but that it did actually fall within the moderate range. Dr. Irani, however, determined that claimant's level of mitral regurgitation could have been overestimated by the improper inclusion of low velocity flow as well as overtracing. Dr. Irani also observed "three images of legitimate regurgitant jet ratios," all of which were below the required level for moderate mitral regurgitation.[14] Finally, with respect to the angulation of Mr. Martin's mitral regurgitant jet, Dr. Irani stated, "the use of multiple imaging planes at various angles generally eliminates the possibility of missing an

---

14. For this reason, we reject claimant's argument that Dr. Irani did not provide sufficient detail for his findings.

-15-

eccentric jet. This is the case in this patient with no suggestion of an eccentric jet that is not fully imaged."[15]

In addition, Dr. Vigilante determined that the Nyquist limit was "borderline low" and that "there was inappropriate excessive color gain with color artifact seen even outside of the blood pool." Although Mr. Martin challenged the Technical Advisor Report on the basis that Dr. Vigilante did not address the specific frames where Dr. Fowles made his measurements, Dr. Vigilante planimetered the largest representative RJA/LAA ratios and determined it to be less than 18% with the other RJA/LAA ratios less than 16%. Moreover, Dr. Vigilante stated that he could not determine how Dr. Fowles obtained his inappropriately high RJA measurements. Finally, Dr. Vigilante observed that the sonographer's measurements, while they "included a small amount of low velocity, non-mitral regurgitant flow," resulted in RJA/LAA ratios of less than 20%. Such unacceptable practices cannot provide a reasonable medical basis for the resulting diagnosis and Gray Form answer.

We also reject claimant's argument that the auditing cardiologist and the Technical Advisor inappropriately relied on visual estimation. Although the Settlement Agreement specifies the percentage of regurgitation needed to qualify as having moderate mitral regurgitation, it does not require that actual

---

15. There also is no support for claimant's argument that Dr. Irani did not review Mr. Martin's entire claim file or that the Trust did not include the documentation required by the Audit Rules.

measurements be made on an echocardiogram. As we have explained, "'[e]yeballing' the regurgitant jet to assess severity is well accepted in the world of cardiology." See Mem. in Supp. of PTO No. 2640 at 15. Claimant essentially requests that we write into the Settlement Agreement a requirement that actual measurements of mitral regurgitation be made to determine if a claimant qualifies for Matrix Benefits. There is no basis for such a revision, and claimant's argument is contrary to the "eyeballing" standards we previously evaluated and accepted in PTO NO. 2640. In any event, both Dr. Irani and Dr. Vigilante provided specific measurements with respect to claimant's level of mitral regurgitation. In particular, Dr. Irani determined that claimant's level of mitral regurgitation was 13.9%, 16%, and 17%, and Dr. Vigilante determined that claimant's level of mitral regurgitation was less than 18%.

For the foregoing reasons, we conclude that claimant has not met his burden of proving that there is a reasonable medical basis for finding that his August 1, 2002 echocardiogram demonstrates moderate mitral regurgitation. Therefore, we will affirm the Trust's denial of Mr. Martin's claim for Matrix A benefits and the related derivative claim submitted by his spouse.