IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: DIET DRUGS (PHENTERMINE/ FENFLURAMINE/DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION | MDL NO. 1203 |
| THIS DOCUMENT RELATES TO: SHEILA BROWN, et al. v. AMERICAN HOME PRODUCTS CORPORATION | CIVIL ACTION NO. 99-20593 2:16 MD 1203 |

**MEMORANDUM IN SUPPORT OF SEPARATE PRETRIAL ORDER NO. 9164**

Bartle, J.                                                November 19, 2013

Tonya R. Marler ("Ms. Marler" or "claimant"), a class member under the Diet Drug Nationwide Class Action Settlement Agreement ("Settlement Agreement") with Wyeth,[1] seeks benefits from the AHP Settlement Trust ("Trust"). Based on the record developed in the show cause process, we must determine whether claimant has demonstrated a reasonable medical basis to support her claim for Matrix Compensation Benefits ("Matrix Benefits") and, if so, whether she met her burden of proving that her claim was not based, in whole or in part, on any intentional material misrepresentation of fact.[2]

---

1. Prior to March 11, 2002, Wyeth was known as American Home Products Corporation. In 2009, Pfizer, Inc. acquired Wyeth.

2. Matrix Benefits are paid according to two benefit matrices (Matrix "A" and Matrix "B"), which generally classify claimants
(continued...)

To seek Matrix Benefits, a claimant must first submit a completed Green Form to the Trust. The Green Form consists of three parts. The claimant or the claimant's representative completes Part I of the Green Form. Part II is completed by the claimant's attesting physician, who must answer a series of questions concerning the claimant's medical condition that correlate to the Matrix criteria set forth in the Settlement Agreement. Finally, claimant's attorney completes Part III if claimant is represented.

In July, 2002, claimant submitted a completed Green Form to the Trust signed by her attesting physician, Howard L. Brazil, M.D., F.A.C.C. Based on an echocardiogram dated June 14, 2002, Dr. Brazil attested in Part II of claimant's Green Form that Ms. Marler suffered from moderate mitral regurgitation and a reduced ejection fraction in the range of 50% to 60%.

---

2. (...continued)
for compensation purposes based upon the severity of their medical conditions, their ages when they are diagnosed, and the presence of other medical conditions that also may have caused or contributed to a claimant's valvular heart disease ("VHD"). See Settlement Agreement §§ IV.B.2.b. & IV.B.2.d.(1)-(2). Matrix A-1 describes the compensation available to Diet Drug Recipients with serious VHD who took the drugs for 61 days or longer and who did not have any of the alternative causes of VHD that made the B matrices applicable. In contrast, Matrix B-1 outlines the compensation available to Diet Drug Recipients with serious VHD who were registered as having only mild mitral regurgitation by the close of the Screening Period or who took the drugs for 60 days or less or who had factors that would make it difficult for them to prove that their VHD was caused solely by the use of these Diet Drugs.

Based on such findings, claimant would be entitled to Matrix A-1, Level II benefits in the amount of $641,205.[3]

In the report of claimant's echocardiogram, Dr. Brazil stated that Ms. Marler had "moderate regurgitation with a regurgitant jet to left atrial area of 28%." Under the definition set forth in the Settlement Agreement, moderate or greater mitral regurgitation is present where the Regurgitant Jet Area ("RJA") in any apical view is equal to or greater than 20% of the Left Atrial Area ("LAA"). See Settlement Agreement § I.22. Dr. Brazil also stated that there was an "ejection fraction of 55%." An ejection fraction is considered reduced for purposes of a mitral valve claim if it is measured as less than or equal to 60%. See id. § IV.B.2.c.(2)(b)iv.

In December, 2003, the Trust forwarded the claim for review by Richard Stagl, M.D., F.A.C.C., one of its auditing cardiologists. In audit, Dr. Stagl determined that there was a reasonable medical basis for Dr. Brazil's findings of moderate mitral regurgitation and a reduced ejection fraction.

