IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS (PHENTERMINE/ FENFLURAMINE/DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION | ) ) ) ) | MDL NO. 1203 |
| THIS DOCUMENT RELATES TO: | ) ) ) | |
| SHEILA BROWN, et al. | ) ) ) | CIVIL ACTION NO. 99-20593 |
| v. | ) ) | |
| AMERICAN HOME PRODUCTS CORPORATION | ) ) ) | 2:16 MD 1203 |

## MEMORANDUM IN SUPPORT OF SEPARATE PRETRIAL ORDER NO. 9360

Bartle, J.                                          October 16, 2014

James P. Holleyhead ("Mr. Holleyhead" or "claimant"), a
class member under the Diet Drug Nationwide Class Action
Settlement Agreement ("Settlement Agreement") with Wyeth,[1] seeks
benefits from the AHP Settlement Trust ("Trust"). Based on the
record developed in the show cause process, we must determine
whether claimant has demonstrated a reasonable medical basis to
support his claim for Matrix Compensation Benefits ("Matrix
Benefits").[2]

---

1. Prior to March 11, 2002, Wyeth was known as American Home
Products Corporation. In 2009, Pfizer, Inc. acquired Wyeth.

2. Matrix Benefits are paid according to two benefit matrices
(Matrix "A" and Matrix "B"), which generally classify claimants
for compensation purposes based upon the severity of their
medical conditions, their ages when they are diagnosed, and the
presence of other medical conditions that also may have caused or
contributed to a claimant's valvular heart disease ("VHD"). See
Settlement Agreement §§ IV.B.2.b. & IV.B.2.d.(1)-(2). Matrix A-1
(continued...)

To seek Matrix Benefits, a claimant must first submit a completed Green Form to the Trust.  The Green Form consists of three parts.  The claimant or the claimant's representative completes Part I of the Green Form.  Part II is completed by the claimant's attesting physician, who must answer a series of questions concerning the claimant's medical condition that correlate to the Matrix criteria set forth in the Settlement Agreement.  Finally, claimant's attorney must complete Part III if claimant is represented.

Under the Settlement Agreement, only eligible claimants are entitled to Matrix Benefits.  Generally, a claimant is considered eligible for Matrix Benefits if he or she is diagnosed with mild or greater aortic and/or mitral regurgitation by an echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period.[3]  See Settlement Agreement §§ IV.B.1.a. & I.22.

_____

2.   (...continued)

describes the compensation available to Diet Drug Recipients with serious VHD who took the drugs for 61 days or longer and who did not have any of the alternative causes of VHD that made the B matrices applicable.  In contrast, Matrix B-1 outlines the compensation available to Diet Drug Recipients with serious VHD who were registered as having only mild mitral regurgitation by the close of the Screening Period or who took the drugs for 60 days or less or who had factors that would make it difficult for them to prove that their VHD was caused solely by the use of these Diet Drugs.

3.   The Screening Period ended on January 3, 2003 for echocardiograms performed outside of the Trust's Screening Program and on July 3, 2003 for echocardiograms performed in the Trust's Screening Program.  See Settlement Agreement § I.49.

-2-

In April, 2012, claimant submitted a completed Green
Form to the Trust signed by his attesting physician, Paul W.
Dlabal, M.D., F.A.C.P., F.A.C.C., F.A.H.A.  Based on an
echocardiogram dated July 9, 2002, Dr. Dlabal attested in Part II
of claimant's Green Form that Mr. Holleyhead had mild aortic
regurgitation, congenital aortic valve abnormalities,[4] and
surgery to repair or replace the aortic and/or mitral valve(s)
following the use of Pondimin® and/or Redux™.[5]  Based on such
findings, claimant would be entitled to Matrix B-1, Level III
benefits in the amount of $163,326.[6]

In the report of claimant's July 9, 2002
echocardiogram, the reviewing cardiologist, Waenard L. Miller,
M.D., F.A.C.C., found that claimant had moderate aortic
regurgitation, which he measured at 33%.  Under the Settlement
Agreement, mild or greater aortic regurgitation is present where
the regurgitant jet height ("JH") in the parasternal long-axis
view (or in the apical long-axis view, if the parasternal

---

4.  Under the Settlement Agreement, the presence of congenital
aortic valve abnormalities requires the payment of reduced Matrix
Benefits.  Settlement Agreement § IV.B.2.d.(2)(c)i)a).

