IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: DIET DRUGS (PHENTERMINE/ FENFLURAMINE/DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION | MDL DOCKET NO. 1203 |
| THIS DOCUMENT RELATES TO: SHEILA BROWN, et al. v. AMERICAN HOME PRODUCTS CORPORATION | NO. 99-20593 |
| THIS DOCUMENT RELATES TO: Claimant: Estate of Charles S. Foster Claim No.: 183/00 8265447 | 2:15 MD 1203 |

**MEMORANDUM IN SUPPORT OF SEPARATE PRETRIAL ORDER NO. 9424**

Bartle, J.                                                           June 30, 2015

The Estate of Charles S. Foster (the "estate" or "claimant") seeks benefits from the ABC Settlement Trust (the "Trust") under the Diet Drug Nationwide Class Action Settlement Agreement ("Settlement Agreement") with Wyeth, Inc.[1] Before the court is the appeal of the estate from a February 25, 2015 determination by an arbitrator that it was not entitled to Matrix Compensation Benefits ("Matrix Benefits") because Charles S. Foster (the "decedent") had not been diagnosed by a Qualified

---

1. Prior to March 11, 2002, Wyeth was American Home Products Corporation. In 2009, Pfizer, Inc. acquired Wyeth.

Physician as FDA Positive or as having mild mitral regurgitation by an echocardiogram performed on or before January 3, 2003.

Under the Settlement Agreement, Matrix Benefits are awarded to compensate claimants for medical conditions caused by Pondimin® or Redux™ ("Diet Drugs").[2] A claimant, such as the Estate, who seeks Matrix Benefits may demonstrate his eligibility for those Benefits in one of two ways. He may be eligible if he was diagnosed by a Qualified Physician as FDA Positive or as having mild mitral regurgitation by an echocardiogram performed on or before January 3, 2003, provided that he registered for Settlement Benefits by May 3, 2003. Alternatively, he may be eligible if he was diagnosed by a Qualified Physician on or before September 30, 2005 with

---

2. Matrix Benefits are paid according to two benefit matrices (Matrix "A" and Matrix "B"), which generally classify claimants for compensation purposes based upon the severity of their medical conditions, their ages when diagnosed, and the presence of other medical conditions that also may have caused or contributed to a claimant's valvular heart disease. See Settlement Agreement, §§ IV.B.2.b. and IV.B.2.d.(1)-(2). Matrix A-1 describes the compensation available to Diet Drug Recipients with serious valvular heart disease who took the drugs for 61 days or longer and who did not have any of the alternative causes of the disease that made the B matrices applicable. In contrast, Matrix B-1 outlines the compensation available to Diet Drug Recipients with serious valvular heart disease who were registered as having only mild mitral regurgitation by the close of the Screening Period or who took the drugs for 60 days or less or who had factors that would make it difficult for them to prove that their heart disease was caused solely by the use of these Diet Drugs.

Endocardial Fibrosis, provided that he registered for benefits by January 1, 2006.

In or around early March 2003, decedent began to experience problems with his heart. He underwent an echocardiogram on March 10, 2003. That echocardiogram showed that decedent suffered from mitral regurgitation of the type which would have rendered him eligible for Matrix Benefits had the echocardiogram been performed on or before January 3, 2003. Decedent also submitted documentation that he had ingested Diet Drugs. Because his echocardiogram was not performed until after the screening period concluded on January 3, 2003, the Trust denied his claim for Matrix Benefits. On April 27, 2007, his appeal from that decision was referred to Arbitration pursuant to §§ VI.C.4(h) and (i) of the Settlement Agreement, but decedent died before the Arbitration Hearing took place.

On February 25, 2015 an Arbitrator concluded that decedent's estate was not entitled to Matrix Benefits because his echocardiogram had not been performed on or before January 3, 2003. The Arbitrator noted that she was bound by the terms of the Settlement Agreement.

The estate now appears to argue that decedent's delay in obtaining an echocardiogram was due to "excusable neglect." Indeed, the Settlement Agreement's deadlines may be extended if a movant is able to show that his or her failure timely to

obtain an echocardiogram was the result of "excusable neglect." In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig., No. 99-20593, 2007 WL 4616903 (Nov. 20, 2007) ("Clark"); In re Orthopedic Bone Screw Prods. Liab. Litig., 246 F.3d 315, 323 (3d Cir. 2001). Having carefully reviewed the materials submitted by the parties, we conclude that the estate has failed to satisfy the four elements necessary for a finding of excusable neglect. See Clark, 2007 WL 4616903, at *2-*5. Accordingly, we must deny her appeal and affirm the Report and Award of the Arbitrator.