IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: DIET DRUGS (PHENTERMINE/ FENFLURAMINE/DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION | MDL NO. 1203 |
| THIS DOCUMENT RELATES TO: SHEILA BROWN, et al. v. AMERICAN HOME PRODUCTS CORPORATION | CIVIL ACTION NO. 99-20593 |

MEMORANDUM IN SUPPORT OF SEPARATE PRETRIAL ORDER NO. 9487

Bartle, J.                                                April 17, 2017

Before the court is the motion of Daniel and Louisa D'Antonio to deem Mr. D'Antonio's privately obtained echocardiogram as timely under the Diet Drug Nationwide Class Action Settlement Agreement ("Settlement Agreement") with Wyeth.[1] Mr. D'Antonio failed to obtain an echocardiogram before January 3, 2003, the deadline to submit a privately obtained echocardiogram.[2] However, he maintains that his delay was due to "excusable neglect."

---

1. Prior to March 11, 2002, Wyeth was known as American Home Products Corporation.

2. The January 3, 2003 deadline marked the end of the original Screening Period, which was the 12-month period beginning on the date of Final Judicial Approval (Jan. 2, 2002). See Settlement Agreement § I.49. To receive Matrix Compensation Benefits ("Matrix Benefits"), the Settlement Agreement required Class Members who chose not to participate in the Screening Program to obtain an echocardiogram between the commencement of diet drug use and the end of the Screening Period. See id. at § IV.B.1.a.

I.

According to Mr. D'Antonio's motion, he was prescribed and took "diet drugs" in 1997. However, Mr. D'Antonio decided not to have an echocardiogram performed prior to January 3, 2003 because of "his apparent good health" and because he "had no intention of seeking benefits under the Settlement Agreement." Seventeen days after the deadline to obtain a private echocardiogram, Mr. D'Antonio developed extreme shortness of breath, and on January 22, 2003, he had an echocardiogram performed for the first time. That echocardiogram demonstrated severe mitral regurgitation. Mr. D'Antonio subsequently underwent "open heart surgery" on January 27, 2003.

Mr. D'Antonio submitted a timely Blue Form[3] to the Trust, and he submitted a Green Form[4] in October 2003. By letters dated October 22, 2004, January 1, 2005, February 10, 2005, and April 12, 2005, Class Counsel's Claims Office notified Mr. D'Antonio that his claim was deficient because his echocardiogram had not been performed prior to the Screening Period deadline. More than 14 months after he received the first

---

3. The Blue Form is one of the forms available to Class Members to register for Matrix Benefits Matrix Benefits with the Trust. The deadline for submitting the form was May 3, 2003. See Pretrial Order ("PTO") No. 3253 (Feb. 12, 2004).

4. Under the Settlement Agreement, Class Members are required to complete the Green Form, in addition to the Blue Form, to receive Matrix Benefits from the Trust.

-2-

notice from Class Counsel's Claims Office that his claim was untimely, Mr. D'Antonio filed the present motion. Mr. D'Antonio claims that his failure to obtain an echocardiogram prior to January 3, 2003 constitutes excusable neglect.

II.

The Settlement Agreement that this court approved in PTO No. 1415 provides strict deadlines for Class Members to seek Matrix Benefits[5] from the Trust. The Settlement Agreement provides, in part:

> The following Class Members, and <u>only</u> such Class Members, shall be entitled to the compensation benefits from Fund B ("Matrix Compensation Benefits"):
>
> a. Diet Drug Recipients who have been diagnosed by a Qualified Physician as FDA Positive or as having Mild Mitral Regurgitation <u>by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period [January 3, 2003]</u> and who have registered for further settlement benefits by Date 2 [May 3, 2003] . . . .

Settlement Agreement § IV.B.1.a. (emphasis added).

This Settlement Agreement provision imposes two deadlines on Class Members. First, Class Members who did not

---

5. Matrix Benefits are payable from Fund B, which was created in the Settlement Agreement to compensate Class Members who have developed Matrix-level conditions, or will develop those conditions in the future. Settlement Agreement § IV.B.-C.