Before the Trust issued a determination based on this review, we imposed a stay on the processing of claims pending implementation of the Seventh Amendment to the Settlement

---

3. Under the Settlement Agreement, an eligible class member is entitled to Level II benefits for damage to the mitral valve if he or she is diagnosed with moderate or severe mitral regurgitation and one of five complicating factors delineated in the Settlement Agreement. See Settlement Agreement § IV.B.2.c.(2)(b). A reduced ejection fraction is one of the complicating factors necessary for a Level II claim.

Agreement. After the stay was lifted, we entered Pretrial Order ("PTO") No. 5632, which provided certain claimants, including Ms. Marler, with the option either to undergo a re-audit of their claims or to elect to stand on the results of their prior audit and proceed pursuant to the Rules for the Audit of Matrix Compensation Claims ("Audit Rules"). Ms. Marler elected not to undergo a re-audit of her claim.

Prior to the Trust's processing of her claim pursuant to the Audit Rules, however, this court approved Court Approved Procedure ("CAP") No. 13, which provided certain claimants, including Ms. Marler, with the option either to submit their claims to a binding medical review by a participating physician or to opt-out of CAP No. 13 and proceed pursuant to the Audit Rules. See PTO No. 6707 (Nov. 22, 2006). Ms. Marler elected to opt-out of CAP No. 13.

Thus, pursuant to Rule 5 of the Audit Rules, the Trust undertook "to determine whether there were any intentional material misrepresentations made in connection with the Claim." As part of this review, the Trust engaged Joseph Kisslo, M.D., to review the integrity of the echocardiogram system used during the performance of echocardiographic studies and the resulting interpretations submitted in support of certain claims. As stated in his March 1, 2007 declaration, Dr. Kisslo determined, in pertinent part, that:

> In Ms. Marler's study, the use of high color gain and a decreased Nyquist setting, the selection and planimetry of backflow, and the

> overmeasurement of the mitral "jet," as well
> as the undermeasurement of the left atrial
> area are the result of deliberate choices and
> conduct engaged in by the sonographer
> performing this study and at a minimum,
> acquiesced in by the Attesting Physician.
> Each of these manipulations exaggerated or
> created the appearance of regurgitation or
> jet duration. Ms. Marler only has mild
> mitral regurgitation--not moderate mitral
> regurgitation as claimed by the Attesting
> Physician. There is no reasonable medical
> basis for a finding of moderate mitral
> regurgitation based on this study.

Accordingly, notwithstanding Dr. Stagl's findings at audit, the Trust issued a post-audit determination denying Ms. Marler's claim based on its conclusion that there was substantial evidence of intentional material misrepresentation of fact in connection with the claim. Pursuant to the Audit Rules, Ms. Marler contested this adverse determination.[4] In contest, claimant argued that her echocardiogram was performed in a manner consistent with the standards set forth in the Settlement Agreement. In support, claimant submitted affidavits from Dr. Brazil; Lynda F. Lollar-Goldstein, the Registered Cardiovascular Technologist who performed Ms. Marler's echocardiogram; and Gerald L. Fitzgerald, Sr., the owner of the company that performed Ms. Marler's echocardiogram. In his affidavit, Dr. Brazil stated, in pertinent part, that:

---

4. Claims placed into audit on or before December 1, 2002 are governed by the Policies and Procedures for Audit and Disposition of Matrix Compensation Claims in Audit, as approved in PTO No. 2457 (May 31, 2002). Claims placed into audit after December 1, 2002 are governed by the Audit Rules, as approved in PTO No. 2807 (Mar. 26, 2003). There is no dispute that the Audit Rules contained in PTO No. 2807 apply to Ms. Marler's claim.