5.  Dr. Dlabal also attested that claimant suffered from mild
mitral regurgitation, arrhythmias, a reduced ejection fraction in
the range of 50% to 60%, and New York Heart Association
Functional Class II symptoms.  These conditions are not at issue
in this claim.

6.  Under the Settlement Agreement, a claimant is entitled to
Level III benefits if he or she suffers from "left sided valvular
heart disease requiring ... [s]urgery to repair or replace the
aortic and/or mitral valve(s) following the use of Pondimin®
and/or Redux™."  Settlement Agreement § IV.B.2.c.(3)(a).

long-axis view is unavailable) is equal to or greater than ten

percent (10%) of the left ventricular outflow tract height

("LVOTH").  See Settlement Agreement § I.22.

In July, 2012, the Trust forwarded the claim for review

by Zuyue Wang, M.D., F.A.C.C., F.A.S.E., one of its auditing

cardiologists.  In audit, Dr. Wang determined that there was no

reasonable medical basis for the attesting physician's

representation that Mr. Holleyhead had mild aortic regurgitation

between the commencement of Diet Drug use and the end of the

Screening Period.  Specifically, Dr. Wang observed that "[t]here

was trace aortic regurgitation (JH/LVOTH was 4%) which was

confirmed by [transesophageal echocardiogram] on 12/17/09."[7]  She

explained, "In the study, the JH was measured at [sic] Nyquist

limit of 33 cm/s which made [sic] [aortic insufficiency] jet

height falsely higher than the actual one."[8]

Based on Dr. Wang's finding, the Trust issued a

post-audit determination denying Mr. Holleyhead's claim.

Pursuant to the Rules for the Audit of Matrix Compensation Claims

("Audit Rules"), claimant contested this adverse determination.[9]

---

7.  As noted in the Report of Auditing Cardiologist Opinions
Concerning Green Form Questions at Issue, trace aortic
regurgitation is defined as a JH/LVOTH ratio of less than 10%.

8.  In her attestation, Dr. Wang noted that she "mistakenly
wrote" in the Report of Auditing Cardiologist Opinions Concerning
Green Form Questions at Issue that claimant's aortic
regurgitation was 12%.

9.  Claims placed into audit on or before December 1, 2002 are
governed by the Policies and Procedures for Audit and Disposition
(continued...)

In contest, Mr. Holleyhead argued that it is not the role of the
Trust to "second guess" the attesting physician.[10]  Claimant also
contended that there was a reasonable medical basis for his claim
because four cardiologists, including one of the Trust's
auditors, Keith B. Churchwell, M.D., agreed that his
echocardiogram demonstrated at least mild aortic regurgitation.
In support, claimant submitted declarations from Dr. Dlabal and
Gerald M. Koppes, M.D.  In his declaration, Dr. Dlabal's stated,
in pertinent part:

> 5.    The [aortic insufficiency] was not
> trace.  Clearly, at least mild [aortic
> insufficiency] was shown on the study, and
> there was a reasonable medical basis for a
> finding of at least mild [aortic
> insufficiency].
>
> 6.    While part of the study was taken at a
> Nyquist limit of 33, the initial part of the
> study was made at Nyquist limits between 64
> and 69, and there was ample clinical data to
> indicate the nature and severity of the
> [aortic insufficiency], as set forth above.
>
> 7.    Further, the jets that I identified were
> true regurgitant jets, they were not
> artifacts, they were not "falsely higher than
> the actual one(s)," and they were

---

9.   (...continued)
of Matrix Compensation Claims in Audit, as approved in Pretrial
Order ("PTO") No. 2457 (May 31, 2002).  Claims placed into audit
after December 1, 2002 are governed by the Audit Rules, as
approved in PTO No. 2807 (Mar. 26, 2003).  There is no dispute
that the Audit Rules contained in PTO No. 2807 apply to
Mr. Holleyhead's claim.

10.  Claimant also included in his contest materials the audit
results from claimant's initial Green Form, received by the Trust
in May, 2003.

representative of other jets that were
clearly in the mild range.[11]

In his declaration, Dr. Koppes also asserted that

claimant's echocardiogram revealed at least mild aortic

regurgitation:

> 4.    The measured JH/LVOTH was 12 to 15%.
> Visually the [aortic insufficiency] appeared
> to be mild rather than trace.  The jets were
> true regurgitant jets, and they were
> representative of other jets that were also
> in the mild range.
>
> 5.    Dr. Wang, the 2nd auditor, felt that the
> [aortic insufficiency] was less than mild
> since part of the study was at a Nyquist
> limit of 33 cm/sec making the jet height
> "falsely high."  The initial part of the
> study was made at 70 cm/sec.  The [aortic
> insufficiency] visually appeared to be mild
> at both settings, and the ratio was greater
> than 10% with either setting.  The degree of
> [aortic insufficiency] will frequently appear
> different at different angles due to an
> eccentric [aortic insufficiency] jet, and the
> 2nd auditor apparently failed to account for
> this difference.  The size of the color jet
> can appear larger with a lower Nyquist limit,
> but no artifact or increased color pixels
> were seen in this study.
>
> 6.    In my opinion, there was a reasonable
> medical basis for a finding of mild [aortic
> insufficiency] in this case.