-3-

participate in the Screening Program[6] were required to obtain a private echocardiogram and consequently have been diagnosed with FDA Positive or Mild Mitral Regurgitation between the time they began using diet drugs and January 3, 2003. Second, Class Members were required to register with the Trust by May 3, 2003. Although Mr. D'Antonio met the second deadline by submitting a Blue Form on or before May 3, 2003, he failed to obtain a private echocardiogram by January 3, 2003. Class Members must meet both deadlines to be eligible for Matrix Benefits.

The deadlines imposed by the Settlement Agreement may be extended if the movant can show his or her failure to meet the deadlines was due to "excusable neglect." In In re Orthopedic Bone Screw Prods. Liab. Litig., 246 F.3d 315, 323 (3d Cir. 2001), our Court of Appeals reiterated the Supreme Court's analysis of excusable neglect as set forth in Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd., 507 U.S. 380, 395 (1993). Four factors should be evaluated when deciding whether excusable neglect exists: (1) the danger of prejudice to the non-movant; (2) the length of the delay and its potential effect on judicial

---

6. The Screening Program provided transthoracic echocardiograms and associated interpretive physician benefits to eligible Class Members. Settlement Agreement § I.50. See also id. at §§ IV.A.1.a. & IV.A.2.b. Diet Drug Recipients who ingested Pondimin® or Redux™ for 61 days or more and who had not obtained a qualifying echocardiogram prior to September 30, 1999, were eligible for the Screening Program. See id. at §§ II.C.1.(b) & IV.A.1.a.; see also Official Court Notice, p. 5.

proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith. Pioneer, 507 U.S. at 395; In re Orthopedic Bone Screw, 246 F.3d at 322-23. We shall discuss each of these factors in turn.

Under the first prong of Pioneer, 507 U.S. at 392 n.10, we must determine the danger of prejudice to the non-movants should the requested extension be granted. Mr. D'Antonio argues that Wyeth and the Trust would not be prejudiced because "Wyeth set aside several billion dollars to fund claims that would be submitted by individuals who had ingested the diet drugs Pondimin and Redux and who suffered from [valvular heard disease ('VHD')] as a result." He also contends that "Wyeth **expected** that individuals would later come forward and file claims as their conditions were diagnosed" because "[a]t the time that the fund was established, Wyeth could not have known precisely how many people would apply and/or qualify for benefits."

The finality provided by the Settlement Agreement to Wyeth, the Trust, and other Class Members has been of paramount importance throughout the administration of the Settlement Agreement. Finality is not only important to Wyeth, but also to the Trust so that it can consider applications for Matrix Benefits and provide those benefits to injured Class Members in a timely manner. If Mr. D'Antonio's motion was the only one of its

kind, his late registration may pose little danger of prejudice to the non-movants. However, Mr. D'Antonio is certainly not the only Class Member who did not obtain an echocardiogram before January 3, 2003. While this may be harsh, Mr. D'Antonio's circumstances are neither unique nor particular to him. "Although the admission of any particular claimant may not in itself cause a substantial drain on the Trust, allowing this claimant to escape the firm deadlines set forth in the Settlement Agreement . . . will surely encourage others to seek the same relief." Mem. in Support of Separate PTO No. 3923 at 3 (Sept. 10, 2004).

Second, we must consider the length of the delay and its effect on judicial proceedings. Pioneer, 507 U.S. at 395; In re Orthopedic Bone Screw, 246 F.3d at 322-23. Mr. D'Antonio argues that the delay in obtaining his echocardiogram—eighteen days after the deadline—is not significant because we previously extended the deadline for the Screening Program to July 3, 2003. See PTO No. 2677 (Dec. 10, 2002). However, that extension applied only to claimants who timely registered for the Screening Program, and for whom the Trust, given the significant volume of claims awaiting processing, could not ensure that they would receive a Screening Program echocardiogram by the January 3, 2003 deadline. See Mem. in Support of Separate PTO No. 2677 at 9-10

-6-

(Dec. 10, 2002). As Mr. D'Antonio opted to obtain a private echocardiogram, this extension is irrelevant.