-5-

>     10.  Contrary to Paragraph 7 of
> Dr. Kisslo's declaration, I did not see
> excessive gain, color pixel dominance and the
> presence of color persistence or marked
> errors in the selection and measurement of
> jets and structures which would alter my
> original conclusions.  Any errors made by the
> echocardiogram technician in tracing were
> slight and did not impact the ultimate
> diagnosis.
>
>     11.  And, contrary to Dr. Kisslo's
> finding, I did not find evidence of a
> concomitant use of decreased Nyquist settings
> or an exaggerated appearance of regurgitation
> and/or complicating factors.  By Dr. Kisslo's
> own admission, the Nyquist setting in this
> instance was within the acceptable range (See
> Figure 5 on page 8 of Dr. Kisslo's
> declaration).
>
>     12.  I agree with Dr. Kisslo's statement
> that, "[s]ome of the hard controls, in
> particular color gain, image gain, and sector
> depth are adjusted to reflect the variability
> in patient physiology and attenuation as well
> as machine sensitivity normally encountered
> in imaging."  My review of Ms. Marler's video
> tape and [magneto optical] disk indicates
> that the [sonographer] made adjustments
> during the course of the procedure to
> optimize the picture, not manipulate or
> materially misrepresent the injury sustained
> by Ms. Marler.  Such adjustments are common
> in the ordinary course of conducting
> echocardiograms and I cannot see any evidence
> of any intentional material misrepresentation
> of fact as Dr. Kisslo and his staff suggest.

In her affidavit, Ms. Lollar-Goldstein stated she was familiar with the Settlement Agreement criteria and that each echocardiogram she performed was in accordance with that protocol and to the best of her ability.  In addition, she noted that any adjustment she made to the echocardiogram machine settings during an echocardiogram "was done to optimize the image for the benefit

of the doctor reading the procedure, not for the purpose of creating the false impression that an injury exists." Finally, Ms. Lollar-Goldstein stated that "virtually all echocardiograms will show some evidence of sparkling or excessive color gain if each frame is analyzed during the time the technician is making adjustments and attempting to optimize an image." In his affidavit, Mr. Fitzgerald stated that he always instructed his technicians to apply the Settlement Agreement criteria.

Claimant also argued that her echocardiogram demonstrated moderate mitral regurgitation. In his declaration, Dr. Brazil stated that he had reviewed claimant's echocardiogram and concluded that it "demonstrates that her regurgitant jet area is 28%, well within the moderate range ...." In addition, Ms. Marler noted that Dr. Brazil participated in the Trust's Screening Program.[5]

The Trust then issued a final post-audit determination, again denying Ms. Marler's claim. The Trust argued that claimant's contest failed to address adequately Dr. Kisslo's findings of mismeasurements. The Trust also asserted that Dr. Brazil did not expressly deny the existence of improper machine settings but instead claimed only that he "did not see" the improper settings. In addition, the Trust contended that Ms. Marler misinterpreted Dr. Kisslo's illustration of available Nyquist levels as acceptable levels. Finally, the Trust

---

5. See Settlement Agreement § IV.A.1.a. (Screening Program established under the Settlement Agreement).

contended that neither claimant nor her experts refuted Dr. Kisslo's findings with respect to the pattern of manipulation found in studies performed by the company that performed Ms. Marler's echocardiogram.

Claimant disputed the Trust's final determination and requested that her claim proceed through the show cause process established in the Settlement Agreement. See Settlement Agreement § VI.E.7.; PTO No. 2807, Audit Rule 18(c). The Trust then applied to the court for issuance of an Order to show cause why Ms. Marler's claim should be paid. On September 26, 2007, we issued an Order to show cause and referred the matter to the Special Master for further proceedings. See PTO No. 7439 (Sept. 26, 2007).

Once the matter was referred to the Special Master, the Trust submitted its statement of the case and supporting documentation. Claimant then served a response upon the Special Master, relying upon the arguments made in contest. On April 14, 2008, the Trust informed the Special Master that it intended to reply upon the documents previously submitted and the arguments that it already raised. Under the Audit Rules, it is within the Special Master's discretion to appoint a Technical Advisor[6] to review claims after the Trust and claimant have had

---

6. A "[Technical] [A]dvisor's role is to act as a sounding board for the judge--helping the jurist to educate himself in the jargon and theory disclosed by the testimony and to think through the critical technical problems." Reilly v. United States, 863 F.2d 149, 158 (1st Cir. 1988). In a case such as this, where
(continued...)

the opportunity to develop the Show Cause Record.  See Audit Rule
30.  The Special Master assigned Technical Advisor, Gary J.
Vigilante, M.D., F.A.C.C., to review the documents submitted by
the Trust and claimant and to prepare a report for the court.
The Show Cause Record and Technical Advisor Report are now before
the court for final determination.  See id. Rule 35.