Although not required to do so, the Trust forwarded the

claim for a second review by the auditing cardiologist.  Dr. Wang

submitted a declaration in which she again concluded that there

was no reasonable medical basis for Dr. Dlabal's representation

_____

11.   Dr. Dlabal also included a still frame image from claimant's
echocardiogram, which purportedly demonstrated a JH/LVOTH ratio
of at least 30%.

-6-

that Mr. Holleyhead had at least mild aortic regurgitation.

Dr. Wang explained, in pertinent part:

> 10. Based on my review, I confirm my finding at audit that there is no reasonable medical basis for the Attesting Physician's finding that Claimant had mild aortic regurgitation. There is only trace aortic regurgitation present on the July 9, 2002 echocardiogram of attestation. At the time of audit, I noted that Claimant had only trace aortic regurgitation with a JH/LVOTH ratio of 4%. (While I initially entered 12% in the electronic audit application, I corrected this value when subsequently completing the Attestation forms.)
>
> 11. Upon review at Contest, I confirmed that aortic regurgitation on the July 9, 2002 study is only trace. Generally, JH/LVOTH should be measured at the parasternal long and short axis because of better axial resolution. Normally, the width of an aortic regurgitation jet is greater from an apical view compared with a parasternal view. This is because the jet's width recorded from a parasternal projection depends on axial resolution, whereas the same dimension recorded apically will rely more on lateral resolution, resulting in the appearance of a wider jet. On the July 9, 2002 echocardiogram, the [aortic insufficiency] jet was not visible at the parasternal long or short axis at aliasing velocity at 60s m/s. The LVOT[H] measured at parasternal long axis was 2.1cm. The [aortic insufficiency] jet may be visualized at 3 and 5 chamber views, where it is trace in severity. In fact, the aortic regurgitation was so minimal that it cannot be detected by [Continuous Wave] Doppler. In summary, the [aortic insufficiency] jet cannot be visualized at parasternal long and short axis views, but it is trace in the 3 and 5 chamber views, therefore, the [aortic insufficiency] is trace. There is no

-7-

> reasonable medical basis to conclude
> that mild mitral regurgitation is
> present on the July 9, 2002
> echocardiogram study.

The Trust then issued a final post-audit determination,
again denying Mr. Holleyhead's claim.  Claimant disputed this
final determination and requested that the claim proceed to the
show cause process established in the Settlement Agreement.  See
Settlement Agreement § VI.E.7.; PTO No. 2807, Audit Rule 18(c).
The Trust then applied to the court for issuance of an Order to
show cause why the claim should be paid.  On February 1, 2013, we
issued an Order to show cause and referred the matter to the
Special Master for further proceedings.  See PTO No. 9002
(Feb. 1, 2013).

Once the matter was referred to the Special Master, the
Trust submitted its statement of the case and supporting
documentation.  Claimant then served a response upon the Special
Master.  The Trust submitted a reply on April 5, 2013, and
claimant submitted a sur-reply on April 26, 2013.  Under the
Audit Rules, it is within the Special Master's discretion to
appoint a Technical Advisor[12] to review claims after the Trust
and claimant have had the opportunity to develop the Show Cause

12.  A "[Technical] [A]dvisor's role is to act as a sounding
board for the judge--helping the jurist to educate himself in the
jargon and theory disclosed by the testimony and to think through
the critical technical problems."  Reilly v. United States, 863
F.2d 149, 158 (1st Cir. 1988).  In a case such as this, where
conflicting expert opinions exist, it is within the discretion of
the court to appoint a Technical Advisor to aid it in resolving
technical issues.  Id.

-8-

Record.  See Audit Rule 30.  The Special Master assigned a
Technical Advisor, Gary J. Vigilante, M.D., F.A.C.C., to review
the documents submitted by the Trust and claimant and to prepare
a report for the court.  The Show Cause Record and Technical
Advisor Report are now before the court for final determination.
See id. Rule 35.