The January 3, 2003 deadline to obtain a private echocardiogram was not an arbitrary date. This date was carefully chosen in light of evidence that the later the diagnosis, the greater the likelihood that the Class Member's valve damage was not caused by diet drugs. In re Diet Drugs, 2000 WL 1222042, at *46-47 (E.D. Pa. Aug. 28, 2000). Diet-drug induced valve regurgitation is not latent and can be detected by an echocardiogram after the Class Member ceases use of the drugs. Id. By January 3, 2003, Class Members who chose not to register for Screening Program benefits had been afforded five years to obtain a private echocardiogram. See PTO No. 2677 at 13 (Dec. 10, 2003).

Moreover, Mr. D'Antonio did not seek relief to submit his late echocardiogram until December 2005. Mr. D'Antonio does not provide any explanation for this delay. However, Mr. D'Antonio had actual notice of the January 3, 2003 deadline when he submitted the Blue Form on or before May 3, 2003.[7] At

---

7. Claimants, such as Mr. D'Antonio, who took diet drugs for 61 or more days, must complete the Blue Form to register for Settlement Benefits. The Blue Form specifically states that, if electing to receive $6,000 in cash or $10,000 in heart valve-related medical services, a claimant must be diagnosed as FDA Positive by the end of the Screening Period (January 3, 2003). See Blue Form; see also Official Court Notice, p. 5.

that point, Mr. D'Antonio should have sought relief to submit his late echocardiogram as timely. Mr. D'Antonio also had actual notice of the January 3, 2003 deadline when he received four separate letters from Class Counsel's Claims Office dated October 22, 2004, January 1, 2005, February 10, 2005, and April 12, 2005, each of which advised Mr. D'Antonio that his claim was deficient because he had not submitted an echocardiogram that was performed prior to January 3, 2003. Mr. D'Antonio likewise did not seek relief at any of those times to submit his late echocardiogram. To allow Mr. D'Antonio an extension to seek relief would undermine the finality of the Settlement Agreement and open the floodgates to similarly situated Class Members who are presently time-barred.

Under the third prong, we must review Mr. D'Antonio's reason for the delay. Pioneer, 507 U.S. at 395; In re Bone Screw, 246 F.3d at 322-23. Mr. D'Antonio argues that it was reasonable for him not to obtain an echocardiogram prior to the close of the applicable Screening Period because of "his apparent good health." We disagree. Mr. D'Antonio does not dispute that he was aware of the risk of VHD associated with Pondimin® and/or Redux™ or of his rights under the Settlement Agreement. The Official Court Notice that was sent to Class Members states that:

> Diet Drug Recipients who have been diagnosed with serious heart valve disease . . . are eligible for Compensation Payments . . . if . . . [t]he Class Member is a [Diet Drug

-8-

> Recipient] who has been diagnosed by a
> qualified physician as (I) FDA Positive or
> (ii) as having Mild Mitral Regurgitation with
> <u>an eligible echocardiogram performed between
> the start of Pondimin and/or Redux use and
> the end of the Screening Period [Jan. 3,
> 2003]</u> [and] has registered for further
> Settlement Benefits within 120 days of the
> close of the Screening Period [May 3, 2003].

Official Court Notice, p. 7 (emphasis added). Notice of the Settlement Agreement complied with Rule 23 of the Federal Rules of Civil Procedure, which states: "For any class certified under Rule 23(b)(3), the court must direct to class members the <u>best notice practicable under the circumstances</u>, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Nationwide Notice Plan was put in place to inform all Class Members of the Settlement Agreement. <u>See</u> Mem. in Support of Separate PTO No. 1415 at 79-87. We have stated previously that the notice plan was the "best notice practicable under the circumstances" and concluded that it was "highly successful." Mem. in Support of Separate PTO No. 997 ¶ 15 at 8; Mem. in Support of Separate PTO No. 1415 at 83. The Nationwide Notice Plan put Mr. D'Antonio on at least constructive—if not actual—notice that he should obtain an echocardiogram even prior to discovering any symptoms, and it put Mr. D'Antonio on notice of the January 3, 2003 deadline.

Finally, we have no reason to doubt that Mr. D'Antonio acted in good faith. However, the danger of prejudice to non-movants and the length of, and reasons for, the delays weigh heavily in favor of finding that Mr. D'Antonio's actions do not constitute excusable neglect. Accordingly, Mr. D'Antonio is not entitled to submit a late echocardiogram for purposes of seeking benefits under the Settlement Agreement.