        The issue presented for resolution of this claim is
whether claimant has met her burden of proving that there is a
reasonable medical basis for her claim.[7]  Where the Trust's
post-audit determination finds intentional material
misrepresentations of fact, the claimant has the burden of
proving that all representations of material fact in connection
with her claim are true.  See id. Rule 24.  Ultimately, if we
determine that there is no reasonable medical basis for the
answers in claimant's Green Form either because of an intentional
material misrepresentation of fact or some other valid reason, we
must affirm the Trust's final determination and may grant such
other relief as deemed appropriate.  See id. Rule 38(a).  If, on
the other hand, we determine that there is a reasonable medical
basis for the answers with no intentional material

---

6.  (...continued)
conflicting expert opinions exist, it is within the discretion of
the court to appoint a Technical Advisor to aid it in resolving
technical issues.  Id.

7.  Given our disposition with respect to claimant's level of
mitral regurgitation, we need not determine whether there is a
reasonable medical basis for finding that claimant suffered from
one of the necessary complicating factors.

-9-

misrepresentations of fact made in connection with the claim, we must enter an Order directing the Trust to pay the claim in accordance with the Settlement Agreement. See id. Rule 38(b).

The Technical Advisor, Dr. Vigilante, reviewed claimant's echocardiogram and concluded that it was not conducted in a manner consistent with medical standards. Specifically, Dr. Vigilante observed:

> There was increased echo gain noted in all views with significantly increased sparkling of myocardial tissue. In addition, there was obvious excessive color gain causing color artifact within the myocardial tissue and outside of the heart. There was persistence with "stuttering" of cardiac images noted with systolic color images seen during diastolic echo images. An inappropriately low Nyquist limit of 51 cm per second was noted at a depth of 13.5 cm in the parasternal long axis and apical views. In addition, low velocity and non-mitral regurgitant flow was measured as part of the supposed RJA by the sonographer in this study. An off-axis view of the left atrium was used to inappropriately measure the LAA.

Despite these deficiencies, Dr. Vigilante noted that he was able to evaluate claimant's echocardiogram and determined that there was no reasonable medical basis for the attesting physician's finding that claimant had moderate mitral regurgitation. Dr. Vigilante explained, in pertinent part, that:

> A thin and short jet of mitral regurgitation was noted in the parasternal long-axis view. Visually, mild mitral regurgitation was noted in the apical four chamber and two chamber views. I digitized the cardiac cycles in the apical four and two chambers views. In spite of excessive echo and color gain as well as persistence and a low Nyquist limit, I was able to accurately planimeter the RJA in the

> mid portion of systole. The largest RJA in
> the apical four chamber view was 1.0 cm2.
> The largest RJA in the apical two chamber
> view was 1.3 cm2. I was able to accurately
> determine the LAA in this study. The LAA was
> 11.4 cm2. Therefore, the largest RJA/LAA
> ratio was less than 12%. Most of the RJA/LAA
> ratios were less than 7%. The RJA/LAA ratio
> never came close to approaching 20%. There
> was one supposed regurgitant jet area
> measured by the sonographer. This
> measurement was 2.47 cm2 taken in the apical
> four chamber view. This measurement was not
> representative of mitral regurgitation and
> included low velocity and non-mitral
> regurgitant flow at the beginning of systole
> and immediately after the QRS complex. This
> jet was a reflection of backflow and not
> mitral regurgitation. The sonographer
> measured the LAA to be 8.71 cm2 in the apical
> four chamber view. This measurement was
> inaccurate and taken in an off-axis view.
> The correct LAA was 11.4 cm2. The
> sonographer's inaccurate RJA and LAA
> determinations provide an RJA/LAA ratio of
> 28% which is the same ratio documented by
> Dr. Brazil in his formal echocardiogram
> report.