        The issue presented for resolution of this claim is
whether claimant has met his burden of proving that there is a
reasonable medical basis for the attesting physician's
representation that Mr. Holleyhead suffered from at least mild
aortic regurgitation between the commencement of Diet Drug use
and the end of the Screening Period.  See id. Rule 24.
Ultimately, if we determine that there is no reasonable medical
basis for the answer in claimant's Green Form that is at issue,
we must affirm the Trust's final determination and may grant such
other relief as deemed appropriate.  See id. Rule 38(a).  If, on
the other hand, we determine that there is a reasonable medical
basis for the answer, we must enter an Order directing the Trust
to pay the claim in accordance with the Settlement Agreement.
See id. Rule 38(b).

        In support of his claim, claimant reasserts the
arguments he made during contest.  Claimant also argues that,
although a portion of the echocardiogram was conducted with a low
Nyquist limit, part of the study was conducted with an
appropriate Nyquist limit and it is this part of the
echocardiogram that reveals at least mild aortic regurgitation.

-9-

Claimant further maintains that his physicians adequately
contested the findings of the auditing cardiologist and
established a reasonable medical basis for a finding of at least
mild aortic regurgitation.

Claimant also submitted supplemental declarations from
Dr. Dlabal and Dr. Koppes, in which they again opine that the
auditing cardiologist is incorrect and that claimant's
echocardiogram reveals the presence of at least mild aortic
regurgitation.  In addition, claimant notes that his physicians
properly determined the level of aortic regurgitation in the
apical views on the echocardiogram because aortic regurgitation
was not well seen in the parasternal views.[13]  Finally, claimant
asserts that the Settlement Agreement and the Seventh Amendment
to the Settlement Agreement "'guaranteed' payments if [a
claimant's] condition worsened to certain points ...."

The Trust counters that claimant has not established a
reasonable medical basis for Dr. Dlabal's representation that Mr.
Holleyhead had at least mild aortic regurgitation between the
commencement of Diet Drug use and the end of the Screening
Period.  In addition, the Trust contends that it properly applied

---

13. In his declaration, Dr. Koppes concedes, "The [parasternal
long-axis] view does give better axial (up and down resolution)
vs. apical view giving lateral (side by side resolution)."
Dr. Koppes also states that "mild [aortic insufficiency] was
documented in several views including [parasternal long-axis
view]."  In his declaration, Dr. Dlabal states, "I agree that
[aortic insufficiency] was not as well seen in the [parasternal]
views as in the [apical] views, and for that reason selected the
[apical] views for diagnostic evaluation."

-10-

the reasonable medical basis standard.  Finally, the Trust
asserts that the Settlement Agreement does not "guarantee"
claimants supplemental Matrix Benefits.

The Technical Advisor, Dr. Vigilante, reviewed
claimant's echocardiogram and concluded that there was no
reasonable medical basis for finding that Mr. Holleyhead had at
least mild aortic regurgitation between the commencement of Diet
Drug use and the end of the Screening Period.  Specifically,
Dr. Vigilante explained, in pertinent part:

> I reviewed the Tape and DVD of the Claimant's
> echocardiogram of July 9, 2002.... This was
> a fair quality study with the usual
> echocardiographic views obtained.  The
> Nyquist limit was appropriately set at 71 cm
> per second in the parasternal long-axis view
> and 67 cm in the apical views.  However,
> towards the end of the study, the Nyquist
> limit was inappropriately set at 33 cm per
> second.  This caused a tremendous amount of
> artifact and excessive color gain.  However,
> it should be noted that this study was
> interpretable.
>
> ....  The parasternal long-axis view was
> available and completely interpretable for
> evaluation.  I digitized the cardiac cycles
> in the parasternal long-axis view.  The LVOTH
> was 2.0 cm.  There was no evidence of aortic
> regurgitation in the parasternal long-axis
> view at the appropriate Nyquist limit of
> 71 cm per second.  Only when there was
> excessive color gain and significant artifact
> at a Nyquist limit of 33 cm per second in the
> parasternal long-axis view was trace aortic
> regurgitation suggested.  However, the JH
> could not be accurately measured at such a
> low Nyquist limit due to artifact.  The
> aortic valve was also evaluated in the apical
> three and five chamber views.  In these
> views, only trace aortic regurgitation was
> obviously present.  However, when the
> available and appropriate parasternal