In response to the Technical Advisor Report, claimant argues that there is no intentional material misrepresentation of fact because each cardiologist was able to evaluate the echocardiogram and that the differences among the readings "was simply the extent of the mitral valve regurgitation."

After reviewing the entire show cause record, we find claimant has not established a reasonable medical basis for the attesting physician's finding that Ms. Marler had moderate mitral regurgitation. In reaching this determination, we are required to apply the standards delineated in the Settlement Agreement and Audit Rules. In this context, we previously have explained that

conduct "beyond the bounds of medical reason" can include: (1) failing to review multiple loops and still frames; (2) failing to have a Board Certified Cardiologist properly supervise and interpret the echocardiogram; (3) failing to examine the regurgitant jet throughout a portion of systole; (4) over-manipulating echocardiogram settings; (5) setting a low Nyquist limit; (6) characterizing "artifacts," "phantom jets," "backflow" and other low velocity flow as mitral regurgitation; (7) failing to take a claimant's medical history; and (8) overtracing the amount of a claimant's regurgitation. See Mem. in Supp. of PTO No. 2640, at 9-13, 15, 21-22, 26 (Nov. 14, 2002).

Here, Dr. Kisslo and Dr. Vigilante each found that claimant's sonographer improperly selected, traced and measured a supposed regurgitant "jet." According to Dr. Vigilante, the sonographer's measurements of claimant's RJA "was not representative of mitral regurgitation and included low velocity and non-mitral regurgitant flow." In addition, Dr. Kisslo and Dr. Vigilante found that the echocardiogram of attestation was not conducted in a manner consistent with medical standards because, among other things, the echocardiogram settings included high color gain and an inappropriately low Nyquist.

Notwithstanding these deficiencies, Dr. Kisslo and Dr. Vigilante determined that Ms. Marler's echocardiogram demonstrated only mild mitral regurgitation. In addition, Dr. Vigilante concluded, after a thorough review, that there was no reasonable medical basis for the attesting physician's opinion

that Ms. Marler had moderate mitral regurgitation. Specifically, he explained that "the largest RJA/LAA ratio was 12%" and that "[m]ost of the RJA/LAA ratios were less than 7%."

Claimant does not substantively challenge the specific findings with respect to the manner in which her level of mitral regurgitation was evaluated. Dr. Brazil disputes that the inappropriate measurements of the sonographer influenced his determination of claimant's level of mitral regurgitation or that any inappropriate settings were used in performing Ms. Marler's echocardiogram, but he does not identify any particular error in the determinations of Dr. Kisslo or Dr. Vigilante that claimant's echocardiogram does not demonstrate moderate mitral regurgitation.[8] A claimant cannot carry her burden when, like here, her expert merely states in conclusory fashion that the echocardiogram at issue does, in fact, demonstrate the requisite level of mitral regurgitation.[9]

We conclude, based on our review of the entire record, that there is no reasonable medical basis for Dr. Brazil's representation that claimant had moderate mitral regurgitation. Thus, we need not determine whether there was, in fact, any

---

8. In addition, Dr. Vigilante noted that the sonographer's measurements on the echocardiogram tape resulted in the exact percentage Dr. Brazil noted in his report of claimant's echocardiogram.

9. Thus, we reject claimant's argument that there is a reasonable medical basis for her claim simply because her attesting physician, Dr. Brazil, participated in the Trust's Screening Program.

intentional material misrepresentation of fact in connection with
Ms. Marler's claim.[10]

For the foregoing reasons, we conclude that claimant has not met her burden of proving that there is a reasonable medical basis for finding that she had moderate mitral regurgitation. Therefore, we will affirm the Trust's denial of Ms. Marler's claim for Matrix Benefits.

---

10. As we previously have stated, "[s]imply because an undeserving claim has slipped through the cracks so far is no reason for this court to put its imprimatur on a procedure which may allow it to be paid." Mem. in Supp. of PTO No. 5625, at 6-7 (Aug. 24, 2005). In this same vein, we will not ignore the findings of other cardiologists simply because a claim has previously passed audit.