-11-

long-axis view was reviewed at the
appropriate Nyquist limit, no aortic
regurgitation was seen.  There was no view
that was consistent with mild or greater
aortic regurgitation in this study.  The time
frames documented by Dr. Koppes in his
Supplemental Declaration regarding the
presence of aortic regurgitation in the
parasternal long-axis view referred only to
that part of the study during which the
Nyquist limit was inappropriately set very
low at 33 cm per second.  An accurate
measurement of the JH is not possible at such
an inappropriately low Nyquist limit.  At a
normal Nyquist limit of 70 cm per second, no
aortic regurgitation was seen in this view.
Time frames documented by Dr. Dlabal in his
Declaration refer to the apical five and
three chamber views.  In these views, there
was obviously trace aortic regurgitation.
However, as per the Settlement Agreement, the
parasternal long-axis view was available and
no aortic regurgitation was seen in those
cardiac cycles in which a proper Nyquist
limit was used.

. . . .

[T]here was no reasonable medical basis for
the Attesting Physician's answer to Green
Form Question C.3.b.  That is, the
echocardiogram of attestation demonstrated no
aortic regurgitation in the parasternal long-
axis view when evaluating the appropriately
acquired cardiac cycles.  In the other views,
it was obvious that there was no worse than
trace aortic regurgitation.  An
echocardiographer could not reasonably
conclude that the echocardiographic study of
July 9, 2002 demonstrated aortic
regurgitation worse than trace aortic
insufficiency even taking into account the
issue of inter-reader variability.

In response to the Technical Advisor Report, claimant
argues that the Technical Advisor failed to apply the reasonable
medical basis standard because he did not provide any times or
still frame images, and instead "substituted his non-objective"

-12-

opinion.[14]  Claimant also asserts that the Technical Advisor's finding that the parasternal long-axis view is evaluable was erroneous because, in that view, the Nyquist limit was inappropriately set at 33 cm/sec.[15]

After reviewing the entire Show Cause Record, we find claimant's arguments are without merit.  As an initial matter, the declarations from Dr. Dlabal and Dr. Koppes do not provide a reasonable medical basis for finding that Mr. Holleyhead had at least mild mitral regurgitation before the end of the Screening Period.  Dr. Wang reviewed claimant's echocardiogram and determined that aortic regurgitant jet was not visible in the parasternal long-axis view during a time when the appropriate

14.  Claimant initially included with his response to the Technical Advisor Report a verified "rebuttal" by Dr. Dlabal. Pursuant to Audit Rule 34, the Special Master determined this rebuttal could not become part of the Show Cause Record. Thereafter, claimant filed "objections" to the decision denying the inclusion of this rebuttal in the Show Cause Record and a motion to have it included.  According to claimant, in his rebuttal, Dr. Dlabal disputes the Technical Advisor's finding with respect to the level of aortic regurgitation.  Pursuant to Audit Rule 34, there is no procedure by which Dr. Dlabal's supplemental statement can become part of the Show Cause Record. See, e.g., Mem. in Supp. of PTO No. 9041, at 9 n.11 (Apr. 5, 2013); Mem. in Supp. of PTO No. 8402, at 12 n.13 (Feb. 22, 2010). For these reasons, we will overrule claimant's objections and deny his motion.

15.  In addition, claimant argues that accepting the technician's JH measurement of 0.6 cm, which Dr. Vigilante does not contest, and Dr. Vigilante's own LVOTH measurement of 2.0 cm results in a JH/LVOTH ratio of 30%, which qualifies as moderate aortic regurgitation.  This, however, ignores, Dr. Vigilante's specific statement that "there was no evidence of aortic regurgitation in the parasternal long-axis view."

-13-

Nyquist limit was set.  Accordingly, she reviewed the apical
three- and five-chamber views and determined that the level of
claimant's aortic regurgitation was trace.[16]  Dr. Wang observed
that "the width of an aortic regurgitation jet is greater from an
apical view compared with a parasternal view ... because the
jet's width recorded from a parasternal projection depends on
axial resolution, whereas the same dimension recorded apically
will rely more on lateral resolution, resulting in the appearance
of a wider jet."

  Dr. Dlabal agreed with Dr. Wang that the parasternal
long-axis view was unavailable for evaluation of claimant's level
of aortic regurgitation, but he stated that her finding of trace
aortic regurgitation "cannot be supported by the facts."
Instead, Dr. Dlabal opined that "multiple images" demonstrated an
aortic insufficiency "equal to or greater than 10%...."
Dr. Koppes also agreed with Dr. Wang that portions of the
parasternal long-axis view were unavailable, but he concluded
that mild or greater aortic regurgitation was visible in certain
parasternal long-axis views.  In addition, he stated that
Dr. Wang's conclusion that the apical views demonstrated trace
regurgitation was "incorrect" because several "specific frames"

--------------------

16.  As previously noted, the Settlement Agreement requires that
aortic regurgitation be determined in the parasternal long-axis
view unless that view is unavailable; if it is unavailable, the
apical views may be used to determine the level of aortic
regurgitation.  See Settlement Agreement § I.22.

showed a JH/LVOTH of at least 10%. Mere disagreement with the auditing cardiologist, however, is not sufficient.

In any event, the Technical Advisor, Dr. Vigilante, reviewed claimant's echocardiogram and determined that it did not demonstrate at least mild aortic regurgitation. First, Dr. Vigilante determined that "[t]he parasternal long-axis view was available and completely interpretable for evaluation." He concluded, however, that "[t]here was no evidence of aortic regurgitation in the parasternal long-axis view at the appropriate Nyquist limit of 71 cm per second." Second, Dr. Vigilante nevertheless reviewed the apical views on claimant's echocardiogram. He determined "only trace aortic regurgitation was obviously present."

With respect to the opinion of Dr. Koppes that claimant's echocardiogram demonstrated at least mild aortic regurgitation in the parasternal long-axis view, Dr. Vigilante observed that the "time frames documented by Dr. Koppes ... referred only to that part of the study during which the Nyquist limit was inappropriately set very low at 33 cm per second." He also concluded that the time frames identified by Dr. Dlabal referred to the apical three- and five-chamber views where "there was obviously trace aortic regurgitation."[17]

_____

17. For these reasons, we reject claimant's argument that Dr. Vigilante did not apply the reasonable medical basis standard to the representations made by Dr. Dlabal and Dr. Koppes in support of Mr. Holleyhead's claim and that Dr. Vigilante did not consider the time frames identified by Dr. Dlabal and Dr. Koppes
(continued...)

-15-

Finally, we do not agree that claimant is entitled to Matrix Benefits under the Seventh Amendment.  As an initial matter, the Seventh Amendment specifically states, "The determinations and actions of the Trust on any aspect of a claim for Cash/Medical Services Benefits of a Category One Class Member or Category Two Class Member, or on any claim for the Matrix Election Payment, shall have no preclusive or precedential effect of any kind on the Trust in the administration ... of claims for Seventh Amendment Matrix Compensation Benefits."[18]   Seventh Amendment § IX.E.   The Seventh Amendment further provides that:

> For each Category One Class Member or
> Category Two Class Member <u>found to be</u>
> <u>eligible for Seventh Amendment Matrix</u>
> <u>Compensation Benefits</u>, the Trust shall
> calculate as a Net Matrix Amount, a sum equal
> to the gross amount payable to the Diet Drug
> Recipient or Representative Claimant and
> their associated Derivative Claimants, if
> any, on the applicable Matrix under section
> IV.B.2 of the Settlement Agreement ....

<u>Id.</u> § IX.A.2. (emphasis added).   Section IV.B.1.a. of the Settlement Agreement sets forth:

> 1.   .... The following Class Members, and
>      only such Class Members, shall be
>      entitled to the compensation benefits

---

17.  (...continued)
in their respective declarations.

18.  Under the Seventh Amendment, Seventh Amendment Matrix Compensation Benefits means "those Matrix Compensation Benefits which may be paid or claimed for High Matrix Level Qualifying Factors to or by Category One Class Members or Category Two Class Members in accordance with the terms of the Seventh Amendment." Seventh Amendment § I.64.  Mr. Holleyhead is a Category Two Class Member, and his claim for Level III Matrix Benefits is a claim for Seventh Amendment Matrix Compensation Benefits.

-16-

from Fund B ("Matrix Compensation Benefits"):

a.   Diet Drug Recipients who have been diagnosed by a Qualified Physician as FDA Positive[19] ... by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period ....

As claimant has not established a reasonable medical basis for finding that he had at least mild aortic regurgitation between the commencement of Diet Drug use and the end of the Screening Period, the Settlement Agreement requires that his claim be denied.

Therefore, we will affirm the Trust's denial of Mr. Holleyhead's claim for Matrix B-1, Level III benefits.

_____

19.   FDA Positive is defined, in pertinent part, as "mild or greater regurgitation of the aortic valve."  Settlement Agreement § I.22.a.

-17-